Jason E. Greene (#13990)
Jared D. Scott (#15066)
Jacob D. Barney (#16777)
ANDERSON & KARRENBERG
50 W. Broadway, Suite 700
Salt Lake City, UT 84101-2035
Telephone: 801-534-1700
Fax: 801-364-7697
jgreene@aklawfirm.com
jscott@aklawfirm.com
jbarney@aklawfirm.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| STEFFEN MAUTE, derivatively on behalf of MERIT MEDICAL SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FRED P. LAMPROPOULOS; RAUL PARRA; A. SCOTT ANDERSON; JILL D. ANDERSON; THOMAS J. GUNDERSON; F. ANN MILLNER; LYNNE N. WARD; and JUSTIN F. LAMPROPOULOS, <br><br> Defendants, <br><br> – and – <br><br> MERIT MEDICAL SYSTEMS, INC., a Utah corporation, <br><br> Nominal Defendant. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT (REDACTED VERSION)** <br><br> **(DEMAND FOR JURY TRIAL)** <br><br><br> Case No. 2:21-cv-00346-DBP <br><br> Magistrate Judge Dustin B. Pead |

Plaintiff Steffen Maute ("Plaintiff"), by and through his undersigned attorneys, hereby

submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of

nominal defendant Merit Medical Systems, Inc. ("Merit" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy the defendants' non-exculpable breaches of fiduciary duties and unjust enrichment beginning no later than February 2019 and continuing through and including October 2019 (the "Relevant Period").

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the pre-suit investigation conducted by and through his attorneys, which included, among other things, a request and inspection of certain non-public books and records pursuant to Utah Code Ann. § 16-10a-1602 in October 2020, public statements made by the Company and the Individual Defendants (defined below), U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Merit, news reports, securities analysts' reports, court filings in related civil lawsuits, advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

## I.      INTRODUCTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant Merit against certain current and/or former officers and directors of the Company based on their non-exculpable breaches of fiduciary duty and other serious misconduct as alleged in detail herein.

2.      Merit is a medical device company whose entire business model was predicated on a "growth-by-acquisitions" strategy.  While the Company completed numerous acquisitions

leading up to the start of the Relevant Period, by late 2018, that strategy had put Merit on such a steep growth trajectory that securities analysts questioned whether Merit could maintain its momentum. To quell these concerns, Merit set its sights on two acquisitions that the Individual Defendants publicly represented would significantly bolster the Company's upward trajectory: (i) Cianna Medical, Inc. ("Cianna"), a manufacturer of devices for the treatment of breast cancer that was by far the largest acquisition in the Company's history; and (ii) ClariVein, a device for varicose vein treatment that was the crown jewel of Vascular Insights, LLC ("Vascular Insights"). Given the critical importance of these transactions to Merit's business strategy and growth prospects, analysts and investors were keenly focused on the progress of these acquisitions, and the Individual Defendants were under intense pressure to deliver a seamless and successful integration of these two businesses.

3.      Accordingly, throughout the Relevant Period, the Individual Defendants repeatedly represented that Merit was timely and successfully integrating Cianna and Vascular Insights. With respect to Cianna, the Individual Defendants made clear that the most important aspect of the integration was Merit's ability to retain Cianna's team of highly trained and specialized sales representatives, who had established deep and valuable relationships with hospitals and physicians. Given that Merit's financial projections for the Cianna business and much of the Company's overall growth were built on this sales force retention, the Individual Defendants specifically and repeatedly represented that Merit would retain the entirety of Cianna's sales force, and that Merit's founder, Chairman, President, and Chief Executive Officer ("CEO"), defendant Fred P. Lampropoulos ("F. Lampropoulos"), would be personally overseeing that retention and "lead[ing Cianna's] efficient integration" of its critical systems into Merit's business.

4.      As the Relevant Period progressed, the Individual Defendants' assurances concerning these transformative acquisitions grew even more pronounced. On February 26, 2019 -- months after the acquisitions were completed -- the Individual Defendants touted that the Cianna integration was going "as well as could be expected," and claimed that ClariVein was well on its way to generating 2019 revenues of "$10 million to $11 million."   On April 23, 2019, the Individual Defendants further represented that: (i) the Cianna integration was now "complete"; (ii) it was "as good of a transaction and transition that we have done"; and (iii) it "may be the best" integration in the Company's history in large part because Merit had successfully "maintained the [Cianna] sales force."   The Individual Defendants also claimed that Merit saw "strong sales in standalone products," including the ClariVein product line, and that they did not "see anything that has changed" post-acquisition regarding ClariVein's purportedly outstanding performance.

5.      These statements were utterly false.  According to detailed allegations based on confidential witness accounts set forth in the operative complaint in the securities class action pending in the U.S. District Court for the Central District of California captioned *In re Merit Medical Systems, Inc. Securities Litigation,* Case No. 8:19-cv-02326-DOC-ADS (the "Securities Action"), the Cianna and ClariVein integrations were a disaster.[1]  For example, contrary to the Individual Defendants' public representations, Merit did not successfully retain Cianna's sales force after the acquisition. To the contrary, within mere months of the acquisition -- and long before defendant F. Lampropoulos claimed publicly that Merit had retained the entirety of

---

[1]      The operative complaint in the Securities Action was filed on June 30, 2020 and sets forth detailed allegations based in part on accounts provided by sixteen confidential witnesses, each of whom is described therein as a former employee of Merit, Cianna, and/or Vascular Insights.  All allegations herein referencing the accounts of confidential witnesses are based on those accounts as they appear in the operative complaint in the Securities Action.

4

Cianna's sales force -- **over 20% of Cianna's total sales representatives resigned**, including Cianna's highest-performing sales team members who were alone responsible for **22% of Cianna's overall revenues**.  Not surprisingly, these departures crippled Cianna's sales, causing a sharp decline in revenue of 25-30% during 2019 alone -- a massive drop that at least some of the Individual Defendants personally reviewed in real time. The Individual Defendants' public statements touting the successful integration of Cianna's systems were patently false.  According to numerous confidential witnesses in the Securities Action, while F. Lampropoulos stated publicly in April 2019 that the integration was "complete," in reality Merit had not yet completed even half of the integration, including the integration of Cianna's critical operating, marketing and customer management systems that were central to Merit's operations and business prospects.

6.        According to the confidential witness accounts in the Securities Action, the Individual Defendants concealed the true facts about Merit's acquisition of Vascular Insights' ClariVein product line.  Indeed, it has been alleged that at the same time the Individual Defendants were touting ClariVein's immediate success in singlehandedly generating $10-$11 million in sales for 2019, they knew (but failed to disclose) a devastating fact: **Merit had not had even a single order for ClariVein during the entire first half of 2019**.  Multiple former Merit and Vascular Insights employees have confirmed in the Securities Action that Merit could not sell the product because of two fundamental roadblocks to sales.  First, the largest commercial insurance companies in the U.S. uniformly declined to cover ClariVein and, without reimbursement coverage, doctors refused to place new orders for ClariVein.  Second, it was internally determined at Merit that U.S. Food and Drug Administration ("FDA") restrictions precluded Merit from marketing ClariVein to treat varicose veins (as Vascular Insights had previously marketed it),

which posed a significant impediment because ClariVein's primary market was vein treatment centers.

7.      Significantly, according to numerous confidential witnesses in the Securities Action, defendants F. Lampropoulos and Raul Parra ("Parra"), Merit's Chief Financial Officer ("CFO"), were fully aware of the dearth of ClariVein orders, because they: (a) **had 60" monitors outside each of their offices that displayed in real-time the daily, monthly, and quarterly orders for ClariVein**; (b) had access to this same sales information on their mobile phones; (c) had access to this same sales information (and more) on their computers through the Company's centralized "Domo" software system, which tracked and stored all of the sales and order data for each of Merit's products in real time; and (d) received highly detailed ClariVein sales information through regular written reports and presentations.

8.      The truth only partially emerged during a July 25, 2019 investor conference, when the Individual Defendants belatedly disclosed that -- contrary to their prior statements touting ClariVein's success -- in reality, ClariVein "**hasn't had an order all year**."  The Individual Defendants further announced that instead of retaining the entirety of Cianna's sales force, as the Individual Defendants had expressly represented during the Relevant Period, there had been "attrition" among Cianna sales representatives and, as a result, post-integration sales for Cianna were well below expectations.  On this news, Merit's stock price plummeted by over **25%**, from $54.85 to $41 per share, wiping out over $740 million in shareholder value.

9.      Even after these disclosures, however, the Individual Defendants continued to issue false and misleading statements to stockholders.  For example, rather than disclose the established industry and regulatory roadblocks to ClariVein sales, defendant F. Lampropoulos

falsely attributed the absence of orders to a "short-term" problem caused by "pipeline filing," *i.e.*, doctors ordering ***too much*** product prior to the acquisition, and falsely represented that ClariVein sales were actually already "ramping to our expectations."  And rather than tell the truth about the Cianna sales force departures, F. Lampropoulos falsely reassured that there had been just "***a little bit***" of attrition, "***but not much***."

10.     Almost immediately after reiterating these misrepresentations, defendant F. Lampropoulos began dumping his Merit stock.  Within weeks of minimizing and misrepresenting the disastrous integration and performance of two of the most important acquisitions in Merit's history, F. Lampropoulos unloaded ***over $6 million*** worth of his personal Company shares. These sudden and unexpected stock sales were deeply suspicious and dramatically out-of-line with his trading history.  Indeed, F. Lampropoulos had not sold ***even a single share*** of Merit stock in the open market over the previous ***three-and-a-half years***, had realized only about $27,000 in proceeds from all stock sales over the preceding six years, and sold more shares during this short three-week period in the summer of 2019 than he had in the past ***thirteen years combined***.  Piper Jaffray analysts specifically noted the highly suspicious nature of F. Lampropoulos' stock sales, remarking that his trading had understandably "drawn the ire of investors."

11.     By the following quarter, the Individual Defendants could no longer conceal the truth.  On October 30, 2019, the Individual Defendants disclosed that sales for ClariVein and Cianna had lagged so far behind that the Individual Defendants were forced to slash Merit's year-end revenue guidance by $27 million and withdraw entirely its guidance for 2020.  With investors and analysts demanding answers, defendant F. Lampropoulos finally admitted that Merit was "***nine or ten months behind***" in integrating ClariVein, which it had acquired ten months earlier—

in other words, Merit had made no progress since the 2018 acquisition.

12.     Further, with regard to Cianna, F. Lampropoulos admitted that the integration -- which he publicly represented months earlier had already been "completed" -- was in fact not complete.  To the contrary, the integration had in reality "taken a lot more time," taught management "some painful lessons," and "caught up with" them.  Moreover, the two debacles completely halted Merit's "growth-by-acquisitions" strategy, leading the Individual Defendants to concede "*we fell on our face*" and that it was "*back to basics*" for the Company.

13.     In response to these disclosures, Merit's stock price tumbled by *29%* in a single trading day, falling from a closing price of $29.11 on October 30, 2019 to close at $20.66 per share on October 31, 2019, eliminating another $452 million in shareholder value.

14.     Given their repeated misrepresentations, outraged analysts excoriated the Individual Defendants, explicitly stating that Merit suffered from a significant "*management credibility issue*."  The October 30, 2019 revelations were so shocking that analysts took the remarkable step of calling for the outright removal of defendants F. Lampropoulos and Parra, with other analysts advising that investors "probably don't want to try catching this falling knife until there have been some changes in the executive suite," and that "*[i]t will take a few years...for established investors to trust this management team again*."

15.     Notwithstanding analysts' public calls to remove F. Lampropoulos and Parra from Merit's senior management team, the Board took no action whatsoever, and indeed, F. Lampropoulos and Parra currently remain in their respective senior executive positions with the Company.

16.     In light of these events, in December 2019, the Securities Action was initiated in

the Central District of California against Merit and defendants F. Lampropoulos and Parra, on behalf of a class of investors who purchased Merit common stock between February 26, 2019 and October 30, 2019 (the "Class Period").  The operative complaint in the Securities Action, which contains detailed allegations based on the accounts of sixteen confidential witnesses, was filed on June 30, 2020.

17.     On March 16, 2021, U.S. Magistrate Judge Autumn D. Spaeth ("Judge Spaeth") issued a Report and Recommendation to U.S. District Judge David O. Carter ("Judge Carter"), in which Judge Spaeth recommended that Judge Carter deny the defendants' motion to dismiss the Securities Action.  Therein, Judge Spaeth stated the following conclusions, among others: (a) that the lead plaintiffs sufficiently alleged that the defendants' public statements during the Class Period related to Merit's acquisition of Cianna were materially false and misleading; (b) that the lead plaintiffs sufficiently alleged that the defendants' public statements during the Class Period related to Merit's acquisition of Vascular Insights and projected ClariVein sales were materially false and misleading; and (c) that the lead plaintiffs' allegations gave rise to "a strong, cogent inference of scienter."

18.     With respect to the "strong, cogent inference of scienter," Judge Spaeth specifically noted that the operative complaint in the Securities Action "contains extensive factual allegations that the two acquisitions were an important part of Merit's business strategy to grow revenue; that Merit and [defendants F. Lampropoulos and Parra] were actively and regularly made aware of sales data and sales problems; that the ClariVein insurance reimbursement and regulatory/marketing issues were sufficiently serious and directly communicated to Merit's executive sales force; and that [F.] Lampropoulos was so actively involved with the sales force

and data that there is no way he did not know there were two significant barriers to ClariVein sales."

19.     On March 29, 2021, Judge Carter entered an Order accepting Judge Spaeth's Report and Recommendation in whole and denying the defendants' motion to dismiss the Securities Action.  After the defendants to the Securities Action submitted objections, on May 3, 2021, Judge Carter entered an Amended Order which once again accepted Judge Spaeth's Report and Recommendation in its entirety and denied the defendants' motion to dismiss the Securities Action.  In addition, Judge Carter's Amended Order overruled all of the defendants' objections. Accordingly, the sustained Securities Action against the Company, F. Lampropoulos, and Parra is now proceeding towards trial.

20.     Significantly, as discussed in detail below, via Utah Code Ann. § 16-10a-1602, Plaintiff has obtained Board-level, non-public Company documents which are relevant to the factual allegations and claims asserted against the Individual Defendants herein.  The Board-level, non-public evidence which Plaintiff obtained from the Company supports Plaintiff's allegations, among other things, of knowing misconduct by certain current members of the Board.

21.     Among other things, the internal corporate documents obtained by Plaintiff have revealed that:

(a)     ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████



(b)

---

2  References to the non-public documents produced by Merit to Plaintiff pursuant to Utah Code Ann. § 16-10a-1602 appear herein in Bates numbered form as received from Merit: "MERITXXXXXX".



22.     As detailed further herein, due to the Individual Defendants' serious misconduct, the Company has been severely damaged. This derivative action seeks to recover those damages for the benefit of the Company from the true wrongdoers – the officers and directors of Merit.

## II.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over all claims under 28 U.S.C. § 1332(a) because Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

24.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

25.    In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

26.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because nominal defendant Merit is incorporated in this District and conducts business in this District.

### III.    THE PARTIES

27.    Plaintiff is a current holder of Merit common stock and has continuously held Merit common stock since at least December 2017.  Plaintiff is a citizen of Wisconsin.

28.    Nominal defendant Merit is a Utah corporation headquartered in South Jordan, Utah.  Merit manufactures and sells single-use disposable medical products for medical procedures to hospitals and physicians.  Historically, the Company sold "accessory" products, such as syringes, inflation devices, and wires for use during non-surgical procedures.  Shortly before start of the Relevant Period, the Company also began selling "therapeutic devices," which are higher-margin products used to treat or cure diseases and used during surgical procedures.  Merit common stock trades on the NASDAQ stock exchange under the symbol "MMSI."

29.    Defendant F. Lampropoulos founded the Company in 1987 and has served as Chairman of the Board, President, and CEO of Merit since the Company's founding.  In the Company's most recent proxy statement filed with the SEC on April 30, 2021, the Board conceded that defendant F. Lampropoulos "is not considered independent because of his employment as President and CEO of the Company."  Upon information and belief, defendant F. Lampropoulos is a citizen of Utah.

30.     Defendant Parra served as Merit's CFO on an interim basis from May 31, 2018 until July 2018 and has served as Merit's CFO on a permanent basis since July 2018.  Previously, defendant Parra served as Merit's Vice President of Accounting from 2016 until May 31, 2018, as Merit's Corporate Controller from 2012 until 2016, and as Merit's Director of Financial Reporting from 2009 until 2012.  Upon information and belief, defendant Parra is a citizen of Utah.

31.     Defendant A. Scott Anderson ("A.S. Anderson") has served as a director of the Company since 2011 and as the Board's "Lead Independent Director" since June 2020.  Upon information and belief, defendant A.S. Anderson is a citizen of Utah.

32.     Defendant Jill D. Anderson ("J. Anderson") has served as a director of the Company since January 2019.  Defendant J. Anderson previously served as President, CEO, and a director of Cianna from 2008 until Merit acquired Cianna in November 2018.  In the Company's most recent proxy statement filed with the SEC and disseminated to Merit shareholders on April 30, 2021, the Board conceded that defendant J. Anderson "may not be considered independent because of her service as the CEO and an employee and director of Cianna Medical, which we acquired in November 2018."  Upon information and belief, defendant J. Anderson is a citizen of California.

33.     Defendant Thomas J. Gunderson ("Gunderson") has served as a director of the Company since 2017 and has also served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Gunderson is a citizen of Minnesota.

34.     Defendant F. Ann Millner ("Millner") has served as a director of the Company since 2015 and has also served as a member of the Audit Committee during the Relevant Period.

Upon information and belief, defendant Millner is a citizen of Utah.

35.     Defendant Lynne N. Ward ("Ward") has served as a director of the Company since August 2019 and has also served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Ward is a citizen of Utah.

36.     Defendant Justin Lampropoulos ("J. Lampropoulos") is the son of defendant F. Lampropoulos and upon information and belief, has served as a Merit executive since at least 2010. J. Lampropoulos currently serves as Merit's President of Europe, the Middle East, and Africa. Prior to holding that position, defendant J. Lampropoulos served as Merit's Executive Vice President of Sales, Marketing, and Strategy for United States, Europe, and Global Marketing. Upon information and belief, defendant J. Lampropoulos is a citizen of Utah.

37.     Defendants F. Lampropoulos, Parra, A.S. Anderson, J. Anderson, Gunderson, Millner, Ward, and J. Lampropoulos are collectively referred to herein as the "Individual Defendants."

38.     Defendants Gunderson, Millner, and Ward are collectively referred to herein as the "Audit Committee Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as

15

to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

41.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

42.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

        a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

        b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

        c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said

reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

43.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should

have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

44.     The Audit Committee Defendants owed specific duties to Merit under the Audit Committee Charter (the "Audit Charter").  According to the Audit Charter, the Audit Committee's purpose is to assist the Board with oversight of: (1) the Company's financial accounting, reporting and control; (2) the Company's compliance with legal and regulatory requirements; (3) the Company's risk management efforts; (4) the performance, qualifications and independence of the Company's independent registered auditor; (5) the Company's internal audit function; and (6) the preparation of the disclosure required by the rules of the [SEC] to be included in the Company's filings with the [SEC]."

45.     Among other things, the Audit Charter specifically charges the Audit Committee Defendants with the following authority and responsibilities:

- Reviewing, in consultation with the Company's independent registered auditor and the internal audit department, the Company's internal and external financial reporting processes and controls;

- Reviewing the performance of the Company's CEO and senior financial officers as their performance relates to controls over financial reporting and related procedures;

- Reviewing and discussing with management and the Company's independent registered auditor the Company's financial press releases, as well as financial information such as *pro forma* or adjusted non-GAAP information and earnings guidance provided to analysts and rating agencies;

- Overseeing the Company's compliance program;

- Reviewing adherence to the Company's Code of Business Conduct & Ethics, including reviewing and investigating any matters pertaining to the integrity of management;

- Reviewing with management the Company's processes related to risk assessment and risk management;

- Reviewing with management and the Company's independent registered auditor the Company's major risk exposures and the steps management has taken to monitor and control such exposures; and

- Reporting regularly to the Board with respect to any issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent registered auditors or the performance of the internal audit department.

46.     Merit maintains a Code of Business Conduct & Ethics (the "Code"), which has applied at all relevant times and continues to apply to all directors, officers, and employees of the Company, and thus all of the Individual Defendants.  The Code specifically provides, among other things:

- **Complying with the Law:** Following the laws, regulations, and Merit policies in the countries where we do business is not only required, but critical to our success. Each of us must follow the laws, regulations, and Merit policies that apply to our individual work, and seek guidance whenever we have questions;

- **Protecting Our Reputation:** Merit's reputation is a valuable corporate asset earned

through the good behavior of employees, past and present. Our favorable reputation often sets us apart from competitors. We all benefit from Merit's reputation for conducting business ethically and with integrity. We all have a responsibility to maintain and enhance this legacy through the integrity we display each day;

- **Fair Dealings:** We should deal fairly with customers, payors, suppliers, competitors, the public, and one another, in accordance with ethical business practices. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice;

- **Accurate Accounting:** Our reports and documents filed with or submitted to the U.S. Securities and Exchange Commission, or other countries' equivalent agencies, and our other public communications must include full, fair, accurate, timely and understandable disclosure; and

- **Securities Laws and Insider Trading:** Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about Merit should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. To assist with compliance with laws against insider trading, Merit has adopted a specific policy governing employees' trading in securities of Merit. All Merit employees receive a copy of its Insider Trading Policy and are expected to adhere to it.

47.     Moreover, Merit maintains a separate, additional Code of Ethics for the CEO and Senior Financial Officers (the "Supplemental Code").  Thus, the Supplemental Code applied at all times and continues to apply to defendants F. Lampropoulos and Parra in their roles as CEO and CFO of Merit, and subjects them to other specific policies, including:

- **Full, Fair, Accurate, Timely and Understandable Disclosure of Reports:** The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the company with the SEC.  Accordingly, it is the responsibility of the CEO and each senior financial officer to promptly bring to the attention of the Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the company in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities in the Company's financial reporting and disclosure, controls and procedures policy.

48.      Per the terms of the Code and the Supplemental Code, the Board is duty-bound to determine (or designate persons to determine) appropriate actions to be taken in the event of violations of the Code and/or Supplemental Code, which shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code and/or Supplemental Code. n determining what action is appropriate in a particular case, the Board (or the Board's designee) is obligated to "take into account all relevant information."

49.     Merit also maintains a set of Corporate Governance Guidelines (the "Governance Guidelines") which provide the following with respect to the duties of all members of the Board:

The basic responsibility of the directors is to act in good faith and with due care so as to exercise their business judgment on an informed basis in what they reasonably and honestly

believe to be in the best interests of the Company and its shareholders. The business affairs of the Company are managed subject to the oversight of the Board, which represents and is accountable to the shareholders of the Company. The Board's responsibilities include taking an active role in regularly evaluating and approving the strategic direction of the Company, management policies and the effectiveness with which management implements its policies. The Board has responsibility to address the selection, evaluation and retention of the Company's Chief Executive Officer; approve the implementation of strategic plans and annual operating plans and budgets; approve and oversee the selection of the Company's independent auditors; approve strategic and significant acquisitions or third party ventures; advise senior management on significant Company actions; nominate directors and committee members; oversee effective corporate governance and, when appropriate, consider other constituencies critical to the success of the Company's business.

## V.   FACTUAL BACKGROUND

### A.   The Individual Defendants Were Under Pressure to Maintain Merit's "Growth By Acquisition" Strategy

50.     Merit was founded in 1987 as a small company with approximately $8 million in annual sales.  Merit's founder, defendant F. Lampropoulos, was an investment banker who worked for stock brokerage firms, including Dean Witter, helping corporations raise capital.

51.     Since Merit's founding in 1987, the Company has experienced exponential growth, which was achieved via the employment of a "growth-by-acquisition" strategy.  Indeed, defendant F. Lampropoulos emphasized publicly prior to the start of the Relevant Period that "[t]his is a growth business" and that it was his mission to "grow that top line."[3] Rather than invest in research and development to "grow that top line," under the Individual Defendants' direction, shareholder dollars were instead used to acquire other companies with established products and businesses.

52.     Leading up to the start of the Relevant Period, the Individual Defendants applied

---

[3]     Merit Medical July 23, 2018 Second Quarter 2018 Earnings Call.

this "growth-by-acquisition" strategy even more aggressively, with analysts noting in mid-2018 that Merit was "leaning more heavily on acquisitions to accentuate its growth profile."[4]  As one analyst aptly put it, mergers and acquisitions are a "fixture in MMSI's business model."[5]

53.    Merit's acquisition-driven growth strategy has long been of interest to the market, but also a source of concern. On the one hand, investors and analysts have been attracted by the fruits of Merit's acquisitions and the prospect of continued high growth. As the pace and scale of its acquisitions increased, Merit reported increasing revenue growth: 6.3% in 2015, 11.4% in 2016, over 20% in 2017, and over 21% in 2018. When Merit's revenues increased, its stock price also soared, from approximately $12 in late 2010 to approximately $56 by late 2018. By the second half of 2018, given years of high growth through acquisitions, the Individual Defendants understood that analysts and investors expected such high growth to continue.

54.    On the other hand, while Individual Defendants' acquisition strategy fueled growth and revenue, it also presented serious risks. As Merit's portfolio expanded over the years to include more complex and specialized products, the makeup of its sales force became an increasingly critical part of its operations. The ability to market more sophisticated medical products required a sophisticated, well-trained, and experienced sales team that could effectively sell and offer ongoing support to highly skilled medical professionals, such as surgeons and oncologists. If Merit proved unable to retain an acquired company's sales force, its success in selling its newly acquired products would suffer. Similarly, the success of Merit's acquisitions

---

[4]    Morningstar, "Merit's growth characteristics impress, but margin improvements are difficult to come by" (June 8, 2018).
[5]    Canaccord Genuity, "Mixed Q2 (in part due to storms) - OM leverage shined; Biz set to accelerate in Q4; PT to $47.50 from $45" (October 25, 2017).

depended upon the careful integration of the acquired company.  If the acquired company's systems were not fully and successfully integrated, expected synergies would be lost.

55.     Integration issues with Merit's acquisition of DFINE in late 2016 exemplified such acquisition risks.  Following that acquisition, members of DFINE's sales force terminated their employment with Merit.  Their terminations, defendant F. Lampropoulos would later admit publicly, directly impacted Merit's sales of DFINE's products.  As analysts noted, the benefits of the DFINE acquisition were delayed "stemming from integration challenges with respect to its specialized sales force."  For sophisticated devices -- such as the one developed by DFINE -- maintaining the acquired entity's sales force was particularly critical to Merit's post-acquisition sales success.  For example, analysts at Canaccord Genuity ("Canaccord") noted in an April 27, 2017 report that it took members of Merit's general sales force "in our estimation, around a year or so to become fully productive" at selling an acquired entity's specialized product.

56.     Given such issues, the Individual Defendants were particularly attuned to acquisition integration risks leading up to the start of the Relevant Period.  Indeed, given the Company's recent experience, analysts explicitly recognized and raised concerns about the Individual Defendants' ability to successfully continue similar acquisitions. Canaccord, for example, noted in 2018 that "[w]hile we favor Merit's recent acquisitions, the company has endured some snafus with previous deals," stating further that "additional M&A [mergers and acquisitions] . . . could pose further integration risk."  Bank of America and SunTrust Robinson Humphrey similarly identified "M&A integration issues" as a risk of Merit's business strategy.

57.     Eager for Merit to remain attractive amongst its larger and better capitalized competitors, defendant F. Lampropoulos successfully squelched concerns about the growth-by-

acquisition strategy.  Over and over, F. Lampropoulos represented publicly that particularly careful due diligence was conducted before every acquisition and companies were only selected that fit neatly within Merit's growing portfolio.  F. Lampropoulos also specifically represented that he was at the forefront of these due diligence efforts.  F. Lampropoulos stated, for example, that Merit was never "in any hurry"[6] to acquire other companies and that "we don't take flyers."[7]  F. Lampropoulos stressed that, instead, "[i]f the right thing comes along," Merit would "take a hard look" and would always be "very patient."[8]

58.     F. Lampropoulos also made repeated assurances that Merit had a specialized and effective process for integrating acquired companies following each acquisition.  When speaking publicly, F. Lampropoulos identified himself and his team as "experts" at being able to integrate acquired businesses into Merit's operations, explaining that they integrated newly-acquired companies "very, very well" and that Merit's senior executives "are seasoned" at executing integrations.[9]  F. Lampropoulos even coined a term for Merit's integration process -- "Meritizing" – and claimed that the Meritizing process began "immediately upon acquisition."[10] F. Lampropoulos likened Merit's purportedly seamless Meritizing integration process to a

---

[6]     Merit Medical July 21, 2011 Second Quarter 2011 Earnings Call; Merit Medical February 26, 2019 Fourth Quarter 2018 Earnings Call.

[7]     MedTech Talk Episode 125, "Merit Medical CEO Fred F. Lampropoulos Lays Out Aggressive Growth Strategy, Including Opportunistic M&A" (February 14, 2019).

[8]     Merit Medical July 21, 2011 Second Quarter 2011 Earnings Call.

[9]     Merit Medical July 6, 2016 Conference Call, "Merit Medical Systems Inc Conference Call to Discuss a Definitive Agreement to Acquire DFINE Inc"; Merit Medical February 26, 2019 Fourth Quarter 2018 Earnings Call.

[10]     *See, e.g.*, Merit Medical October 26, 2016 Third Quarter 2016 Earnings Call; Medtech Talk, Episode 125 Podcast, "Merit Medical CEO Fred F. Lampropoulos Lays Out Aggressive Growth Strategy, Including Opportunistic M&A" (February 14, 2019).

"symphony," which he carefully orchestrated and personally carried out to perfection.[11]

59.     Analysts accepted F. Lampropoulos' representations.  For example, Barrington Research ("Barrington") highlighted how "Merit has repeatedly said that deals under consideration need to be scalable, make sense strategically, and contribute to the company's financial goals reasonably quickly."   Canaccord likewise embraced the Individual Defendants' purported commitment to have "diligently assessed, strategically consummated, and successfully launched newly acquired/licensed, higher margin therapeutic products."  It is within this landscape that under the Individual Defendants' direction the two most significant acquisitions in Merit's history would be made.

### B.     The Individual Defendants Caused Merit to Purchase Cianna in the Largest Acquisition in Company History, and Committed to Retaining Cianna's Specialized Sales Force

60.     Under the Individual Defendants' direction, Merit historically focused its acquisition efforts on companies that created "medical accessory" products, such as syringes, inflation devices, and wires.  Over the past few years, however, the Individual Defendants shifted strategies in an attempt to cause Merit to break into the larger, more lucrative "therapeutic device" market.  F. Lampropoulos explained this transformation publicly in April 2018, representing that Merit had adopted a "strategy to move from accessories to a more therapeutic model."[12]

61.     Therapeutic devices are far more sophisticated and complex than medical accessory products.  They are intended to be used in, on, or for human beings in connection with preventing, diagnosing, monitoring, treating, or curing a disease.  Examples of therapeutic devices

---

[11]    Merit Medical February 26, 2019 Fourth Quarter 2018 Earnings Call.
[12]    Merit Medical April 25, 2018 First Quarter 2018 Earnings Call.

include pacemakers, implantable loop recorders, glucose monitoring systems, and hemodialysis machines. Unlike the market for medical accessories, the global therapeutic device market is vast, and was valued at $425 billion as of 2018. Entering this market presented Merit with diverse opportunities for expansion, but also pitted Merit against significantly larger and better capitalized competitors, including Fortune 500 companies like Medtronic, Boston Scientific, and Abbott Laboratories.

62.     Accordingly, the Individual Defendants sought to jump-start the effort for Merit to enter the therapeutic device market and compete with its larger rivals by causing Merit to acquire Cianna, a California-based company that had already gone to market with a successful therapeutic product. In 2015, Cianna developed and began selling a revolutionary therapeutic device, the SCOUT, for the treatment of breast cancer. Cianna's SCOUT product was a wire-free breast tumor radar localization system that aided surgeons in locating target tissue during lumpectomies. Specifically, the SCOUT was designed to produce audible and visual indicators that surgeons could use to identify cancerous tissue during lumpectomies and biopsies. Cianna sold its sophisticated SCOUT product through a small, specialized sales force of 19 highly trained and educated Cianna professionals, each of whom possessed an in-depth understanding of how the SCOUT works and how to properly market it to physicians and surgeons.

63.     On October 1, 2018, the Individual Defendants caused Merit to announce that it was acquiring Cianna for $200 million. The Cianna acquisition was the Company's largest acquisition ever. With a $200 million price tag, the purchase price was almost one quarter of Merit's entire revenue for all of 2018 and nearly five times greater than the Company's net income for 2018. Given that a *total* of $300 million had been spent on Merit's *ten* acquisitions between

mid-2016 and mid-2018 prior to the Cianna acquisition, Cianna's $200 million price tag immediately signaled publicly that Cianna was by far the most significant transaction in Merit's history.

64.     To announce this landmark deal, the Individual Defendants issued a press release and conducted a special conference call with investors and analysts on October 1, 2018, which was devoted entirely to discussing the Cianna acquisition.   During the call, defendants F. Lampropoulos and Parra touted the Cianna acquisition as "the largest transaction [Merit] has ever done," and as a vehicle for accelerated Company growth that had been purportedly deeply researched, brushing aside concerns that the Company's entry into a new market (therapeutic devices) posed significant risks. In particular, F. Lampropoulos and Parra represented that Merit would not repeat prior failures of having significant attrition in the acquired company's sales force. During the conference call, F. Lampropoulos emphasized how the Individual Defendants had purportedly "known this company for a long time," "followed it," and waited until the "opportunity became available."  The Individual Defendants' press release and statements during the conference call further represented that the Individual Defendants had closely "looked at [Cianna]," that the acquisition was being completed with "discipline," and that defendant F. Lampropoulos himself was personally "lead[ing Cianna's] efficient integration."  F. Lampropoulos stated that Cianna was a "perfect fit" for Merit and would drive an estimated $50 to $56 million in revenues in 2019 alone.  F. Lampropoulos added that Cianna "has a track record of growth and has some of the largest accounts in the country."

65.     Given the complexity of Cianna's products, the large pre-existing Cianna sales accounts, and Merit's prior failure to retain sales personnel, F. Lampropoulos emphasized several

times during the October 1, 2018 conference call that Merit would keep "in place" Cianna's "entire sales force."  Cianna's sales force consisted of a small, qualified and knowledgeable group of salespeople who were highly skilled and experienced in selling Cianna's SCOUT product to sophisticated medical professionals.  As the Individual Defendants recognized during the Relevant Period, given the complexity of the SCOUT product as compared with Merit's medical "accessory" products, it was vital that the Cianna sales force be retained after the acquisition.  F. Lampropoulos thus reiterated publicly that the Cianna employees who "are sales and marketing and in the field" would be "staying in place."  He explained, "I want them to become part of the Merit family, and that's exactly [what] we're going to do."  F. Lampropoulos stressed the importance of doing so, explaining that the expected "returns" from the acquisition were dependent upon the "maintenance of their sales force," so they would be "keeping that sales force and adding to it." F. Lampropoulos further assured that the Individual Defendants had "learned lessons from our situations in the past" -- where Merit failed to keep all members of the acquired entity's specialized sales force after the acquisition.  He further explained that maintaining Cianna's sales force was so important that the Company's financial models depended on that fact, stating that for "this particular situation [*i.e.*, the acquisition of Cianna], the [financial] models that we're talking about and the [financial] returns ***reflect the maintenance of the sales force***."

66.    Underscoring the importance of Merit's retention of the members of Cianna's small and specialized sales force, analysts immediately asked how the Cianna sales force would be integrated and utilized.  During the October 1, 2018 conference call, Canaccord analyst Jason Mills asked whether the Individual Defendants' intent was to bring the "Cianna sales effort into your existing sales force without a significant effort in terms of training."  F. Lampropoulos

confirmed that Merit was keeping, and needed to keep, Cianna's sales force, as they had "momentum" and "we don't want to take away from the momentum that these guys have." He reiterated, "in terms of the sales team, we want to keep them in place and keep that momentum going." An analyst from Barrington similarly sought confirmation that the Cianna sales force would be kept "intact." F. Lampropoulos again assured that it would, responding that, "I've said it over and I'll say it again: I do not want to disrupt the momentum of this company. I want them to become part of the Merit family, and that's exactly what we're going to do. Our model reflects that." F. Lampropoulos further represented that the Individual Defendants had learned from prior mistakes, stating that Cianna was "night and day from the DFINE acquisition in terms of sales force integration." Maintaining Cianna's sales force was so important to Merit that F. Lampropoulos made clear that he was personally involved with retaining the Cianna sales force, citing a call he was having with the Cianna sales force later in the day, and his trip to meet them personally in Orange County, California later in the week.

67.     Analysts embraced the Individual Defendants' promises that Merit would keep Cianna's sales force intact after the acquisition, noting that this was critical for the success of the deal. For example, an October 2, 2018 Morningstar analyst report stated: "*[W]e're encouraged that [Merit's management] intends to keep the Cianna sales team and research and development organization largely intact following integration*. One of our key criticisms of management's acquisition strategy has been poor post-integration sales performance, largely due to cost-cutting and sales force attrition associated with a handful of transactions completed over the years." Analysts at Canaccord echoed in a report on October 1, 2018 that they expected "*the full, combined, scaled sales force hitting the ground running from day one*."

68.     Analysts also viewed the retention of the Cianna sales force as a mitigating factor to Cianna's significant $200 million price tag.  On October 2, 2018, for example, Raymond James reported that while Cianna is Merit's "largest acquisition to date," the fact that the plan was "to keep the entire Cianna team . . . *lessens the risk profile*."  Thereafter, on October 26, 2018, Canaccord issued a "Buy" rating and increased its price target for Merit, applauding the Cianna acquisition as "the most accretive deal yet" and specifically highlighting the "plans to leverage Cianna's existing sales force."

69.     Analysts also accepted the Individual Defendants' representations about the benefits of the Cianna acquisition, its unique importance to the effort for Merit to enter and become competitive in the market for therapeutic devices, and the ability to immediately generate blockbuster revenues for the Company in 2019.  In an October 1, 2018 analyst report, Canaccord reported that the Cianna acquisition "could take over the number one position in MMSI's history" as the Company's "most accretive deal, dethroning" other recent additions to the Company's "broadening and increasingly therapeutically focused product portfolio."  In an October 2, 2018 analyst report, Piper Jaffray applauded the Cianna acquisition as "more accretive than any deal in recent history for Merit," stating that "MMSI is moving closer to a company focused on therapeutic areas."  In another report on the same day, Raymond James maintained its "Outperform" rating for Merit "following the proposed Cianna deal."

70.     Over the ensuing weeks leading up to the start of the Relevant Period, certain of the Individual Defendants continued to reassure analysts that the members of the Cianna sales force remained in place.  For example, during an October 25, 2018 investor call, a Needham & Co. ("Needham") analyst asked, "which of [Merit's] sales forces would be selling [Cianna]

products once you close the deal?"  Defendant F. Lampropoulos responded that "some of the things we've learned just from history is we didn't want to destroy what we think is a very, very important team with a lot of momentum.  So we've kept it in place."  Similarly, in discussing the plan to retain the entire Cianna sales force, F. Lampropoulos highlighted the enthusiasm of the Cianna sales force to join the Merit team, stating that "almost everybody on [the Cianna] sales team [had] sen[t] me a note and share[d] with me their excitement and they're looking forward to being a part of Merit."

71.    In addition to their assurances about maintaining the Cianna sales force, the Individual Defendants also explained the importance of a successful integration of the companies' systems to unlocking the value of the Cianna acquisition.  In Merit's Quarterly Report on Form 10-Q filed with the SEC on November 9, 2018, the Individual Defendants stated that the integration process involved combining "operations, culture, information management systems and other characteristics of the acquired entity with our own, including sales models related to capital equipment."  The Individual Defendants recognized in their public statements that a failure to successfully integrate Cianna's operational systems would harm the Company, stating that Merit could not achieve the "financial results, product development and other anticipated benefits" if Cianna's operational systems were not successfully integrated.[13]

72.    On November 13, 2018, approximately three months before the start of the Relevant Period, the Individual Defendants caused Merit to issue a press release announcing that the Company had successfully closed the Cianna acquisition.  In the press release, defendant F.

---

[13]    Merit Medical Press Release, "Merit Medical Closes Cianna Medical, Inc. Deal" (November 13, 2018).

Lampropoulos stated that "[w]e are delighted to have Cianna Medical join the Merit family," "continu[e] Cianna's momentum," and "associat[e] with Cianna Medical's domestic sales and marketing team."

### C.    The Individual Defendants Caused Merit to Acquire ClariVein from Vascular Insights and Promised Substantial Immediate Revenues

73.    On the heels of the announcement that Merit had completed the Cianna acquisition, the Individual Defendants announced on December 17, 2018 that Merit had completed another transformative acquisition targeting a therapeutic device company. This time, the Individual Defendants announced that Merit had acquired the assets of Vascular Insights for $60 million -- specifically, its one and only product line, ClariVein -- which was marketed to treat varicose veins. This acquisition, the Individual Defendants claimed, positioned Merit to exploit a $700 million global market opportunity.

74.    In a December 17, 2018 press release announcing the acquisition, the Individual Defendants represented that, like with Cianna, they had thoroughly vetted ClariVein, as "[w]e have had our eye on these products for some time." The Individual Defendants explained that ClariVein would significantly expand Merit into the "$700 million global market" for therapeutic relief for varicose veins. The Individual Defendants further represented that ClariVein would immediately contribute meaningful sales once combined with Merit's "global sales footprint," injecting additional revenues "in the range of $10-$11 million" for ClariVein in 2019.

75.    Analysts credited the Individual Defendants' representations that the acquisition of ClariVein would generate important and immediate revenues for Merit in 2019. In a December 17, 2018 analyst report, Piper Jaffray stated that ClariVein's "assets (used for the treatment of varicose veins) complement an already substantial vascular portfolio and it should drop in the bag

quickly, allowing MMSI's large global sales force to address this $700M global market." Analysts specifically highlighted how Merit "expects $10-$11M in revenue from the [ClariVein] purchase in 2019, which should be accretive to the 2019 bottom line," and that Merit "will integrate the asset quickly, make any necessary refinement, and enjoy success in this large overall market opportunity." Piper Jaffray analysts similarly noted in a February 11, 2019 report that ClariVein, "a disposable hand-held device that is used to treat varicose veins . . . [is] a very good product" and "will prove successful in growing [Merit's] franchise in the coming years." Wells Fargo analysts concluded that in light of the Cianna and ClariVein acquisitions, "2019 is shaping up to be another strong year for MMSI." Raymond James observed that "[w]ith a slew of new products in 2019" and "a strong track record of execution, we have confidence in. . . the potential for upside going forward." With these two acquisitions underfoot, the consensus price target for Merit's stock shot up to $68 per share.

### D.   The Individual Defendants Falsely Claimed That Cianna's Sales Force Remained Intact as Part of a "Successful" and "Complete" Integration

76.    After the announcement of the Cianna acquisition on October 1, 2018, investors and analysts were laser-focused on the status of Cianna's integration into the Company. This heightened attention was not surprising. The Cianna acquisition was the largest in Merit's history, carrying a $200 million price tag, and F. Lampropoulos had represented that Cianna would provide Merit with an immediate boost of meaningful revenue in 2019.

77.    On February 26, 2019, five months after the Individual Defendants announced the Cianna acquisition, and nearly four months after it closed, the Individual Defendants held an earnings conference call. Given that Cianna's integration had been well underway for several months by the time of the conference call, analysts were particularly anxious to learn about the

status and promised success of the integration.  Defendant F. Lampropoulos kicked off the earnings call by stating that "Cianna is the largest acquisition Merit has ever made, and I would have to say that to this point, we are very pleased with the transition."  When a Piper Jaffray analyst asked to hear "more about the [Cianna] integration," F. Lampropoulos responded that "*the integration . . . is going as well as could be expected*," and underscored that "*everything is working quite nicely*."

78.     As he had done when the acquisition was first announced in October 2018, defendant F. Lampropoulos continued to emphasize during the February 26, 2019 investor conference the critical importance of maintaining Cianna's uniquely qualified sales force. He underscored that the Cianna sales force consisted of "highly trained, clinical personnel" with "a higher level of clinical understanding and support" than the existing Merit sales force.  He further emphasized the "critical" need for this sophisticated sales force to continue to remain with Merit given the Company's recent transition from an accessory device company to a therapeutic device company, stating that "as our products get more complicated, *we need to have these folks [i.e., the members of the Cianna sales force] who know how to sell*, interface with surgeons, and have a strong knowledge of physiology and anatomy."  He added that, given the complexity of these products and the reasons for their use, the Cianna sales force's special skillset was vital to Merit's ability to sell Cianna's unique products, highlighting that Cianna's existing sales force was key "to drive the business to the upside."

79.     Given its critical import, F. Lampropoulos represented that Merit continued to maintain the members of Cianna's sales force.  He specifically stated during the February 26, 2019 conference call that "*we kept the [Cianna] sales force in place* . . . that was not only the appropriate thing to do, but we think that it's part of what we expect will drive our business."  He went on to

confirm that "[w]e're seeing the stability, as I mentioned earlier, in the sales force and in the operating staff.  And by that, what I mean by stability, *we haven't lost anybody*."  By contrast, he stated that Merit had lost some Cianna employees "on the operational side."  Underscoring how critical and purportedly successful the Cianna integration had been, the Individual Defendants attributed up to *40%* of the entire Company's expected 2019 revenue growth to Cianna revenues alone.

80.     F. Lampropoulos further represented during the February 26, 2019 conference call that he personally kept a close watch over the Cianna sales force. He trumpeted his firsthand knowledge of the group's composition and direct involvement in transitioning the team to Merit. He claimed that he "did a lot of work [in reviewing] the operations, the manufacturing, sales force" and further explained that he visited Cianna multiple times in Southern California, and even recently "invited [Cianna's] best producers" to join him and his fellow Merit executives "in all of our national meetings and international meetings."

81.     Analysts reacted favorably to the Individual Defendants' assurances about the Cianna integration and the retention of the Cianna sales force.  In a February 26, 2019 analyst report, for example, Piper Jaffray reiterated that "[t]he integration of Cianna is going well," and further that "management commentary and tone surrounding Cianna was positive, in our view, with the CEO stating he is more bullish on the asset than before they acquired the company."  The next day, on February 27, 2019, Barrington similarly credited the Individual Defendants' representation that the Cianna "integration efforts seem to be going well," and Wells Fargo reported that, according to the Individual Defendants, "the integration process has gone very well to date."  Likewise, on February 27, 2019, Canaccord published a "buy" rating and raised its price

target for Merit's stock, projecting a "positive 2019 and beyond" as "the Cianna Medical acquisition -- which we think holds the potentially to become MMSI's most accretive deal ever – is integrated within the Merit portfolio."

82.     Then, on April 23, 2019, seven months after the Cianna acquisition was announced and six months after it closed, the Individual Defendants issued a press release announcing that the Cianna transition was fully accomplished and just as successful as the Individual Defendants had always believed it would be.  Defendant F. Lampropoulos stated in the press release that "*[t]he Cianna transition is complete, and sales continue to grow according to our expectations*."  F. Lampropoulos likewise confirmed the supposed completion of the Cianna integration process during an earnings conference call the same day.  When securities analyst David Kenneth Rescott of Canaccord asked during the call for details about the completed integration, F. Lampropoulos made clear that the integration of Cianna had gone superbly -- even perfectly -- and was the "best" integration the Company had ever completed in its history. He boasted that "*the bottom line is, it's as probably as good of a transaction and transition that we have done*" and "*I don't know how you could do it any better, to be honest with you*."

83.     During the same April 23, 2019 conference call, defendant F. Lampropoulos also continued to represent that the Cianna sales force remained at Merit.  In fact, he unequivocally stated that Merit had "*maintained the sales force*" and that the "*goal to maintain the sales force*" was "*moving along*" without issue.  Then, in response to an analyst's question about the Cianna "rollout," F. Lampropoulos pointed to the Company's continued employment of Cianna's sales force, explaining that, "*as you recall . . . we maintained their sales force. And we think that was a critical thing to do*."

84.     Analysts again credited these representations, focusing on the Individual Defendants' assurances that the integration was complete and had proceeded consistent with their integration plan.  On April 23, 2019, Piper Jaffray reported that "***MMSI has completed the integration of Cianna***, with minimal disruptions and strong results out of the gate."  The next day, Barrington issued a report maintaining its "Outperform" investment rating for Merit's stock and cited the Individual Defendants' positive statements about the integration: "***Management said that the transition of the Cianna asset may be the 'best' that Merit has ever done. This is an encouraging assessment given the fact that Merit has done dozens of transactions over its 30-plus year history***."

### E.     The Individual Defendants Falsely Promoted the Performance and Sales of ClariVein

85.     Analysts and stockholders were also eager during the Relevant Period to learn about the status of Merit's recently acquired ClariVein product from Vascular Insights, and whether the acquisition had been as lucrative for Merit as the Individual Defendants promised it would be. The Individual Defendants repeatedly represented that it had been nothing less than a complete success, and that it was driving Company growth.

86.     On February 26, 2019, the Individual Defendants provided an update to the market on the purported success of ClariVein, which Merit had now owned for nearly three months. In a press release issued by the Individual Defendants that day, F. Lampropoulos specifically identified the acquisition of Vascular Insights' ClariVein and stated that "***integration of these new businesses and sales of our core products. . .continue to drive growth***."

87.     F. Lampropoulos continued to tout the supposed immediate success of Vascular Insights' ClariVein during the Company's investor conference call held that same day.  At the

beginning of the call, F. Lampropoulos spoke specifically about Vascular Insights.  He reported how the Individual Defendants were "satisfied" with the acquisition and how at that point in time -- with over three months of experience selling ClariVein -- "*our confidence is built*."  Defendant Parra echoed F. Lampropoulos' enthusiasm for ClariVein, stating later in the conference call that "*we haven't changed the guidance that we disclosed when the acquisition happened*" three months earlier, with ClariVein still generating $10 to $11 million in revenues in 2019.

88.     The Individual Defendants made further efforts during the February 26, 2019 conference call to assure stockholders that Merit was successfully selling ClariVein in line with prior expectations.  Defendant F. Lampropoulos specifically singled out the Company's supposed early success with ClariVein as a key reason not only for maintaining the Individual Defendants' previous statement that $10 million to $11 million in Vascular Insights revenues would be generated for 2019, but also for maintaining the Individual Defendants' extraordinary issuance of full-Company revenue guidance for the following year, 2020.  While the Individual Defendants never provided any financial guidance for 2019 throughout all of 2018, on February 26, 2019, the Individual Defendants estimated revenue growth of 8-10% for 2020, due in part to supposed ClariVein sales strength.  SunTrust analyst Bruce Nudell noted during the February 26, 2019 conference call that "it's kind of unusual . . . for a company of your size to put out 2020 guidance" and asked defendant F. Lampropoulos "what gave [him] the confidence to really take that forward-looking step."  In response, F. Lampropoulos pointed to Merit's purportedly successful "2 or 3 months" with Vascular Insights' ClariVein, and with Cianna, as an important basis for the Individual Defendants providing financial guidance all the way through the end of 2020.

89.     As 2019 progressed, the Individual Defendants continued to tout the acquisition

of Vascular Insights' ClariVein and its purported immediate and meaningful contribution to the Company's 2019 revenues. On March 1, 2019, four months after the acquisition, the Individual Defendants caused Merit to publish a letter to shareholders, which defendant F. Lampropoulos signed, highlighting "the acquisitions of Cianna Medical and Vascular Insights" as a key part of Merit's "global growth and profitability plan," and claiming that the "*[i]ntegration of these new businesses and sales of our core products . . . continue to drive growth*."

90.    On April 23, 2019, over five months after the Vascular Insights acquisition, the Individual Defendants again created the impression during an investor conference call that Merit had encountered no impediments selling Vascular Insights' ClariVein, with the acquisition proving to be just as lucrative as the Individual Defendants expected it would be. During that call, in which the Individual Defendants announced Merit's first quarter 2019 results, defendant F. Lampropoulos stated that "*the first quarter met and exceeded our expectations*." Defendant Parra further represented that, as part of the Company's exceptional revenue acceleration, "*we had strong sales in stand-alone products," which included ClariVein*. When asked whether anything had changed with respect to the 2019 and 2020 guidance previously issued by the Individual Defendants, F. Lampropoulos responded that "*I don't see that anything has changed*," and that "there are always headwinds, but I think there are more tailwinds. *We're feeling the breeze to our back*."

91.    Analysts and stockholders trusted the Individual Defendants' representations about the Company's purported success with the ClariVein product. For example, on February 27, 2019, Canaccord published a report reiterating its "buy" rating, raising Merit's target price, and highlighting that the positive "top-line performance in Q4" was "driven by ramping

contributions from recent acquisitions [Cianna and Vascular Insights' ClariVein]." Likewise, on February 27, 2019 and again on April 24, 2019, Barrington issued reports maintaining its "Outperform" investment rating and increasing its price target for Merit. To support its thesis, Barrington pointed to "the Q4/18 M&A activity" that brought ClariVein to Merit. On April 23, 2019, Canaccord analysts also issued a "buy" rating for Merit stock and reported that Merit had a "[s]olid start to 2019," highlighting that, according to the Individual Defendants' representations, Merit "continues to see momentum in recently acquired assets."

F. **Contrary to the Individual Defendants' Public Statements, Top Cianna Salespeople Quit Shortly After the Acquisition, Merit Failed to Complete the Cianna Integration, and Merit Had *Zero* ClariVein Orders For Over Six Months After Acquiring Vascular Insights**

92.     At the same time that the Individual Defendants were publicly touting the immediate success of the acquisitions of Cianna and Vascular Insights' ClariVein, they internally faced a harsh reality. The Individual Defendants' efforts to integrate Cianna and keep its critical sales force had failed, which was adversely impacting the Company's ability to sell Cianna's products. In addition, Merit actually had a remarkable *zero* orders of ClariVein for the entire first half of 2019, and fundamental issues precluded successful marketing and selling of ClariVein in the second half of 2019 and beyond -- namely, a widespread refusal by insurance companies to reimburse physicians for the costs of ClariVein, and the determination not to market ClariVein for its intended use. Rather than disclose these critical facts, the Individual Defendants instead kept them hidden from stockholders.

1. **The Most Important Members of Cianna's Sales Force Left Merit Shortly After the Cianna Acquisition**

93.     As set forth above, maintaining Cianna's sales force was critical to the Individual

Defendants' ability to market Cianna products, and the Individual Defendants had repeatedly represented publicly, both before and during the Relevant Period, that the Cianna sales force was being kept intact.  However, these statements were false and misleading and omitted material facts. In reality, three of Cianna's top four salespeople -- including the top performers in its most critical sales region -- all quit within a matter of months after the acquisition, leaving Merit without sales coverage in broad swaths of the country.  All told, by April 15, 2019, a full 8 days before defendant F. Lampropoulos claimed publicly that Merit had successfully "maintained the [Cianna] sales force" and "I don't know how you could do it better, to be honest with you," more than *20%* of the Cianna sales force had quit.  These departures included *60%* of Cianna's sales force in the Western region, including the region's top performers, who were single-handedly responsible for *75%* of the region's entire sales and *22%* of Cianna's total company-wide sales.  They were also the only sales representatives selling Cianna product in *15* U.S. states -- *i.e.*, nearly one-third of the entire country.

94.     By way of background, the Cianna sales force was divided into discrete regions: the Western, Eastern, and Central regions.  According to the confidential witness referred to in the operative complaint in the Securities Action as "Cianna Sales Rep 3,"[14] the Western region generated the most sales of any region and, for this achievement, was awarded "Region of the Year" in 2018.  Likewise, according to the confidential witness referred to in the operative

---

[14]     "Cianna Sales Rep 3" is described in the Securities Action as having worked as an Account Executive at Cianna from February 2014 until Cianna was acquired by Merit in November 2018, and having thereafter worked for Merit until April 2019.  Cianna Sales Rep 3 is described as having been responsible for sales and clinical support, including speaking with doctors about Cianna's SCOUT product, helping them trial the product, and selling it as needed.

complaint in the Securities Action as "Cianna's VP of Sales,"[15] the Western region was Cianna's strongest performing region prior to the acquisition, described by this confidential witness as "a very important region" for Cianna that generated a "very significant" percentage of Cianna's sales.

95.    According to the Securities Action, Cianna Sales Rep 3 has explained that the Western region's sales force consisted of five sales representatives.  Each of these five sales representatives covered distinct parts of the Western United States.  In the Securities Action, multiple former Merit employees, including Cianna Sales Rep 3, have explained that three of those five salespeople quit within a matter of weeks of each other shortly after the Cianna acquisition, and all before defendant F. Lampropoulos' public representations on April 23, 2019 that "we maintained [Cianna's] sales force" and accomplished the "goal to maintain the sales force."

96.    The members of Cianna's sales force in the Western region who quit Merit shortly after the acquisition -- referred to in the operative complaint in the Securities Action as "Cianna Sales Reps 1 and 2,"[16] in addition to Cianna Sales Rep 3 – are alleged to have been with Cianna

---

[15]    "Cianna's VP of Sales" is described in the Securities Action as having worked for Cianna from October 2015 as a Regional Director of Sales until Merit acquired Cianna and having thereafter worked for Merit until March 2020 in the same role under the title of Regional Vice President of Sales at Merit Oncology.  Cianna's VP of Sales is described as having overseen a large region of Cianna, including 16 employees, and also having responsibility for certain customer service functions.  It is alleged that prior to joining Cianna, Cianna's VP of Sales had significant prior experience as a sales manager in the medical field.

[16]    "Cianna Sales Rep 1" is described in the Securities Action as having worked as an Account Executive at Cianna beginning in April 2014, and then having worked for Merit after the acquisition until February 2019.  It is alleged that Cianna Sales Rep 1 was responsible for selling the Cianna SCOUT and specialized in Breast, Cardiac Intervention, and Cardiac Surgery areas.  Prior to joining Cianna, Cianna Sales Rep 1 is alleged to have had 17 years of experience in sales of complex medical devices across several medical device companies, and to have risen to the top of each sales force.  Cianna Sales Rep 1 is described as having earned a B.S. in Management for Business Management and an associate degree in Nursing.  Meanwhile, "Cianna Sales Rep 2" is described in the Securities Action as having worked as an Account Executive at Cianna from August 2017 until Cianna was acquired by Merit in November 2018 and having worked thereafter

for, collectively, over 10 years, and were the only salespeople covering the vast majority of the Western United States.  According to the account of Cianna Sales Rep 3, Cianna Sales Reps 1, 2, and 3 were the only sales representatives selling Cianna product in Northern California and in twelve states (Arizona, Colorado, Idaho, Utah, Oregon, Washington, Montana, New Mexico, North Dakota, South Dakota, Wyoming, and Alaska).

97.     The Securities Action alleged that Cianna Sales Reps 1, 2, and 3 were Cianna's most important salespeople in its most important sales region.  According to the account of Cianna Sales Rep 3, these three former sales representatives were responsible for ***nearly 75% of the Western region's sales, and over 20% of the total sales for the entire company in 2018***.

98.     The Securities Action further alleged that having consulted a January 3, 2019 Cianna internal sales report listing the names of the 19 members of the Cianna sales force and covering total sales in 2018, Cianna Sales Rep 3 explained that these representatives were responsible for sales of $7.141 million of Cianna's approximate $9 million in total sales in the Western region for the company's primary product, Savi SCOUT -- *i.e.*, 74.5% of total sales in the Western region in 2018.  It is alleged that Cianna Sales Reps 1, 2, and 3 were also responsible for more than 22% of the total, overall company-wide sales of Savi SCOUT -- $7.141 million of the company's total $32.184 million in sales -- rendering them three of the four top salespeople in the entire company for Savi SCOUT.  It is further alleged that these representatives also sold 73% of the total number of SCOUT consoles sold by the Western region's sales representatives (*i.e.*, 61 of the 84 total Consoles sold) and 27% of the total number of the SCOUT consoles sold company-

---

for Merit until March 2019.  It is alleged that Cianna Sales Rep 2 was responsible for selling the SCOUT product in the Pacific Northwest.

wide (*i.e.*, 61 of the 226 consoles sold) during 2018.[17]  According to the account of Cianna Sales Rep 3, in addition to their sales of Savi SCOUT, these top salespeople also sold $1.3 million of the company's overall $10 million in total sales of Cianna's only other product, Savi Brachy, representing 13% of the entire company's Savi Brachy sales in 2018.

99.     The Securities Action alleged that Cianna Sales Rep 1 was one of Cianna's top salespeople, who received Cianna's Account Executive of the Year award in 2016 as well as the coveted President's Club Award for 2015 and 2018.  According to the account of Cianna Sales Rep 3, the President's Club Award was given to the sales representatives who had the most company-wide sales for Cianna's products.  It is alleged that Cianna Sales Rep 1 was Cianna's lone sales representative covering Arizona, Utah, Colorado, Wyoming, New Mexico, North Dakota, and South Dakota, and had been with Cianna beginning in April 2014 -- *i.e.*, over four years before the acquisition.  According to the Securities Action, a January 2019 Cianna sales report, which was corroborated by Cianna Sales Rep 3's account, reflected that Cianna Sales Rep 1 sold $2.266 million in annual sales of the company's primary product, Savi SCOUT, ***meaning that Cianna Sales Rep 1 was single-handedly responsible for 7% of Cianna's total Savi SCOUT sales for 2018***.  Cianna Sales Rep 3 is alleged to have stated that Cianna Sales Rep 1 quit Merit in March 2019, approximately three months after the acquisition closed in November 2018 and long before defendant F. Lampropoulos' false and misleading representation on April 24, 2019 that Merit "maintained the [Cianna] sales force."

100.     According to the Securities Action, Cianna Sales Rep 2 was also one of Cianna's

---

[17]     It is alleged in the operative complaint in the Securities Action that Cianna Sales Reps 1, 2, and 3 all reported to Cianna's Regional Vice President of Sales, Mark Vinger ("Mr. Vinger").

top salespeople, and was Cianna's lone sales representative covering Idaho, Washington, Oregon, Alaska, and Montana.  It is alleged that the January 2019 Cianna sales report described in the Securities Action and corroborated by Cianna Sales Rep 3 reflected that Cianna Sales Rep 2 sold $2.265 million in Savi SCOUT product during 2018, placing Cianna Sales Rep 2 just behind Cianna Sales Rep 1, and *meaning that Cianna Sales Rep 2 was single-handedly responsible for approximately 7% of Cianna's total Savi SCOUT sales*.  Moreover, Cianna Sales Rep 2 was one of Cianna's up-and-coming stars.  The Securities Action alleged that in 2018, Cianna Sales Rep 2 exceeded Cianna's year-end performance target by approximately $1.2 million, which was *the highest actual-to-target performance of all Cianna salespeople*.  Cianna Sales Rep 2 also is alleged to have sold the second-highest number of consoles of any of Cianna's salespeople in 2018.  Cianna Sales Rep 2, who joined Cianna well over a year before the acquisition, quit Merit in March 2019 -- approximately three months after the acquisition closed in November 2018 and long before defendant F. Lampropoulos' false and misleading representation on April 24, 2019 that Merit "maintained the [Cianna] sales force."

101.    Cianna Sales Rep 3 is also described in the Securities Action as having been one of Cianna's top salespeople.  According to the Securities Action, Cianna Sales Rep 3 ranked highest in the country in total sales of Savi SCOUT consoles and second highest in total sales of Savi SCOUT product, selling $2.61 million worth of product in 2018 (*i.e.*, approximately 8% of the Company's overall sales) – which is allegedly corroborated by the January 3, 2019 Cianna sales report recapping each salesperson's total sales in 2018.  In 2018 alone, Cianna Sales Rep 3 is alleged to have exceeded Cianna Sales Rep 3's sales target by $1.18 million, which was the second-best performance, relative to sales target, of all Cianna sales representatives.  Cianna Sales

Rep 3 is described as having been Cianna's lone sales representative covering Northern California, including Bakersfield, Redding, San Jose, and San Francisco, and had been with Cianna for five years before the acquisition.  It is alleged that Cianna Sales Rep 3 personally had over 50 accounts, including some of the most important accounts, such as Stanford Hospital ("Stanford").  Cianna Sales Rep 3 stated that Cianna Sales Rep 3 quit, effective immediately, on April 15, 2019 -- approximately four months after the Cianna acquisition and before defendant F. Lampropoulos' false and misleading representation on April 24, 2019 that Merit "maintained the [Cianna] sales force."

102.    In addition to these critical departures, the Securities Action alleged that another Cianna account executive from the Central region -- referred to as "Cianna Sales Rep 4" -- also quit Merit shortly after the Cianna acquisition.  Cianna Sales Rep 4 is described as having joined Cianna in March 2018 and as the sales representative covering all of Missouri, Kansas, Iowa, and Nebraska, as well as Southern Illinois.  Cianna Sales Rep 4 is further described as having over 10 years of sales experience in women's oncology products before joining Merit.  While at Merit, Cianna Sales Rep 4 is alleged to have handled several important accounts, including St. Anthony's and St. Luke's hospitals.  The Securities Action alleges that Cianna Sales Rep 4 left Merit in January 2019, approximately one month after the acquisition and long before defendant F. Lampropoulos' false and misleading representation on April 24, 2019 that Merit "maintained the [Cianna] sales force."

103.    The rapid departure of over 20% of Cianna's sales force within just months of the acquisition, who collectively covered nearly a third of the country and were responsible for nearly one-fourth of Cianna's total revenues, dealt a significant blow to the purportedly transformative

Cianna acquisition.  The impact of these departures was particularly acute for at least three reasons: (1) the sales force departures included Cianna's top performers; (2) the sales force was extremely small to begin with, making the loss of even one key salesperson extraordinarily impactful; and (3) the bulk of the sales force losses occurred in Cianna's most important region, the Western region.  In the Securities Action, Cianna's VP of Sales is quoted as saying that when these top performers left in quick succession, it "felt like a mass exodus" in the critical Western region. Similarly, according to the account of Cianna Sales Rep 3, "the West coast sales team was decimated" and this was widely discussed at Merit.  The account of "Cianna's Clinical Account Manager"[18] corroborates these accounts, explaining that in early 2019, just months after the acquisition and right after sales quotas went out for the sales representatives, Cianna sales representatives who were among Cianna's top performers and who worked in a large area in the Western region, quit Merit, leaving Merit with hardly any sales representation on the West Coast.

104.    Not surprisingly, the departure of 60% of Cianna's total West Coast sales force and over 20% of its total overall sales force, including its top performers, negatively impacted Cianna's ability to generate and grow revenues after the acquisition.  Merit could not easily replace these highly-valued sales professionals with individuals with equivalent experience, training, and, most importantly, relationships with existing customers -- relationships that required years to develop.    Plus,  as  defendant  F.  Lampropoulos  himself  publicly  acknowledged,  Cianna's

---

[18]     "Cianna's Clinical Account Manager" is described in the Securities Action as having joined Cianna in October 2017 and then having worked for Merit from the time Merit acquired Cianna until October 2019.  It is alleged that Cianna's Clinical Account Manager's responsibilities included  interfacing  regularly  with  customers,  including  traveling  to  hospitals  and  training physicians as to how to use Cianna's products, as well as acting as a clinical liaison for Cianna accounts.

technology was a different, more complex technology than the accessory products Merit was accustomed to selling and, accordingly, Merit could not substitute its own sales representatives. According to the account in the Securities Action of Cianna Sales Rep 3, the sales force at Merit -- which Cianna Sales Rep 3 described as a "widget" company that sold tubes and syringes -- was not equipped to sell Cianna's sophisticated products.

105.     According to the Securities Action, Cianna Sales Rep 3 has stated that new business dropped off precipitously once Cianna Sales Rep 3's colleagues quit.  It is alleged that Cianna Sales Rep 3 has further explained that, in Cianna Sales Rep 3's current position with a new employer, Cianna Sales Rep 3 continues to work in the same territory for a different medical device company.  When Cianna Sales Rep 3 returned four months after starting a new job to some of Cianna Sales Rep 3's biggest former accounts, including Stanford, those former accounts told Cianna Sales Rep 3 that they had never even seen Cianna Sales Rep 3's replacement sales representative.

106.     According to the account in the Securities Action of the confidential witness referred to as "Merit's Southeast Regional VP of Sales,"[19] it was a "really big deal" when the Cianna West Coast sales representatives quit Merit shortly after the acquisition.  Merit's Southeast Regional VP of Sales explained that these individuals were tenured sales representatives and had great relationships with Cianna accounts, who they introduced to the SCOUT technology.  Merit's Southeast Regional VP of Sales further explained that their departures were expected to have, and

---

[19]     "Merit's Southeast Regional VP of Sales" is described in the Securities Action as having served as a Regional Vice President of Sales at Merit from February 2019 until February 2020 in the Southeast region.  It is alleged that Merit's Southeast Regional VP of Sales managed sales representatives that sold Cianna's products in 14 states within the Southeast region.

did have, a significant impact on sales of Cianna products going forward.  Merit's Southeast Regional VP of Sales is quoted in the Securities Action as follows: "***Everyone knew, we lost a significant percentage of our sales force in the West, so there was going to be drop off in revenue…[w]hen these sales reps left, they created a significant ripple effect in terms of a drop off in revenue***."

107.    According to the Securities Action, Merit's Southeast Regional VP of Sales explained that the drop off in revenue caused by the West Coast sales representatives' departures was clearly visible, including in the Company's regional sales figures.  Merit's Southeast Regional VP of Sales is alleged to have further explained that Merit's sales leadership received weekly, monthly, and quarterly sales figures, which were sent by email to the sales leadership and were also available on the Company's Domo software system as described in more detail below. According to Merit's Southeast Regional VP of Sales, these sales figures were broken out by sales region, and after the Cianna sales representatives in the West coast region quit, there was a significant decline in the sales numbers for the Western region, as reflected in these weekly, monthly, and quarterly sales reports.  Merit's Southeast Regional VP of Sales further confirmed that defendant F. Lampropoulos had access to these sales numbers via Domo, which reflected the decrease in sales in the West Coast region.

108.    Merit's Southeast Regional VP of Sales is further alleged to have explained that the sales numbers in the West Coast Region -- which was one of the higher performing regions in 2018 -- were down by at least ***25% to 30%*** the entire time Merit's Southeast Regional VP of Sales was with the Company in 2019 because of the sales force departures in the Western region.  Merit's Southeast Regional VP of Sales is quoted as saying, "this was a significant decline which they

50

never recovered from." According to Merit's Southeast Regional VP of Sales, in stark contrast to its sales performance pre-acquisition, the West Coast region was recording *the least sales of all of Merit's sales regions* after the acquisition in 2019.

109. The Securities Action alleged that the West Coast's Regional VP of Sales, Mr. Vinger, openly recognized and discussed with his colleagues the crippling impact of these top performers' departures on the Company's sales. Merit's Southeast Regional VP of Sales allegedly discussed the impact of these critical departures with Mr. Vinger shortly after they occurred, and Mr. Vinger told Merit's Southeast Regional VP of Sales that Merit was "going to get killed" by the departures of these core salespeople in the West Coast. It is further alleged that during subsequent meetings and tradeshows that they attended together, Mr. Vinger told Merit's Southeast Regional VP of Sales that these departures adversely affected the West Coast region's sales numbers.

110. The Securities Action alleges that Merit's Southeast Regional VP of Sales further recounted how each regional sales leader provided a regional sales report during quarterly "close-out" meetings in advance of Merit's quarterly investor calls. According to Merit's Southeast Regional VP of Sales, during these close-out meetings, the West Coast's regional sales leader reported the Company's very soft sales numbers in the Western region. It is further alleged that defendant J. Lampropoulos, Merit's then-Executive Vice President of Sales, Marketing & Strategy and the son of defendant F. Lampropoulos, attended the close-out meeting for the first quarter of 2019, and that both F. Lampropoulos and J. Lampropoulos attended the close-out meeting for the second quarter of 2019 in advance of the Company's quarterly investor call. Thus, both F. Lampropoulos and J. Lampropoulos were informed of the poor sales in the Western region shortly

before the Company's earnings calls for both the first and second quarters of 2019.

111.    Confidential witnesses described as former Cianna and Merit employees have explained in the Securities Action that defendant F. Lampropoulos' public statements about the Cianna sales force were false and misleading.   When told of F. Lampropoulos' public representations in February 2019 and April 2019 that Merit maintained the Cianna sales force, Cianna Sales Rep 3 is quoted in the Securities Action as follows: "It's false to say [that]."

## 2.    Merit Struggled to Integrate Cianna, Which Remained Unintegrated Beyond the First Quarter of 2019

112.    During the Relevant Period, defendant F. Lampropoulos not only falsely represented that Cianna's sales force remained intact; he also falsely claimed that Cianna's integration was proceeding successfully and was complete by the end of the first quarter of 2019. According to the Securities Action, multiple former Merit employees have recounted that the integration efforts were an unmitigated disaster and far from complete by the first quarter of 2019. Indeed, they were not even complete by October 30, 2019, as the Individual Defendants would later concede.

113.    The Securities Action alleges that the confidential witness referred to as "Cianna's VP of Marketing" was identified by Cianna on its website as a member of its leadership team and was one of three Cianna executives responsible for the integration process following the acquisition.[20]  It is alleged that Cianna's VP of Marketing attended meetings with F. Lampropoulos

---

[20]    "Cianna's VP of Marketing" is described in the Securities Action as having worked for Cianna from July 2013 until November 2018, and then for Merit until August 2019.  It is alleged that Cianna's VP of Marketing was responsible for developing and executing the launch of the SCOUT Radar Localization System, and has over 25 years of medical device marketing experience.

and other Merit executives during the due diligence phase prior to the acquisition in December 2018, and that during these meetings all of Cianna's separate systems were discussed.

114.    Contrary to defendant F. Lampropoulos' April 23, 2019 public claim that the transition was "complete" by the end of the first quarter of 2019, according to the account of Cianna's VP of Marketing, *Merit had not completed 50% of the items planned for integration by that time*.  Indeed, in addition to failing to integrate the sales force, as discussed above, Cianna's Clinical Account Manager confirmed that Merit wanted, but failed, to integrate a number of key aspects of Cianna, including Cianna's most important systems and platforms, including its customer relationship management platform, marketing platform, and meeting planner.

115.    *The Individual Defendants failed to integrate Cianna's CRM platform*. Companies that sell medical products, such as Merit and Cianna, maintain customer relationship management platforms ("CRMs").  These platforms are central to medical product companies' operations, as they contain the core customer information and sales data necessary to analyze performance and trends.  The Individual Defendants recognized the importance of these critical systems, stating in Merit's SEC filings that the integration process entailed integrating the acquired companies' "information management systems."   In Merit's SEC filings and elsewhere, the Individual Defendants repeatedly represented that Merit was, in fact, integrating acquired companies' "processes" and "technology."

116.    Cianna's Vice President of Marketing has explained in the Securities Action that Cianna's CRM was highly sophisticated and designed to track everything that occurred within Cianna's accounts, including who customers were, who the decisionmakers were at the accounts, what the sales process was for the accounts, and where Cianna was within the sales process on the

accounts.   According to the account of Cianna's Vice President of Marketing, Cianna's CRM included information about current and anticipated future sales and tracked sales opportunities for 6 to 12 months in the future.   Cianna's Vice President of Marketing is alleged to have noted that Cianna's CRM generated analyses of downturns in sales by region, providing comparisons of previous quarters to the current quarter by region.   Cianna's Clinical Account Manager is further alleged to have explained that the Cianna CRM additionally contained sales forecasting information and contracts with customers.

117.   The Individual Defendants understood early in the due diligence process for the Cianna acquisition that Cianna and Merit had two separate CRMs that would need to be integrated. The Securities Action alleges that Cianna's VP of Marketing presented directly to defendant F. Lampropoulos and his fellow Merit executives during up-front meetings in the third quarter of 2018, in advance of the acquisition.   According to the Securities Action, Cianna's VP of Marketing explained that all of Cianna's systems were discussed during these meetings, and it was specifically discussed during these meetings that Merit operated using a different CRM system than Cianna. Cianna's VP of Marketing further explained that F. Lampropoulos "was an active participant in these [up-front] meetings," all of which he attended, and was deeply involved in the operational details.   It is alleged that during these meetings, Cianna's sales, marketing, and R&D groups all presented their organizations to F. Lampropoulos, including in PowerPoint presentations.   Cianna's VP of Marketing is alleged to have specifically recalled personally presenting at one such meeting in November 2018, during which there was a discussion regarding how Cianna operated from a sales and marketing perspective.

118.   The Individual Defendants understood and stated publicly that integrating

Cianna's information systems, such as its CRM, was a necessary part of the integration, and that a failure to fully complete the integration would adversely impact Merit. For example, the Company's 2018 Annual Report on 10-K filed with the SEC on March 1, 2019 (the "2018 10-K"), which was signed by defendants F. Lampropoulos, Parra, A.S. Anderson, J. Anderson, Gunderson, and Millner,[21] stated that "[a]s we grow through acquisitions, we face the additional challenges of integrating the . . . information management systems . . . of the acquired entity with our own." The Individual Defendants' failure to integrate the two companies' platforms would result in needless expenses and inefficiencies and prevent the Company from realizing anticipated synergies from the acquisition. As Cianna's VP of Marketing explained in the Securities Action, "Merit Medical was paying for two separate CRM platforms, and that is not very efficient."

119.    The Securities Action alleges, according to the accounts of former senior employees of Merit, that the integration of the two companies' platforms was not complete by April 23, 2019, notwithstanding defendant F. Lampropoulos' public claim on that date that the Cianna integration was "complete," and, in fact, that the integration was not complete even by October 30, 2019. According to the account of Cianna's VP of Marketing, the plan was to integrate the two companies' CRMs after the acquisition. But the two platforms were not integrated as planned, and former Cianna employees were still operating from (and Merit was still paying for) a separate CRM platform as of at least June 2019, with Cianna using a Salesforce platform and Merit using a Microsoft Dynamics platform to operate their respective CRMs.

120.    The attempt in early 2019 to integrate the two CRMs failed miserably. In the

---

[21]    Defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, and Millner comprise a majority of the current members of Merit's Board.

Securities Action, Cianna's Clinical Account Manager provided an account of the failed efforts in early 2019 to integrate the companies' CRMs.   Cianna's Clinical Account Manager is alleged to have explained that after Merit's January 2019 sales meeting the two companies tried to merge the data from their respective CRMs, but when the integration was attempted it became a jumbled mess, resulting in incorrect account numbers and addresses listed for Cianna accounts. As a result, previously ordered products for long-time Cianna customers were sent to the wrong locations. This, according to Cianna's Clinical Account Manager, caused customers to become upset because they had scheduled surgeries and did not receive their equipment due to errors caused by the failed attempt to integrate the two CRMs.  Cianna's Clinical Account Manager is further alleged to have stated that Merit and Cianna employees were still using separate CRMs by the time Cianna's Clinical Account Manager left Merit in October 2019.  According to Cianna's Clinical Account Manager, Cianna remained "on its own island" and its operations were "not integrated" with the rest of Merit Medical.

121.   ***The Individual Defendants also failed to integrate Cianna's marketing platform***.  In the medical device industry, marketing platforms are a critical component of a company's operations given the level of competition, the complexity of products, and the pace of innovation.  These platforms aid medical device companies in creating marketing materials to increase visibility and, by extension, sales.  According to the account in the Securities Action of Cianna's VP of Marketing, prior to the acquisition, Merit and Cianna used two different marketing platforms.  Cianna's VP of Marketing explained that Merit planned on integrating Cianna's marketing platform into its own after the acquisition.

122.   Prior to the Cianna acquisition, the Securities Action alleges that Cianna utilized

a marketing platform known as "Showpad," and Cianna's VP of Marketing explained that this marketing platform contained information about Cianna's marketing and pricing of its products. This description was corroborated by the account of Cianna's VP of Sales, who added that all of Cianna's strategy information and marketing materials were stored in its marketing platform. Merit did not use Showpad, but instead utilized a different marketing platform.

123.     According to the account of Cianna's VP of Marketing, Merit planned on integrating Cianna's marketing platform into its own after the acquisition, but those efforts stalled and Merit ultimately failed to integrate the two companies' marketing platforms.  Cianna and Merit continued to use two separate and unintegrated marketing platforms in June 2019 -- *i.e.*, well after defendant F. Lampropoulos' public representations on that date that the integration was "complete."  The confidential witness referred to as "Merit's Senior Marketing Event Manager"[22] similarly confirmed that Merit failed to integrate Cianna's marketing platform by the second quarter of 2019, and that the marketing platforms remained unintegrated as of Merit's Senior Marketing Event Manager's departure from the Company in July 2019.

124.     ***The Individual Defendants also failed to integrate Cianna's medical meeting planner***.  Medical device companies regularly attend medical conventions and meetings to promote their products.  In Merit's SEC filings, including the 2018 10-K filed on March 1, 2019

---

[22]     "Merit's Senior Marketing Event Manager" is described in the Securities Action as having worked for Merit in different roles for over 20 years.  It is alleged that starting in August 2015, Merit's Senior Marketing Event Manager became a Marketing Communications Specialist, and then a Senior Business Analyst in Executive Sales Support, before becoming Senior Marketing Communications Manager in May 2017 and holding that role until July 2019.  Merit's Senior Marketing Event Manager is described as having been responsible for marketing the ClariVein product line and coordinating with executives and other groups for all of Merit's 75-80 annual U.S. trade shows.

and signed by defendants F. Lampropoulos, Parra, A.S. Anderson, J. Anderson, Gunderson, and Millner, the Individual Defendants specifically represented that "[a]s part of our product sales and marketing efforts, we attend major medical conventions throughout the world." Cianna likewise attended and relied upon medical meetings as part of its marketing and sales efforts. In the Securities Action, Cianna's VP of Marketing explained that Cianna attended more medical meetings than Merit.

125.    To facilitate these marketing efforts, medical device companies utilize medical meeting planners, which are important tools to manage the medical conferences in which the companies participate. According to the Securities Action, Cianna's VP of Marketing explained that Merit planned, but failed, to integrate Cianna's medical meeting planner with its own. Cianna's VP of Marketing stated that Merit hired a medical meeting planner consultant in April or May of 2019 to help with this intended integration, and that Cianna's VP of Marketing discussed the intended integration of the meeting planner with defendant J. Lampropoulos during the first quarter of 2019. However, as Cianna's VP of Marketing further explained, the integration efforts fizzled out by June 2019, and Merit and Cianna employees continued to operate with two, separate and unintegrated meeting planners.

126.    ***The Individual Defendants also failed to integrate Cianna's sales force***. As described in detail above, the most critical part of the Cianna integration was that of its sales force. Despite the Individual Defendants' repeated public representations that Cianna's "entire" sales force would be integrated and maintained, in truth, Merit failed to do so. Cianna's top salespeople, who were responsible for nearly 25% of Cianna's annual revenue, all left Cianna shortly after the acquisition closed, resulting in poor financial results for Cianna in 2019.

127.    In touting the "completed" Cianna integration, the Individual Defendants failed to disclose any of these integration failures.  As discussed below, when the truth eventually emerged, Merit's stock plummeted.

### 3. As the Individual Defendants Ultimately Were Forced to Admit, Merit Had *Zero* ClariVein Orders During the Entire First Half of 2019 Due to Pre-Existing Reimbursement and Regulatory Roadblocks

128.    During the Relevant Period, the Individual Defendants also hid the true facts about the Company's other major acquisition, Vascular Insights' ClariVein.  The Individual Defendants touted the acquisition, representing that ClariVein addressed a $700 million market and would singlehandedly generate $10 million to $11 million in additional revenues for Merit in the first year following the acquisition.  As Merit marched through the first half of 2019, the Individual Defendants continued to create the public impression that nothing had changed in that assessment, representing that based on their experience tracking the performance of ClariVein for several months, their "confidence [was] built there." As the Relevant Period progressed, the Individual Defendants continued touting Vascular Insights' integration into Merit, which supposedly "continued to drive growth" and the purported "strong sales" of Merit's stand-alone products, including ClariVein.

129.    Unbeknownst to the public at the time, but well known to the Individual Defendants, was that these statements were false and misleading.  The efforts at Merit to sell the "blockbuster" ClariVein product were a disaster from the outset, ***with Merit incredibly not completing even a single order during the entire first half of 2019***.  As defendant F. Lampropoulos would eventually be forced to admit in late 2019, "***we haven't had an order [for ClariVein] all year***" -- an admission that sent Merit's stock price tumbling by ***30%*** in a single day.

130.    It is reasonable to infer that the fact that Merit did not have a single order for ClariVein during the entire first half of 2019 was obviously well-known at the highest levels of the Company, including the Board level, given that Merit had just paid *$60 million* to acquire the product.  Moreover, in the Securities Action, multiple high-level former Merit employees have described how, among other top Company insiders, defendants F. Lampropoulos and Parra had instantaneous and constant access to ClariVein's sales information.

131.    According to the Securities Action, detailed sales information for ClariVein was displayed in real-time on large screen televisions that hung directly outside of defendants F. Lampropoulos' and Parra's offices on the third floor of the Company's headquarters.  In the Securities Action, several former employees described these screens, which live streamed sales data, in meticulous detail.  The confidential witness referred to as "Merit's Vice President of Business Continuity,"[23] who is alleged to have reported directly to F. Lampropoulos and to have had an office on the same floor, explained that one of the screens was 60 inches by 60 inches and was mounted to the wall just outside and to the right of F. Lampropoulos' office, and streamed daily sales reports for Merit's different product lines.  According to the account of Merit's Senior Marketing Event Manager, who is alleged to have seen F. Lampropolous every day and had an

---

[23]    "Merit's Vice President of Business Continuity" is described in the Securities Action as having joined Merit in July 2016 after Merit acquired DFINE, where Merit's Vice President of Business Continuity had worked as a Corporate Compliance Officer since October 2011. According to the Securities Action, because Merit's Vice President of Business Continuity came so highly recommended by DFINE and had so much compliance experience, defendant F. Lampropoulos created Merit's Vice President of Business Continuity's new position and title. Merit's Vice President of Business Continuity was responsible for creating Merit's Compliance department with processes to ensure compliance with federal healthcare laws and regulations, and stayed with Merit until September 2019.

office on the same floor during their tenure at Merit, the screen constantly streamed daily sales information for each of the Company's products, broken down by daily, monthly, and quarterly numbers.  According to the account of "Merit's Senior Product Manager,"[24] who the Securities Action alleges to have participated in weekly meetings and sometimes twice-a-week meetings in F. Lampropoulos' office, there was a screen positioned directly outside of F. Lampropoulos' office showing the daily orders that came in, including revenue and what was sold.  The Securities Action alleges that these screens contained rolling charts that would show the sales for each product's stock keeping units ("SKUs"), as well as what products had orders for the day, the daily sales for each individual SKU, what products were shipped out, the quantity of material shipped out, the amount of any backorders, and the names of sales force leaders.

132.    The Securities Action alleged that defendant F. Lampropoulos regularly reviewed the data displayed on the screen immediately outside his office.  According to "Merit's Project Manager,"[25] for example, defendant F. Lampropoulos looked at the screen, which showed product-line level information, every time he exited his office.  Merit's Senior Marketing Event Manager further reported that there was a similar, second screen displaying the same information in front of defendant Parra's office.  According to the account of Merit's Project Manager, defendant Parra, just like defendant F. Lampropoulos, could see the sales information on the screens each time he

[24]    "Merit's Senior Product Manager" is described in the Securities Action as having worked for Merit from February 2018 to July 2018 and having been responsible for managing Merit's microcatheter and guide wire portfolio.  It is further alleged that Merit's Senior Product Manager was also responsible for product development and for keeping existing product afloat.
[25]    "Merit's Project Manager" is described as having worked for Merit from December 2016 until August 2019 as a liaison between R&D and production, which included helping to manage issues in the product coming out of certain facilities.

exited his office.

133.    The Securities Action alleges that Merit used an integrated sales reporting software system called Domo that was accessible on demand by Merit's employees, including defendants F. Lampropoulos, Parra, and other members of senior management. According to the account of the confidential witness referred to as "Merit's Strategic Accounts Contract Manager,"[26] Domo tracked and stored all of the sales and order data for each of Merit's products on an up-to-date basis. Merit's Strategic Accounts Contract Manager is alleged to have explained that, among other things, Domo tracked when orders were placed, by which customer, and for how much. Merit's Strategic Accounts Contract Manager further described that the Domo user could pull a report for the month for a particular account and see the product sales for that month, and that this centralized database is where most Merit business analysts and executives went to find out about sales. According to the account of Merit's Strategic Accounts Contract Manager, F. Lampropoulos and Parra each had full access to Domo and requested data from Domo frequently.

134.    In the Securities Action, multiple confidential witnesses have recounted how, in addition to viewing the sales and order data streamed on these screens, F. Lampropoulos had available and constantly reviewed the same information on his mobile phone. According to the account of Merit's Project Manager, the same information that was displayed on the screen outside F. Lampropoulos' office was also contained on his mobile phone, and during meetings F.

---

[26]    "Merit's Strategic Accounts Contract Manager" is described as having worked for Merit from August 2016 until May 2019 and having been responsible for handing all of Merit's contracts for ClariVein sales for major organizations and purchasing groups. It is further alleged that part of Merit's Strategic Accounts Contract Manager's job was to keep product pricing in line with Company standards. The Securities Action alleges that Merit's Strategic Accounts Contract Manager interacted with defendant F. Lampropoulos frequently.

Lampropoulos looked at his phone for this information and then talked about individual product sales.  According to the account of Merit's Senior Marketing Event Manager, who is alleged to have seen F. Lampropoulos every day at work and to have known him for over 30 years, F. Lampropoulos was "hooked on the sales system that they use."

135.     It is alleged in the Securities Action that, in addition to the ability to access ClariVein's sales and order information at all times, defendants F. Lampropoulos and other top Company insiders also received regular reports with this same information, including an email at the end of each day with daily sales numbers.  According to the account of Merit's Senior Marketing Event Manager, an email detailing the daily sales numbers tracked by the Company's sales reporting system was sent to the Company's top executives, including F. Lampropoulos, at the end of every day with a link to get more detailed information on specific product reporting.  In other words, throughout the Relevant Period, F. Lampropoulos and other top executives were informed on a ***daily basis*** that the Company had not booked ***any*** new orders of ClariVein.

136.     Moreover, defendants F. Lampropoulos and Parra also are alleged to have asked for and received additional, constantly updated periodic reports with quarter-over-quarter and year-over-year information synthesized from Domo.  The Securities Action alleges that Merit's business analyst team would run these reports with regularity and send them to executives.  According to the account of Merit's Strategic Accounts Contract Manager, the executives' requests for periodic reports on sales were "constant" and F. Lampropoulos regularly had the business analysts up in his office to produce them for him.

137.     Based on this steady stream of information, Merit's inability to sell ClariVein following the acquisition was known at the highest levels of the Company.  According to the

account of Merit's Senior Marketing Event Manager, who is alleged to have served on the marketing team for ClariVein, there were constant discussions about the need to sell more ClariVein. Merit's Senior Marketing Event Manager is alleged to have recounted that the status of sales of ClariVein product resulted in an "Oh My God" issue at Merit during the first quarter of 2019, and that first quarter sales of ClariVein were being tracked in order to figure out why sales were not increasing. According to the account of Merit's Senior Marketing Event Manager, there were constant discussions about having to sell ClariVein, such that Merit's Senior Marketing Event Manager is quoted saying that "it was pretty much every single day" discussions. The Securities Action alleges that when asked about sales of ClariVein during the first two quarters of 2019, the confidential witness referred to as "Vascular Insights National Account Manager" also described them as "disastrous."[27]

138.     The Securities Action alleges that F. Lampropoulos' obsession with products' sales numbers was no secret. Merit's VP of Business Continuity is quoted as stating that F. Lampropoulos "knew everything about sales" and was "aware every day of how sales were going." According to the account of Merit's Senior Marketing Event Manager, in fact, it was well-known within the Company that F. Lampropoulos, specifically, logged into Domo several times a day. F. Lampropoulos even touted his contemporaneous knowledge of the Company's sales during

---

[27]     "Vascular Insights National Account Manager" is described in the Securities Action as having worked as a former National Account Manager, Market Access for Vascular Insights from September 2016 until it was acquired by Merit in December 2018. It is alleged that Vascular Insights National Account Manager then worked for Merit until October 2019, and was responsible for working on reimbursements for the ClariVein product. It is further alleged that part of Vascular Insights National Account Manager's job responsibilities included accompanying sales representatives in the field to ensure that they understood how reimbursement worked, and that Vascular Insights National Account Manager has over 30 years of experience working in the pharmaceutical and medical device industry.

investor conference calls, for example, stating on April 23, 2019 that he had talked to "2 or 3 or 4 of our salespeople every day."

139.    In addition to knowing, but failing to disclose, the absence of ClariVein orders during the first half of 2019, the Individual Defendants also knew or should have known of the undisclosed roadblocks preventing meaningful sales of ClariVein, including that: (i) insurance companies consistently refused to provide reimbursement for ClariVein; and (ii) Merit was restricted by federal regulations from marketing ClariVein for its intended purpose of treating varicose veins.  But instead of disclosing these highly material facts, the Individual Defendants continuously concealed them.  Even when they were finally forced to disclose in late July 2019 that there were zero ClariVein orders in the entire first half of 2019, the Individual Defendants continued to conceal the true reasons for the lack of orders by citing false reasons, claiming that a "short-term" issue of "pipeline filling" -- *i.e*., excess prior orders, was the cause.

140.    ***Insurance companies were consistently denying reimbursement requests for ClariVein***.  Merit and Vascular Insights followed a "buy and bill" model for the ClariVein product, whereby physicians first purchased ClariVein directly from Vascular Insights (and after the acquisition Merit) and then, after using it with a patient, sought reimbursement under a patient's health insurance policy. Insurance payors, commercial and federal programs alike, were free to determine for themselves whether they would provide reimbursement. When insurance payors denied claims, physicians were not reimbursed, and the physicians lost money.

141.    Unbeknownst to the public, nearly every insurance payor was denying reimbursement coverage for ClariVein, which prevented meaningful new orders.  In the Securities Action, former Vascular Insights employees described how ***insurance carriers were denying a***

*remarkable 80% of physicians' reimbursement claims submitted for ClariVein* and how, by October 2018, shortly before the acquisition, less than 5% of ClariVein sales were covered for reimbursement under any commercial insurance policy. These reimbursement denials, which interfered with orders of ClariVein throughout the Relevant Period, are alleged in the Securities Action to have been well-known and documented by Vascular Insights and Merit employees.

142.    In the Securities Action, the accounts of several Vascular Insights professionals detailed how the vast majority of insurance payors denied reimbursement claims for ClariVein. According to the account of the confidential witness referred to as "VI Area Manager,"[28] about 80% of reimbursement claims for ClariVein were being denied as outside of insurance coverage. VI Area Manager is quoted as stating that "every single commercial payor, with the exception of a couple of random one offs, had ClariVein as investigative or experimental on their policy" and, thus, would be automatically denied for coverage.  It is further alleged that the confidential witness referred to as "VI Territory Manager"[29] confirmed that commercial insurance carriers were not covering the use of ClariVein in VI Territory Managers' territory.   According to the account of VI Area Manager, the major carriers that denied coverage included Tricare, Tricare Prime, Aetna,

---

[28]    "VI Area Manager" is described in the Securities Action as having worked as an Area Manager at Vascular Insights in the Mid-Atlantic region from February 2014 to October 2018 and having been personally responsible for submitting explanations of benefits ("EOBs") showing that Medicare was denying claims for coverage of ClariVein.  It is alleged that VI Area Manager has vast experience in navigating reimbursement challenges with both Medicare and commercial insurance payors for peripheral interventional medical devices and has over a decade of experience selling medical devices.

[29]    "VI Territory Manager" is described in the Securities Action as having worked as a Territory Manager at Vascular Insights from October 2016 until the acquisition, and then for Merit until December 2019.  It is alleged that VI Territory Manager was responsible for selling ClariVein as well as several legacy Merit medical supplies.

Humana, UnitedHealthcare, and Blue Cross. VI Area Manager further explained that no national insurance policies covered the product, physicians got tired of dealing with the reimbursement issues, and Vascular Insights saw its sales go down. By the time VI Area Manager left Vascular Insights in October 2018, the situation was so dire that less than 5% of ClariVein's sales were provided reimbursement coverage under any commercial insurance policy nationwide. The Securities Action alleges that VI Area Manager has explained knowledge of these facts through VI Area Manager's experience, attendance at sales meetings, weekly conference calls with the Vice President of Sales and the other sales representatives, and through discussions with sales representatives who VI Area Manager spoke with regularly and who knew what reimbursement requests were getting approved and denied.

143.    In the Securities Action, the VI Area Manager has explained that Vascular Insight's sales representatives were tasked in or about early 2018 with compiling EOBs from physicians. EOBs are statements sent by health insurance companies to physicians explaining what medical treatments and services were (or were not) covered by the insurance company. The Securities Action alleges that a total of approximately 100 EOBs were obtained, and they came from all types of insurance plans. It is alleged that the VI Area Manager explained that 80% of the EOBs received reflected a denial of coverage because ClariVein was outside of the insurance policy's coverage.

144.    Coverage was equally as dismal for federal coverage programs. According to the account of the VI Area Manager in the Securities Action, almost every single one of the Medicare Advantage Plans was denying coverage for ClariVein. Further, the confidential witness referred

to as "VI Sales VP"[30] is alleged to have noted that Novitas Solutions, Inc. ("Novitas"),[31] the biggest Medicare Administrator Contractor, stopped providing reimbursement for ClariVein in the second quarter of 2017.  This was a substantial blow to ClariVein because 30% to 45% of prior ClariVein sales had been from Novitas before it stopped providing reimbursement.  According to the account of VI Sales VP, Novitas' denial of reimbursement coverage put ClariVein at a substantial disadvantage to its competitors (including Medtronic) because, in the medical device industry, there was a limited window for a company to prove a product's value and worth, and ClariVein's window had closed.

145.    The Securities Action alleges that the widespread denial of reimbursement by both private and government health insurance doomed all efforts at Merit to meaningfully generate new ClariVein orders.  According to the account of VI Sales VP, beginning in the second quarter of 2017, sales of ClariVein markedly declined due to a lack of reimbursement. Doctors and hospitals became increasing reluctant to purchase ClariVein due to legitimate fears that they would not be reimbursed.  It is alleged that VI Sales VP explained that ClariVein quarterly sales dropped by 50% in the second quarter of 2017 (from $4 million to $2 million), and then continued to decline

---

[30]    "VI Sales VP" is described in the Securities Action as having served as Vice President of Sales, U.S. at Vascular Insights and having led Vascular Insights' U.S. sales team from 2014 until being let go when Merit purchased the company in 2018.  It is alleged that while at Vascular Insights, VI Sales VP oversaw the sales team and had direct reports including the two area directors that covered the east and west halves of the country and managed all of the sales representatives in the field.  VI Sales VP is alleged to have over 25 years of experience in sales and commercials leadership in the medical arena for both mature and start up organizations.

[31]    Novitas is an administrative services processing company for government-sponsored health care programs on behalf of the federal government.  It has two jurisdictions.  Novitas' Jurisdiction L spans Delaware, Maryland, New Jersey, Pennsylvania, and the Washington, D.C. Metro Area.  Novitas' Jurisdiction H spans Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, Texas, and includes Indian Health Service ("HIS") and Veterans Affairs ("VA") nationally.

further.  VI Area Manager allegedly wrote to Jay Agee (Vascular Insight's National Sales Director) in an email dated July 20, 2018, "*we have missed our team quota by a significant amount every single month, we have consistently come in under 70% to plan*."  Consistent with the account regarding this email, the Securities Action alleges that VI Area Manager confirmed that sales of ClariVein were declining in 2018.  According to the account of VI Sales VP, a lack of reimbursement was the biggest obstacle to ClariVein's sales, with doctors stating that they were not re-ordering product because of the reimbursement denials.

146.   The Securities Action alleges that following the acquisition, numerous Vascular Insights employees who joined Merit also told their new colleagues at Merit about the industrywide reimbursement barrier to selling ClariVein.  For example, VI Territory Manager is alleged to have given a presentation to Merit's entire sales team at a National Sales Conference in January 2019, attended by Merit's management group.  VI Territory Manager -- who is alleged to have explained that the reimbursement difficulties persisted from 2017 throughout VI Territory Manager's entire time at Merit, which ended in December 2019 -- stated that the January 2019 presentation detailed the "good, bad, and the ugly" about ClariVein.  VI Territory Manager is quoted as having explained that "*the ugly was the reimbursement*" and that VI Territory Manager "told them about reimbursement issues right out of the gate."  The Securities Action alleges that VI Territory Manager bluntly described the reimbursement issues, stating that "*we don't have any commercial insurance covering us*."  According to the account of VI Territory Manager, Lance Thrash ("Mr. Thrash"),[32] who was responsible for reimbursement of Vascular Insights' products

---

[32]   The Securities Action alleges that Mr. Thrash went on to be Merit's Senior Director of Healthcare Economics and Reimbursement from December 2018 to July 2019, and then Vice President of Healthcare Economics and Reimbursement from July 2019 to February 2020.

both before and after the acquisition, also gave a presentation on reimbursement at the same January National Sales Conference in 2019. The Securities Action alleges that VI National Account Manager recalled Mr. Thrash's presentation and confirmed that Mr. Thrash was clear that commercial reimbursement was spotty and that Mr. Thrash did not "candy-coat anything" when discussing reimbursements.

147. The Securities Action alleges that the reimbursement struggles were so substantial that even Cianna's VP of Sales learned about them. According to the account of Cianna's VP of Sales, ClariVein's reimbursement challenges were discussed by a Franchise Vice President[33] during an April 2019 director's meeting held in Richmond, Virginia to discuss Merit's performance in the first quarter of 2019 -- a meeting that was attended by the regional sales directors and defendant J. Lampropoulos.[34]

148. The Securities Action alleges that Merit was also advised of the reimbursement issues plaguing ClariVein by Vascular Insights employees. According to the Securities Action, between December 2018 and February 2019, VI Area Manager informed multiple Merit sales representatives about these very issues when they reached out to VI Area Manager to ask questions, in response to which VI Area Manager explained to them the reimbursement issues and the denials from insurance carriers, such as Tricare. VI Area Manager allegedly explained that Merit sales representatives, including a Merit sales representative who worked in Richmond, Virginia, reached

---

[33]     Upon information and belief, the "Franchise Vice President" referred to in the Securities Action is Will Irby ("Irby").   https://www.merit.com/wp-content/uploads/2020/07/SCOUT-Report-2019-February-Seasoned-Leader-Appointed-to-Guide.pdf.   It is alleged in the Securities Action that Merit's Southeast Regional VP of Sales reported to Mr. Irby.

[34]     According to the Securities Action, Cianna's VP of Sales believes that the meeting occurred during the first three weeks of April 2019.

out to VI Area Manager in December 2018 to discuss the ClariVein product.  The Securities Action alleges that in a written exchange with the Merit sales representative on December 17, 2018, VI Area Manager specifically told the Merit sales representative that ClariVein was not covered by the national commercial plans, with "*nothing National like BCBS [Blue Cross Blue Shield], UHC [United Health Care], Cigna, etc*."  It is alleged that VI Area Manager further explained to the Merit sales representative, who was tasked with selling ClariVein, that Medicare Advantage Plans also did not cover ClariVein, with VI Area Manager writing to the Merit sales representative that there was "*nonpayment on the [Medicare] advantage plans*" and further that it was these "*reimbursement [issues] that caused the company [Vascular Insights] to start a downward spiral*" before the acquisition.  The Securities Action alleges that VI Area Manager warned the Merit sales representative that the absence of reimbursement is "*gonna end up with a lot of pissed off doctors who have been told they have coverage, do the procedure then it get[s] denied! Trust me in this…[i]t cost us and it will cost y'all at some point*."

149.    Not surprisingly, these well-founded warnings proved accurate, with Merit completing *zero* orders for ClariVein in the first half of 2019.  The Securities Action alleges that the absence of orders was a cause of great concern within Merit's corporate headquarters.  According to the account of VI Territory Manager, "[t]hings started to turn pretty quick in the first quarter [of 2019].  They [Merit] were frustrated, and *I was trying to tell them that this is the real life, we don't have reimbursement here*."

150.    The reimbursement issues plaguing ClariVein were so severe and deep-rooted that immediately after the acquisition, Merit allegedly retained a lobbyist in an effort to get insurance plans to cover ClariVein reimbursement codes.  Per the account of Merit's Senior Marketing Event

Manager, these extraordinary lobbying efforts commenced by February 2019.  The Individual Defendants, however, hid the reimbursement problem from the public on February 26, 2019 -- when they touted the acquired product -- and would go on to do so throughout the Relevant Period, until they finally, shockingly disclosed that Merit had no orders for ClariVein during the entire first half of 2019.

151.     ***It was determined at Merit that the Company could not market ClariVein for treatment of varicose veins***.  ClariVein was developed and used to treat enlarged veins close to the surface of one's skin and typically found in the leg, called varicose veins. Prior to the acquisition, Vascular Insights marketed ClariVein as a minimally invasive treatment for varicose veins.  Immediately after the acquisition, however, it was determined internally at Merit that Vascular Insights' marketing efforts were inconsistent with ClariVein's FDA-approved indication, and thus there would be a need to revamp how Merit marketed the product in order to avoid breaking the law.

152.     According to the Securities Action, Merit's Senior Marketing Event Manager oversaw Merit's marketing efforts for ClariVein.  On or about December 14, 2018, Merit's Senior Marketing Event Manager was allegedly provided with the marketing materials used by Vascular Insights for purposes of updating and rebranding after the acquisition, and that by the second week of January 2019, Merit's Senior Marketing Event Manager was trying to get Merit's regulatory team to approve the marketing materials for ClariVein, now rebranded as a Merit product.  But, according to the account of Merit's Senior Marketing Event Manager, ***Merit's regulatory team refused to approve any marketing materials for ClariVein that mentioned anything about treating varicose veins***.  Merit's Senior Marketing Event Manager is alleged to have explained

that this posed a problem: the primary market for the products was vein treatment centers, and Merit's sales force was now expected to attempt to establish relationships with vein treatment centers without being able to explain that the product could be used to treat varicose veins.  As Merit's Senior Marketing Event Manager is alleged to have stated, walking into a vein center and trying to sell ClariVein without being able to explain that it could treat varicose veins just could not be done.

153.     The accounts of other confidential witnesses in the Securities Action corroborate the Senior Marketing Event Manager's account.  Per the account of the confidential witness referred to as "Merit's Senior Marketing Communications Manager,"[35] for example, Vascular Insights had been marketing the ClariVein product in ways that were inconsistent with the Instructions for Use ("IFU") prior to being acquired by Merit.  Merit's Senior Marketing Communications Manager is further alleged to have confirmed that, after Merit acquired Vascular Insights, Merit internally looked at how the ClariVein product could be marketed for its intended use, as Merit's regulatory team did not approve the marketing of ClariVein outside of its IFU. According to the account of Merit's Senior Marketing Communications Manager, the inability to market the ClariVein product the way that Merit wanted to limited sales representatives' ability to sell the product for its intended use.

154.     Merit's Senior Marketing Communications Manager is quoted in the Securities

---

[35]     "Merit's Senior Marketing Communications Manager" is described in the Securities Action as having worked at Merit from July 2018 until September 2019 and having been responsible for leading all U.S. marketing and communication initiatives for the Cardiac Interventions division of Merit Medical, including strategic planning and implementation of integrated marketing programs for new product launches, trade shows, physician training programs, and public relations.

Action as stating that "the level of frustration that [Merit's Senior Marketing Event Manager] was going through during that time was great. [Merit's Senior Marketing Event Manager] was trying to get that [*i.e.*, the marketing] set-up. The way they wanted to market it, they couldn't." Merit's Senior Marketing Communications Manager is further alleged to have stated that this issue was known at Merit by late December 2018 or early January 2019, and that Merit's Senior Marketing Communications Manager was rather shocked upon finding out about it. Merit's Senior Marketing Communications Manager is quoted as follows: "***I knew that they were unable to market the ClariVein the way they wanted to, which meant that their sales reps couldn't market it that way, which resulted in low sales***."

155.    The Securities Action alleges that top Merit insiders, including defendant F. Lampropoulos, were promptly advised that ClariVein could not be marketed for its intended purpose of treating varicose veins. According to the account of Merit's Senior Marketing Event Manager, defendant F. Lampropoulos met with, among others, Merit's Chief Regulatory Officer and the Vice President of Regulatory and Clinical Affairs at Merit, Lorraine Hanley, to discuss the issue. Merit's Senior Marketing Event Manager, who is described as having overseen Merit's marketing efforts for ClariVein, reported in the Securities Action that F. Lampropoulos knew it had been determined that Merit could not market ClariVein for its intended purpose (varicose veins) by February 2019 or March 2019. Remarkably, F. Lampropoulos again failed to disclose this critical information when publicly touting the supposedly successful integration and sales of Vascular Insights' ClariVein during the Relevant Period.

## G.    The Truth Begins to Emerge, Merit's Stock Price Plummets, and Analysts Disparage "Management Credibility"

156.    The truth began to emerge on July 25, 2019, when certain of the Individual

Defendants held an investor conference call after the close of trading.  During the call, defendant F. Lampropoulos stunningly disclosed that, contrary to the Individual Defendants' prior representations, Merit "***hasn't had an order all year***" for its ClariVein product acquired from Vascular Insights.  This revelation stood in stark contrast to the Individual Defendants' repeated assurances during the course of the year, including when F. Lampropoulos represented that Merit's standalone products, including ClariVein, were showing "strong sales" just three months earlier. Given these poor results, the Individual Defendants slashed the Company's 2019 revenue guidance by $2.5 million -- *i.e.*, by roughly the same amount of the $2.3 million shortfall in ClariVein revenue during the first half of 2019.

157.    The Individual Defendants also could no longer hide the fact that Cianna's sales force had not been kept intact.  In this regard, F. Lampropoulos revealed for the first time that Cianna's sales force was experiencing "attrition" and, as a result, certain "areas [of the country] didn't have attention" from Cianna sales representatives.

158.    In response to these shocking disclosures, Merit's stock price plummeted by over 25%, from a close of $54.85 per share on July 25, 2019 to close at $41 per share on July 26, 2019. This decline eliminated over $740 million in shareholder value in just one day.

159.    Analysts were stunned by the Individual Defendants' July 25, 2019 disclosures. Following the news, Piper Jaffray slashed its price target for Merit's stock by nearly 25%, calling the July 25, 2019 disclosures "surprising" and stating that the "biggest reason" for Merit's poor revenues "was slower than expected sales from Cianna and ClariVein."  Barrington similarly reported that "revenue associated with recent M&A" was the "primary driver" of Merit's second quarter revenue miss.  Canaccord proclaimed that Merit was now "in the doghouse" and the

"penalty box," and cut its price target for Merit's stock by nearly 20%.

160.     Despite their July 25, 2019 disclosures, the Individual Defendants continued to conceal the full truth in an effort to stave off an all-out freefall in Merit's stock price.  Although the Cianna salespeople responsible for nearly one-fourth of Cianna's sales had quit months earlier, defendant F. Lampropoulos falsely stated that there had been only "a little bit" and "not much" attrition among Cianna's sales force.  As explained above, this significant attrition caused sales in the critically important Western region to drop by 25% to 30%.  The Individual Defendants also continued to conceal the highly material fact that the Cianna integration was far from "complete," and that the attempted integration of the companies' systems was an abject failure.

161.     The Individual Defendants further failed to disclose the real reasons why Merit "ha[d]n't had an order all year" for its ClariVein product.  Rather than admit the truth -- *i.e.*, that doctors could not get reimbursed for the product and it had been determined that Merit could not market the product for its intended use – defendant F. Lampropoulos falsely attributed the absence of orders entirely to a purported "short-term" problem of "pipeline filling" by Vascular Insights' customers shortly before the acquisition.  According to F. Lampropoulos, this "pipeline filling" was the result of customers purchasing excess product before the acquisition due to "fear by the distributor that somehow they wouldn't be able to keep."  F. Lampropoulos further falsely represented that the Individual Defendants had overcome this purported issue, stating that the "thunderstorm has left" and ClariVein would still deliver blockbuster sales going forward as ClariVein sales were already purportedly "ramping to our expectations."  The Individual Defendants again reaffirmed that, as they had previously asserted on February 26, 2019 and April 23, 2019, Vascular Insights' revenues for 2019 would total $10 million to $11 million.

162.     The Individual Defendants' false and misleading statements helped stem the dramatic decline in Merit's stock price.  Following the July 25, 2019 investor conference call, securities analysts noted that F. Lampropoulos "stressed that the company is 'not changing our 2020 forecast.'"[36]   On July 26, 2019, analysts at Barrington reiterated their "Outperform" investment rating for Merit's stock, taking solace in the Individual Defendants' assurances that the absence of ClariVein orders "stems from some unusual order patterns prior to the company's closing of the deal that have resulted in some excess inventory among certain distributors of the products."   Based on the Individual Defendants' representations, Barrington concluded (incorrectly) that "the issues within the ClariVein business" are "short term and will be worked through reasonably quickly."   Likewise, the Barrington analysts credited the Individual Defendants' false assurances that the "Cianna revenue shortfall has more to do with timing than anything else."

### H.     October 30, 2019: The Individual Defendants Finally Disclose That Cianna and Vascular Insights Were Failed Acquisitions, Sending Merit Stock Plummeting

163.     On October 30, 2019, after having successfully concealed the full truth about the disappointing Cianna and ClariVein businesses, and with F. Lampropoulos' insider stock sales accomplished (as discussed below), the Individual Defendants finally revealed that the failed integrations were so far behind schedule, and revenues so low, that Merit would fall far short of previously issued guidance for 2019 and 2020.

164.     An investor conference call was held on October 30, 2019, after the close of

---

[36]     https://www.fool.com/investing/2019/07/26/why-merit-medical-systems-is-tanking-today.aspx

trading.  During the call, the Individual Defendants disclosed that, contrary to their prior statements that the Cianna integration was "complete" and ClariVein was "ramping up" to meet expectations, in fact, it was "[c]lear" that Cianna and Vascular Insights "***didn't perform the way we wanted to***" and, indeed, "it's taken a lot more time and we've had to learn some painful lessons" -- *i.e.*, the integrations "caught up with us" and the Individual Defendants could no longer hide the truth.  The Individual Defendants further disclosed that "Cianna and ClariVein fell behind by $4 million and $3 million, respectively" for the third quarter.  These results were the polar opposite of the Individual Defendants' representations in late July 2019 that Cianna and ClariVein would still deliver on previously issued guidance amid already "ramping" sales, and a direct result of the detrimental attrition that occurred in Cianna's key Western region.  Defendant F. Lampropoulos further admitted that the Company was "***nine or ten months behind where we thought it would be***" with ClariVein.  As Merit had only acquired Vascular Insights' assets ten months earlier, F. Lampropoulos effectively admitted that Merit had made no progress with ClariVein following the completion of the $60 million acquisition.

165.     As a result of the failed Cianna and Vascular Insights deals, the Individual Defendants: (i) slashed 2019 revenue guidance by approximately $27 million at the midpoint; (ii) cut revenue guidance for Merit's "non-core" products, which included ClariVein and Cianna, by approximately 20%; and (iii) withdrew entirely the previously issued guidance for 2020.  The Individual Defendants made clear that these reductions and withdrawals were due to the Cianna and Vascular Insights acquisitions, which were such monumental failures that they would continue to materially harm the Company going forward.

166.     Due to the failed Cianna and Vascular Insights integrations, the Individual

Defendants were forced to announce a complete reset in the Company's business model: "back to basics."  Defendant F. Lampropoulos announced that the "growth-by-acquisitions" strategy that had been vigorously advanced for years as the touchstone of the Company's growth would come to a halt.  In a surprising about-face, F. Lampropoulos explained that, going forward, the Company was "really slowing down" and "[n]ot trying to go out and do another deal." Given the Individual Defendants' October 30, 2019 disclosures, F. Lampropoulos later summarized during Merit's June 22, 2020 Annual Meeting of Shareholders that – far from the Individual Defendants' positive Relevant Period representations about the 2018 Cianna and ClariVein acquisitions -- "we all know that in 2019, we stubbed our toe.  Some will say *we fell on our face*."

167.    The Individual Defendants' stunning October 30, 2019 disclosures sent the Company's stock price plummeting.  Immediately following the disclosures, Merit's stock price tumbled 29% in a single trading day, falling from a closing price of $29.11 per share on October 30 to close at $20.66 per share on October 31, 2019, eliminating $452 million in shareholder value. All told, in just four short months, Merit stock lost more than 62% of its value as a direct result of the Individual Defendants' disclosures.

168.    Analysts were shocked by these disclosures, and specifically questioned management's credibility, with some even calling for the removal of senior management.  Analysts seized on the lagging Cianna and ClariVein acquisitions as the basis not only for Merit's poor overall third quarter results, but also for its forecast for the fourth quarter of 2019, commenting that Cianna and ClariVein were "the primary source of the shortfall"[37] and "lagging."[38] Analysts

---

[37]    Piper Jaffray, "Another Shoe Drops Here in Q3; Sticking with OW" (October 30, 2019).
[38]    Barrington Research, "Q3 Profitability Falls Well Short; Guidance Reduced Significantly – Again; Shares Likely to be Down Big; Reducing PT to $1 (from $59)" (October 31, 2019).

at Piper Jaffray, who had once touted Merit stock as a "must own," slashed their price target for the stock by 25%, from $40 to $30 per share.  Piper Jaffray noted that a "big part of [Merit's] reduced outlook is weak performance from two of the recent acquisitions [Cianna and Vascular Insights' ClariVein]," and singled out Merit's "weakness in the acquired products" as "the biggest disappointment" driving this change.  Piper Jaffray also called out "the light performance in Cianna" as particularly "frustrating."  Analysts at Barrington similarly reduced their price target for Merit's shares by 47%, stating that "the integration of recent transactions continues to plague near-term results at Merit" and that revenues from the "recent Cianna and Vascular Insights transactions continue to track well behind initial expectations."

169.    The Individual Defendants' October 30, 2019 disclosures were so striking, given their prior representations, that analysts specifically and explicitly questioned the credibility of Merit's management, including defendant F. Lampropoulos.  In an analyst report published after the Individual Defendants' July 25, 2019 disclosures, Piper Jaffray analysts observed that "***there is a management credibility issue priced into shares of MMSI at the moment***."  This challenge to management's credibility only intensified following the disclosure of Merit's third quarter results.  The Individual Defendants' October 30, 2019 disclosures were so shocking in light of their prior representations that securities analysts took the remarkable and unusual step of calling for the removal of Merit's top executives.  In an October 31, 2019 report titled "Here's Why Merit Medical Systems Stock Is Tumbling Today," analysts at the securities analysis website Motley Fool concluded: "***You probably don't want to try catching this falling knife until there have been some changes in the executive suite***."  An October 30, 2019 analyst report by Canaccord concluded that, if management were to stay on, "***[i]t will take a few years . . . for established***

*investors to trust this management team again*."

## VI.   THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

170.    During the Relevant Period, the Individual Defendants made a series of materially false and misleading statements.  In addition to the statements identified and discussed above, the Individual Defendants' materially false and misleading statements include the following:

### A.    February 2019 Investor Conference

171.    On February 26, 2019, the Individual Defendants provided an update on Merit's 2018 acquisitions of Cianna and Vascular Insights.  Defendants F. Lampropoulos and Parra led the Company's investor conference call, which was attended by investors and analysts covering the company, including Wells Fargo, SunTrust, Piper Jaffray, and Barrington, among others (the "February 2019 Investor Call").

172.    Defendant F. Lampropoulos began the February 2019 Investor Call by emphasizing the critical importance of the Cianna acquisition, which he noted was "the largest acquisition Merit has ever made."  F. Lampropoulos represented that the integration of Cianna was successfully proceeding as planned, explaining that "*we are very pleased with the transition*" and "*the integration I think is going as well as could be expected*."  When Piper Jaffray analyst Matthew Oliver O'Brien stated that "on Cianna, I would love to hear a little bit more about the integration there, sales force retention," Lampropoulos responded that "[o]n the Cianna business, *the integration…is going as well as could be expected*"; "*everything is working quite nicely*"; and "*we've managed this correctly*."

173.    These statements touting Merit's supposed successful integration of Cianna were materially false and misleading.  Once the Individual Defendants chose to tout Merit's integration

81

of Cianna, they were obligated (but failed) to disclose the adverse facts about their integration efforts.  As discussed herein, confidential witnesses in the Securities Action have recounted that 50% of the items planned for integration were not integrated, including Cianna's and Merit's customer relationship management platforms, marketing platforms, and meeting planners.  When the Individual Defendants attempted to integrate these systems, they failed, which resulted in inefficiencies and operational setbacks.  In addition, as part of the integration, Merit had committed to maintaining Cianna's sales force, but that effort also failed, with over 20% of the sales force quitting shortly after the acquisition, including the top performers in the core Western region, who were responsible for 22% of overall sales.  In late October 2019, the Individual Defendants finally admitted that the Cianna integration had not proceeded successfully, and, indeed, "***Cianna…just caught up with us***."  The Individual Defendants admitted that "[c]learly, they didn't perform the way we wanted to," and that "it's taken a lot more time and we've had to learn some painful lessons."

174.    During the February 2019 Investor Call, defendant F. Lampropoulos also highlighted the supposed success of the Company's acquisition of Vascular Insights and sales of its product, ClariVein.  F. Lampropoulos stated that "***we're generally satisfied with the overall business***" and further represented that Merit's supposed experience selling ClariVein after the acquisition was positive and demonstrated that ClariVein would generate the anticipated $10 million to $11 million in sales during 2019.  When asked why the Individual Defendants had taken the unusual step of providing not only financial guidance for 2019, but also for all of 2020, F. Lampropoulos stated: "We've had 2 or 3 months now of Cianna.  Our confidence is built there. ***I would say the same thing about Vascular Insights***."

175.     The Individual Defendants' statements were materially false and misleading. Once the Individual Defendants chose to tout Vascular Insights' business and sales, they were obligated (but failed) to disclose the adverse facts about those matters.  Among other things, despite the Individual Defendants' positive proclamations regarding ClariVein, in truth, Merit **had not received a single order** for ClariVein by this time.  Moreover, the Individual Defendants knew that Merit was and would continue to be unable to generate meaningful sales of ClariVein because, unbeknownst to the public, (i) insurance payors were not providing reimbursement for the product; and (ii) it had been determined that Merit could not market ClariVein for its primary purpose of treating varicose veins because, as the Individual Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded ClariVein's FDA approval.  The Individual Defendants were ultimately forced to admit that the Company did not have **a single order for ClariVein during the entire first half of 2019**, had lackluster sales each quarter, and was nine to ten months behind schedule on sales and integration.

176.     During the February 2019 Investor Call, despite these critical issues preventing ClariVein orders, the Individual Defendants reiterated and reinforced their annual revenue guidance for ClariVein.  Specifically, during the February 2019 Investor Call, defendant Parra stated that the guidance for "ClariVein is $10 million to $11 million" in 2019 and "[w]e haven't changed the guidance."  These statements were materially false and misleading.  The Individual Defendants knew that the guidance they provided for ClariVein was unattainable.  There had been no orders for ClariVein, which the Individual Defendants knew or should have known because, among other things, there were screens at the Company's corporate headquarters that showed the daily, monthly, and quarterly orders for each of Merit's products.  The Individual Defendants also

knew that Merit's guidance was unattainable because insurance payors were not providing reimbursement coverage for ClariVein.  In addition, the Company had determined that ClariVein could not be marketed for its primary purpose of treating varicose veins because, as the Individual Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded ClariVein's FDA approval.  The Individual Defendants ultimately admitted that the Company did not have even a single order for ClariVein during the first half of 2019, had lackluster sales each quarter, and was nine to ten months behind schedule on sales and integration.  Further, the Individual Defendants ultimately withdrew their 2020 revenue guidance, and missed their 2019 guidance by 25%.

### B.    February 2019 Press Release

177.    On February 26, 2019, the Individual Defendants also caused Merit to issue a press release that provided an update on the status of the Company's acquired business (the "February 2019 Press Release").  In the February 2019 Press Release, the Individual Defendants singled out Vascular Insights, and said that it, along with the Company's other recent acquisitions, "continue[d] to drive growth" for Merit.  Quoting defendant F. Lampropoulos, the press release stated: "'2018 was an important and very positive year for the company and included the closing of the Becton Dickinson deal, the acquisitions of Cianna Medical and Vascular Insights, and the execution of our global growth and profitability plan,' said Fred P. Lampropoulos, Merit's Chairman and Chief Executive Officer.  *'Integration of these new businesses and sales of our core products continue to drive growth*...'"

178.    The Individual Defendants' statement asserting that the integration of Vascular Insights supposedly "continue[d] to drive growth" was materially false and misleading.  Once the

Individual Defendants chose to tout the integration of Vascular Insights and how it supposedly "continue[d] to drive growth," they were obligated (but failed) to disclose adverse information about these matters that cuts against the positive representations. Among other things, there was not a single order for Vascular Insights' ClariVein during the entire first half of the year after the acquisition. Moreover, Merit was unable to generate any orders of ClariVein because, unbeknownst to stockholders, insurance payors were not providing reimbursement for the product. In addition, it had been determined that Merit could not market ClariVein for its primary purpose of treating varicose veins because, as the Individual Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval. As the Individual Defendants ultimately admitted, the Company did not have even a single order for ClariVein during the first half of 2019, had lackluster sales each quarter, and was nine to ten months behind schedule on sales and integration.

### C.      The 2018 Form 10-K Filed in March 2019

179.      On March 1, 2019, the Individual Defendants caused Merit to file its 2018 Form 10-K, which was signed by defendants F. Lampropoulos, Parra, A.S. Anderson, J. Anderson, Gunderson, and Millner. In the 2018 Form 10-K, the Individual Defendants claimed that it was merely a potential "risk factor" that "limits on reimbursement . . . *may* adversely affect the ability of hospitals and others to purchase our products, which *could* adversely affect our business and results of operations."

180.      The Individual Defendants' statement above was materially false and misleading. The Individual Defendants merely "warned" that reimbursement limits could potentially occur in the future -- *i.e.*, that "limits on reimbursement *may* adversely affect the ability of hospitals and

others to purchase our products, which ***could*** adversely affect our business and results of operations." In truth, the reimbursement issues with ClariVein were already significantly reducing hospitals' purchases and in turn reducing Merits' revenues. Third party payors were almost ***categorically*** denying reimbursement coverage for ClariVein. Indeed, by the time of the Vascular Insights acquisition, less than 5% of ClariVein sales were covered for reimbursement under any commercial insurance policy and claims for reimbursement for ClariVein were consistently denied. As the Individual Defendants ultimately admitted on July 25, 2019, Merit had ***zero*** orders for ClariVein for the first half of 2019. And, as the Individual Defendants would later admit on October 30, 2019, the barriers to ClariVein orders, including the debilitating reimbursement issues, were so severe that Merit missed its guidance for ClariVein sales by huge percentages and was "nine or ten months" behind overall.

181.    The Individual Defendants incorporated the false and misleading "risk factor" statement set forth above from the 2018 10-K into Merit's subsequent Quarterly Reports on Form 10-Q, including Merit's first quarter 2019 Form 10-Q filed with the SEC on May 3, 2019, and Merit's second quarter 2019 Form 10-Q filed with the SEC on August 9, 2019.

### D.    March 2019 Letter to Stockholders

182.    Also on March 1, 2019, the Individual Defendants published a letter to the Company's stockholders, which was signed by F. Lampropoulos and attached to the 2018 Form 10-K (the "March 2019 Letter"). The March 2019 Letter again singled out the acquisition of Vascular Insights, and stated that it, along with the Company's other recent acquisitions, "continue[d] to drive growth" for Merit. The March 2019 Letter stated: "2018 was an important and very positive year for our company. It included the closing of the Becton Dickinson deal, the

acquisitions of Cianna Medical and ***Vascular Insights***, and the execution of our global growth and profitability plan. ***Integration of these new businesses and sales of our core products . . . continue to drive growth***."

183.    The statement above in the March 2019 Letter to stockholders asserting that the integration of Vascular Insights supposedly "continue[d] to drive growth" was materially false and misleading. Once the Individual Defendants chose to tout the integration of Vascular Insights and how it supposedly "continue[d] to drive growth," they were obligated (but failed) to disclose the adverse information about these matters that cut against their positive representations.  Among other things, there was not a single order for Vascular Insights' ClariVein during the entire first half of the year after the acquisition.  Moreover, Merit was unable to generate meaningful sales of ClariVein because, unbeknownst to the public, insurance payors were not providing reimbursement for the  product.  In addition, it had been determined that Merit could not market ClariVein for its primary purpose of treating varicose veins because, as the Individual Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval.  As the Individual Defendants ultimately admitted, the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and was nine to ten months behind schedule on sales and integration.

          **E.**        **April 2019 Press Release**

184.    On April 23, 2019, the Individual Defendants caused the Company to issue a press release announcing Merit's first quarter 2019 results and providing an update on the status of the Company's integrations of its recent acquisitions (the "April 2019 Press Release"). In the April 2019 Press Release, the Individual Defendants stated that the Company's integration of Becton,

Dickinson -- an entity that Merit acquired in February 2018 -- was still not yet complete.  In contrast, the April 2019 Press Release announced that the Cianna transition was complete, quoting defendant F. Lampropoulos as stating: "*'The Cianna transition is complete and sales continue to grow according to our expectations.'*"

185.    The Individual Defendants' statement set forth above that "[t]he Cianna transition is complete" was materially false and misleading.  Contrary to the Individual Defendants' public representation, confidential witnesses in the Securities Action have recounted that 50% of the items planned for integration were not integrated by at least April 2019, including Cianna's and Merit's customer relationship management platforms, marketing platforms, and meeting planners. When the Individual Defendants attempted to integrate their systems during the Relevant Period, they failed, which resulted in inefficiencies and operational setbacks.  In addition, as part of the integration, Merit was supposed to maintain Cianna's sales force, but that effort failed, with over 20% of the sales force quitting shortly after the acquisition, including the top performers in the core Western region, who were responsible for 22% of Cianna's overall sales.  In late October 2019, the Individual Defendants admitted that the integration of "*Cianna…just caught up with us,*" that "[c]learly, they didn't perform the way we wanted to," and that "it's taken a lot more time and we've had to learn some painful lessons."

186.    Moreover, the Individual Defendants' statement set forth above that Cianna "sales continue to grow according to our expectations" was also materially false and misleading.  Once the Individual Defendants chose to tout how Cianna's "sales continue[d] to grow according to [Merit's] expectations," they were obligated (but failed) to disclose the adverse facts about those matters.  The Individual Defendants did not disclose at the time that over 20% of Cianna's sales

force quit shortly after the acquisition, including the top performers responsible for sales in 15 U.S. states; 75% of sales in Merit's most important sales region, the Western Region; and 22% of Cianna's overall, company-wide total sales.  As a result of these departures, the Western region went from Cianna's top sales performer to its worst performer, with the departures resulting in a decline of 25% to 30% in the region.  The Individual Defendants ultimately admitted that the Cianna sales force had suffered from "attrition," and also disclosed unexpectedly low sales for Cianna products in the second and third quarters of 2019, following the sales force departures. The Individual Defendants also admitted that the failed Cianna integration and low Cianna sales were so severe that they would continue in the future.  The Individual Defendants informed stockholders of the Company's poor sales in the fourth quarter of 2019 and completely retracted all guidance for 2020.

## F.      April 2019 Investor Conference

187.      Also on April 23, 2019, the Individual Defendants hosted an investor conference call.  Defendants F. Lampropoulos and Parra led the call, which was attended by investors and analysts covering the Company, including Wells Fargo, Needham, SunTrust, Piper Jaffray, and Canaccord, among others (the "April 2019 Investor Call").

188.      During the April 2019 Investor Call, defendant F. Lampropoulos continued to tout the successful integration of Cianna, repeatedly emphasizing that the members of Cianna's all-important sales force remained with Merit.  When asked by an analyst for "some color around kind of the rollout so far" for Cianna, F. Lampropoulos responded:

 "Well, first of all, I think with Cianna there's a couple of things I think that are important. We, as you will recall. . .*we maintained their sales force. And we think that was a critical thing to do…[b]ut I guess the bottom line is, it's as probably a good of a transaction and transition that we have done*. I think it may be the best

one. I mean we've done a lot of small deals. But I think that speaks volumes to Jill Anderson and her team. And just the way that our team has worked. We kept all the R&D people, *we kept the salespeople*, we've done, *I think they fit into the family actually quite easily*. I've been down there several times. I'm going to head down there again soon. So I think all in all, it was a transaction and a business that -- *I don't know how you could do it any better, to be honest with you. I think we've done it well*."

189.     These statements were materially false and misleading.  In reality, contrary to F. Lampropoulos' assertions, over 20% of the Cianna sales force quit shortly after the acquisition, including the top performers responsible for Cianna's sales in 15 of the country's 50 states; 75% of sales in Merit's most important sales region, the Western region; and 22% of Cianna's over-all, company-wide total sales.  As a result of these departures, the Western region went from Cianna's top sale performer to its worst performer, with their departures resulting in a decline of 25% to 30% in the region.  The Individual Defendants finally admitted that the Cianna sales force suffered from "attrition," and also disclosed unexpectedly low sales for the Cianna products in the second and third quarters of 2019, following these departures.  The Individual Defendants also admitted that the failed Cianna integration and poor Cianna sales were so severe that they would continue in the future.  The Individual Defendants ultimately disclosed poor sales in the fourth quarter of 2019 and completely retracted all guidance for 2020.

190.     In addition, during the April 2019 Investor Call, defendant Parra claimed that Merit had "strong sales in stand-alone products," which included ClariVein.  This was false and misleading.  Once the Individual Defendants chose to tout "strong sales" in stand-alone products, which included ClariVein, they were obligated (but failed) to disclose the adverse facts about those matters.  Among other things, *there was not a single order for ClariVein during the entire first half of 2019*.  Moreover, Merit was unable to generate meaningful sales of ClariVein because,

unbeknownst to the public, insurance payors were not providing reimbursement for the product. In addition, it had been determined that Merit could not market ClariVein for its primary purpose of treating varicose veins because, as the Individual Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval. As the Individual Defendants ultimately admitted, the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and was nine to ten months behind schedule on sales and integration.

191.    During the April 2019 Investor Call, defendant F. Lampropoulos also stated, in response to an analyst's question about the 2019 and 2020 guidance issued by the Individual Defendants, that "I don't see anything that has changed," and that "[t]here are always headwinds but I think there are more tailwinds. We're feeling the breeze to our back." These statements were false and misleading. The Individual Defendants knew that they encountered substantial setbacks selling ClariVein and that the guidance they provided for ClariVein was unattainable. There had been no orders for ClariVein, which the Individual Defendants knew because, among other things, there were screens in Merit's corporate headquarters that showed the daily, monthly, and quarterly orders for each of their products. They also knew that their guidance was unattainable because insurance payors were not providing reimbursement coverage for the product. In addition, it had been determined that Merit could not market ClariVein for its primary purpose of treating varicose veins because, as the Individual Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval. The Individual Defendants finally admitted that the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and was nine to ten months behind schedule

on sales and integration.  Further, the Individual Defendants ultimately withdrew their 2020 revenue guidance, and missed their 2019 guidance by 25%.

### G.   July 2019 Investor Conference

192.      On July 25, 2019, the Individual Defendants hosted an investor conference call to discuss the Company's results for the second quarter of 2019 (the "July 2019 Investor Conference").  Defendants F. Lampropoulos and Parra led the call, which was attended by investors and analysts covering the Company, including Wells Fargo, Needham, SunTrust, Piper Jaffray, Barrington, and Canaccord, among others (the "July 2019 Investor Call").

193.      During the July 2019 Investor Call, defendant  F.  Lampropoulos  misleadingly minimized the severe problems plaguing Merit's latest acquisitions.  Specifically, while finally admitting that there had been attrition among Cianna's sales force, F. Lampropoulos claimed that there only had been "a ***little bit*** of attrition but ***not much***."  It was misleading to represent that there was merely "a little bit" and "not much" attrition among Cianna's sales force when, in reality, over 20% of the sales force quit shortly after the acquisition, including Cianna's top performers responsible for sales in 15 of the country's 50 states; 75% of sales in Merit's most important sales region, the Western region; and 22% of Cianna's over-all, company-wide total sales.  As a result of these departures, the Western region went from the Company's top sale performer to its worst performer, with their departures resulting in a decline of 25% to 30% in the region.  The departures led to unexpectedly low sales for Cianna products in all of the second, third, and fourth quarters of 2019, and a resulting complete retraction of the guidance issued by the Individual Defendants for all of 2020.

194.      During the July 2019 Investor Call, F. Lampropoulos also misrepresented and

downplayed the true causes for the dearth of ClariVein orders during the first half of 2019. F. Lampropoulos falsely and misleadingly asserted that "pipeline filling" was the cause for the lack of orders for the entire first half of the year.  Specifically, he stated that "[w]e haven't had an order all year *because of pipeline filling from the former customer or fear by the distributor that somehow they wouldn't be able to keep it*."  F. Lampropoulos additionally claimed that there were no further impediments to Merit immediately achieving ClariVein orders, and that instead, "pipeline filling" was a "short term" issue.  F. Lampropoulos stated that "if you look at all the events that took place, I think we have explained them. *They are short term or those storms are over*."

195.    These statements were materially false and misleading. It was false and misleading to state that the dearth of ClariVein orders during the first half of the year was due to "pipeline filling," when, in fact, (i) nearly all commercial insurance companies refused to cover ClariVein, causing doctors and hospitals not to order the product; (ii) it had been determined that Merit could not market ClariVein for its primary purpose because the FDA had not cleared the product to treat varicose veins; and (iii) Merit had made no progress in integrating Vascular Insights -- it was, as the Individual Defendants later admitted, "nine to ten months behind." Further, the dearth of ClariVein orders during the first half of the year was not caused by a "short-term" problem that had been resolved; rather, it was caused by long-standing and persistent impediments to the sale of the ClariVein product -- namely, a lack of reimbursement and an inability to market the product to treat varicose veins.

196.    Parra also made misleading statements during the July 2019 Investor Call, falsely attributing the "sales shortfall for ClariVein" to "pipeline filling," and claiming that there were no

further impediments to Merit achieving its forecasted $10 to $11 million in revenue for ClariVein for the year.  Repeating the "pipeline filling" story, Parra represented that ClariVein's lackluster sales were "*the result of excess inventory of some of the distributors prior to our acquisition*." Defendant Parra further stated that all issues adversely impacting sales had been solved, explaining, "*We believe we have made it past that, and sales are ramping to our expectations*."

197.     These statements were materially false and misleading. The dearth of ClariVein orders during the first half of the year was not caused by a "short-term" problem that had been resolved; rather, it was caused by long-standing and persistent impediments to the sale of the product.  Once the Individual Defendants chose to discuss why there were no orders of ClariVein, they were required (but failed) to disclose the true reasons for the absence of orders, including: (i) nearly all commercial insurance companies refused to cover ClariVein, causing doctors and hospitals not to order the product; (ii) it had been determined that Merit could not market ClariVein for its primary purpose because the FDA had not cleared the product to treat varicose veins; and (iii) Merit had made no progress in integrating Vascular Insights – the integration was, as the Individual Defendants only later admitted, "nine to ten months behind."

198.     During the July 2019 Investor Call, the Individual Defendants also reaffirmed their revenue guidance for ClariVein of $10 million to $11 million for 2019.  At the time, however, there had been no orders for ClariVein, which the Individual Defendants knew because, among other things, there were screens at Merit's corporate headquarters which showed the daily, monthly, and quarterly orders for each of their products.  The Individual Defendants also knew that their guidance was unattainable because the critical factors preventing orders, *i.e.*, insurance payors were not providing reimbursement coverage for the product, and Merit's inability to market

the ClariVein for its primary purpose of treating varicose veins, were not abating.  Indeed, the Individual Defendants were ultimately forced to disclose that they were nine to ten months behind schedule on the integration and there was a massive gulf between the promised $10 million to $11 million in sales, and the reality of their inability to sell the product.  The Individual Defendants ultimately reported that Merit missed the full-year 2019 guidance for Vascular Insights by approximately the same percentage guidance was missed in each quarter during the Relevant Period: 30%.

## VII.    SUSPICIOUS INSIDER SALES DURING THE RELEVANT PERIOD

199.    During the Relevant Period, certain top Company insiders, including defendants F. Lampropoulos, Parra, J. Lampropoulos, and Millner (the "Insider Selling Defendants"), took advantage of their possession of material, non-public, adverse information, and traded their personally-held Merit shares at artificially inflated prices.  Most notably, shortly after issuing the false and misleading statements on July 25, 2019 set forth above, in August 2019 and September 2019 defendant F. Lampropoulos unloaded a total of *over 200,000 shares* of Merit stock at prices between $30.41 and $36.86 per share, reaping nearly *$6.5 million* in proceeds.

200.    Defendant F. Lampropoulos' stock sales on the heels of the Individual Defendants' false and misleading July 25, 2019 disclosures were highly unusual in amount and timing, and completely out-of-line with his prior trading history.  These sales, which were not made pursuant to any pre-set stock trading plan and occurred over a span of just three weeks, amounted to *over 16%* of F. Lampropoulos' total Merit holdings -- the highest percentage of his annual sales to holdings in at least a decade.

201.    In stark contrast to his August 2019 and September 2019 stock sales, F.

Lampropoulos did not sell even a single Merit share on the open market for more than three years prior to the Relevant Period; (ii) sold only 3,125 shares in the six years prior to the Relevant Period, for net proceeds of only $27,370 (after converting the underlying stock options); and (iii) sold more shares during the Relevant Period than in all of the prior 13 years combined.  Moreover, F. Lampropoulos did not purchase a single share of Merit stock during the second quarter of 2019, or any other quarter of the Relevant Period.  As analysts noted, F. Lampropoulos' stock sales during the Relevant Period were so suspicious that they understandably drew "the ire of investors."

202.     The below chart details the Insider Selling Defendants' suspicious stock sales, for proceeds totaling nearly $7.5 million:

| Date | Insider | Shares | Price | Total |
|---|---|---|---|---|
| 3/13/19 | Parra | 5,000 | $60.20 | $301,020 |
| 5/07/19 | Parra | 2,000 | $57.11 | $114,212 |
| 6/19/19 | J. Lampropoulos | 8,000 | $60.87 | $486,928 |
| 8/15/19 | F. Lampropoulos | 40,000 | $36.86 | $1,474,480 |
| 8/15/19 | Millner | 3,780 | $36.67 | $138,616 |
| 9/6/19 | F. Lampropoulos | 161,817 | $30.7 | $4,967,090 |
| | | | | **$7,482,346** |

## VIII.   THE SUSTAINED SECURITIES ACTION

203.     As a result of the Individual Defendants' serious misconduct alleged herein, on December 3, 2019, the Securities Action was initiated in the Central District of California on behalf of on behalf of a class of investors who purchased Merit common stock during the Class Period. The operative complaint in the Securities Action, which asserts claims under the federal securities laws against Merit, F. Lampropoulos, and Parra, was filed on June 30, 2020 and sets forth detailed allegations based on the accounts of sixteen confidential witnesses.

204.     After the operative complaint was filed in the Securities Action, the defendants

filed a motion to dismiss.  On March 16, 2021, Judge Spaeth issued a Report and Recommendation to Judge Carter, in which Judge Spaeth recommended that Judge Carter deny the defendants' motion to dismiss the Securities Action.  Therein, Judge Spaeth stated the following conclusions, among others: (a) that the lead plaintiffs sufficiently alleged that the defendants' public statements during the Class Period related to Merit's acquisition of Cianna were materially false and misleading; (b) that the lead plaintiffs sufficiently alleged that the defendants' public statements during the Class Period related to Merit's acquisition of Vascular Insights and projected ClariVein sales were materially false and misleading; and (c) that the lead plaintiffs' allegations gave rise to "a strong, cogent inference of scienter."  Stated another way, Judge Spaeth concluded there was *indicia* that defendants F. Lampropoulos and Parra participated in a scheme to defraud Merit investors during the Class Period.

205.    With respect to the "strong, cogent inference of scienter," Judge Spaeth specifically noted that the operative complaint in the Securities Action "contains extensive factual allegations that the two acquisitions were an important part of Merit's business strategy to grow revenue; that Merit and [defendants F. Lampropoulos and Parra] were actively and regularly made aware of sales data and sales problems; that the ClariVein insurance reimbursement and regulatory/marketing issues were sufficiently serious and directly communicated to Merit's executive sales force; and that [F.] Lampropoulos was so actively involved with the sales force and data that there is no way he did not know there were two significant barriers to ClariVein sales."

206.    On March 29, 2021, Judge Carter entered an Order accepting Judge Spaeth's Report and Recommendation in whole and denying the defendants' motion to dismiss the

Securities Action.  After the defendants to the Securities Action submitted objections, on May 3, 2021, Judge Carter entered an Amended Order which once again accepted Judge Spaeth's Report and Recommendation in its entirety and denied the defendants' motion to dismiss the Securities Action.  In addition, Judge Carter's Amended Order overruled all of the defendants' objections. Accordingly, the sustained Securities Action is now proceeding towards trial.

## IX.   INTERNAL, BOARD-LEVEL CORPORATE DOCUMENTS CONFIRM THE INDIVIDUAL DEFENDANTS' KNOWLEDGE OF THE MISCONDUCT DESCRIBED HEREIN

207.   Plaintiff's review of non-public, Board-level, internal corporate books and records obtained from the Company pursuant to Utah Code Ann. § 16-10a-1602 have confirmed the Individual Defendants' misconduct during the Relevant Period.

208.   Inspection of these non-public corporate documents has revealed, among other things, ███████████████████████████████████████████████████████████████

███████████████████████████  ███████████  ██████████████████████

████████  ██  ██████  ██████  ██████  ██████  ██████  ██████  ██

█████████████████████████████  ██  ██████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████

209.   ████████████████████████████████████  ████████████████

█████████████████████████████████████████████████████████████

210.

████████████████████████████████████████████████

███████████████████

211.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

212.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

213. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████ ██ ████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

214. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████ ██████████████████████████████
████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████

## X.      DAMAGES TO MERIT

215.      Merit has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

216.      As a direct and proximate result of the Individual Defendants' conduct, Merit has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

a.  legal fees associated with the lawsuits filed against Merit and its officers and directors for violations of the federal securities laws, including the sustained Securities Action;

b.  loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

c.  amounts paid to outside lawyers, accountants, and investigators in connection with any investigations; and

d.  loss of revenues and profits.

## XI.      DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

217.      Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

218.     Plaintiff is a current shareholder of the Company, was a shareholder of the Company during the entirety of the Individual Defendants' wrongdoing alleged herein, and has been a shareholder of the Company continuously since at least December 2017.

219.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

220.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

221.     The Board currently consists of nine (9) directors: defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, Millner, and Ward, and non-parties Lonny J. Carpenter, David K. Floyd, and James T. Hogan.[39]   A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal.  Plaintiffs have adequately alleged that there is reason to doubt that at least five (5) current directors of Merit are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.     Defendant F. Lampropoulos is Not Independent or Disinterested

222.     Defendant F. Lampropoulos is incapable of independently considering a demand to commence and vigorously prosecute this action because defendant F. Lampropoulos' principal professional occupation is his employment as President and CEO of the Company.  Accordingly,

---

[39]     Merit's three current non-party directors each joined the Board in June 2020, after the Individual Defendants' wrongdoing alleged herein occurred, and are not alleged at this time to have breached their fiduciary duties.

defendant F. Lampropoulos is incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. Indeed, the Company's most recent proxy statement filed with the SEC and disseminated to Merit shareholders on April 30, 2021 admits that defendant F. Lampropoulos "is not considered independent because of his employment as President and CEO of the Company."

223.     In addition, defendant F. Lampropoulos is incapable of independently considering a demand to commence and vigorously prosecute this action against his own son, Company executive and defendant J. Lampropolous.

224.     Further, defendant F. Lampropoulos is not capable of disinterestedly considering a demand to commence and vigorously prosecute this action.  As alleged herein, F. Lampropoulos is a defendant in the Securities Action, in which the lead plaintiffs' claims against F. Lampropoulos have overcome a motion to dismiss and are proceeding towards trial.  The potential liability of F. Lampropoulos, therefore, is not speculative and thus the likelihood of his personal liability is sufficient to excuse demand.

225.     Moreover, defendant F. Lampropoulos is directly interested based on his challenged, suspicious insider trades during the Relevant Period, pursuant to which he received direct, personal financial benefits not shared with Merit shareholders.

### B.      Defendant J. Anderson is Not Independent

226.     Defendant J. Anderson is incapable of independently considering a demand to commence and vigorously prosecute this action because she previously served as President, CEO, and a director of Cianna from 2008 until Merit acquired Cianna in November 2018.  In the Company's most recent proxy statement filed with the SEC and disseminated to Merit shareholders

on April 30, 2021, the Board conceded that defendant J. Anderson "may not be considered independent because of her service as the CEO and an employee and director of Cianna Medical, which we acquired in November 2018."

### C. Defendant Millner is Not Disinterested

227.    Defendant Millner is directly interested based on her challenged, suspicious insider sale of Merit stock during the Relevant Period as alleged above, pursuant to which she received direct, personal financial benefits not shared with Merit shareholders.

### D. A Majority of the Board Members Face a Substantial Likelihood of Liability Because they Had Actual Knowledge of – or Recklessly Disregarded – Material Undisclosed Facts

228.    ██████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████  ███████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████

229.    ██████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

███████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████

████████████████ ██ ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

230. █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

231. █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

232. █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

233.

234.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ .

    **E.**    **A Majority of the Board Members Face a Substantial Likelihood of Liability Because They Signed the False and Misleading 2018 10-K**

235.    The Individual Defendants had a duty to ensure that the Company's SEC filings did not contain material omissions. Again, each Individual Defendant failed to do so. A director's breach of the duty of candor is not entitled to protection under the business judgment rule.

236.    A majority of Merit's current Board members signed the Company's 2018 Form 10-K -- defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, and Millner.  In the 2018 Form 10-K, defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, and Millner represented that it was merely a potential "risk factor" that "limits on reimbursement . . . *may* adversely affect the ability of hospitals and others to purchase our products, which *could* adversely affect our business and results of operations."

237.    As alleged above, this statement was materially false and misleading.  The Individual Defendants merely "warned" that reimbursement limits *could potentially* occur in the future -- *i.e*., that "limits on reimbursement *may* adversely affect the ability of hospitals and others to purchase our products, which *could* adversely affect our business and results of operations."  In truth, the reimbursement issues with ClariVein were already significantly reducing hospitals' purchases and, as a result, reducing Merits' revenues.  Third party payors were almost *categorically* denying reimbursementcoverage for ClariVein.  Indeed, by the time of the

acquisition, less than 5% of ClariVein sales were covered for reimbursement under any commercial insurance policy and claims for reimbursement for ClariVein were consistently denied.  As the Individual Defendants ultimately admitted on July 25, 2019, Merit had *zero* orders for ClariVein for the first half of 2019.  And, as the Individual Defendants additionally admitted on October 30, 2019, the barriers to ClariVein orders, including the debilitating reimbursement issues, were so severe that Merit missed its guidance for ClariVein sales by huge percentages and was "nine or ten months" behind overall.

238.     The false and misleading "risk factor" statement set forth above from the 2018 10-K was subsequently incorporated into Merit's later-filed Quarterly Reports on Form 10-Q, including Merit's first quarter 2019 Form 10-Q filed with the SEC on May 3, 2019, and Merit's second quarter 2019 Form 10-Q filed with the SEC on August 9, 2019.

239.     As such, defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, and Millner – who comprise a majority of the members of the current Board -- each face a substantial likelihood of personal liability, excusing demand. Their knowing and/or reckless breaches of fiduciary duty constitute bad faith under Utah law.  Bad-faith conduct is non-exculpable and is not protected under the business judgment rule. Thus, defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, and Millner face a substantial likelihood of liability. Demand is thus futile and excused.

### F.      A Majority of the Board Members Have Failed to Take Any Action Against F. Lampropoulos and Parra

240.     As alleged above, after the truth fully emerged on October 30, 2019, analysts took the remarkable and unusual step of calling for the removal of F. Lampropoulos and Parra from the Company's senior management team.  In an October 31, 2019 report titled "Here's Why Merit

Medical Systems Stock Is Tumbling Today," analysts at the securities analysis website Motley Fool concluded: "You probably don't want to try catching this falling knife until there have been some changes in the executive suite."  An October 30, 2019 analyst report by Canaccord concluded that, if management were to stay on, "[i]t will take a few years . . . for established investors to trust this management team again."

241.    Nonetheless, the Board – on which defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, Millner, and Ward served at the time – chose to take no action whatsoever.  In such circumstances, a reasonable Merit shareholder would have reason to doubt that the Board would commence and vigorously prosecute this action, excusing demand.

242.    Moreover, the failure by defendants F. Lampropoulos, A.S. Anderson, J. Anderson, Gunderson, Millner, and Ward to take any action in these circumstances runs contrary to their duties specifically undertaken by those individuals pursuant to Merit's own corporate governance policies.  For example, as Audit Committee members, defendants Gunderson and Millner were duty-bound, among other things, to: (a) review "the performance of the Company's CEO and senior financial officers as their performance relates to controls over financial reporting and related procedures," and (b) review "adherence to the Company's Code of Business Conduct & Ethics, including reviewing and investigating any matters pertaining to the integrity of management."

## COUNT I
### Breach of Fiduciary Duty Against the Individual Defendants

243.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

244.    The Individual Defendants, as current or former Merit officers and/or directors,

owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

245. By virtue of their positions as Merit directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

246. Each Individual Defendant was required to: (a) use his or her ability to control and manage Merit in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Merit rather than his or her own interests.

247. By their acts alleged herein, including but not limited to causing Merit to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

248. The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

249. Merit has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## <u>COUNT II</u>
**Against the Individual Defendants for Unjust Enrichment**

250. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Merit.

252.     Plaintiff, as a shareholder and representative of Merit, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Merit to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Merit restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

**DATED**: June 3, 2021                    By:      */s/ Jared D. Scott*
                                                    Jared D. Scott
                                                    **ANDERSON & KARRENBERG**
                                                    Broadway Media Building
                                                    50 West Broadway, Suite 700
                                                    Salt Lake City, UT 84101

                                                    **SHUMAN, GLENN & STECKER**
                                                    Kip B. Shuman
                                                    100 Pine Street, Suite 1250
                                                    San Francisco, CA 94111
                                                    (303) 861-3003

                                                    **SHUMAN, GLENN & STECKER**
                                                    Rusty E. Glenn
                                                    600 17th Street, Suite 2800 South
                                                    Denver, CO 80202
                                                    (303) 861-3003

                                                    **SHUMAN, GLENN & STECKER**
                                                    Brett D. Stecker
                                                    326 W. Lancaster Ave.
                                                    Ardmore, PA 19003
                                                    (303) 861-3003

                                                    **KASKELA LAW LLC**
                                                    Seamus Kaskela
                                                    18 Campus Blvd. Ste. 100
                                                    Newtown Square, PA 19073
                                                    (888) 715-1740

                                                    ***Counsel for Plaintiff***

## <u>Merit Medical Systems, Inc. Verification</u>

I, Steffen Maute, hereby verify that I am familiar with the allegations in the Verified

Shareholder Derivative Complaint and that I have authorized the filing of the Verified Shareholder

Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge,

information and belief.



Date: June 3, 2021.

STEFFEN MAUTE