Jared D. Scott (#15066)
ANDERSON & KARRENBERG
50 W. Broadway, Suite 600
Salt Lake City, UT 84101-2035
Telephone: 801-534-1700
jscott@aklawfirm.com

Rusty E. Glenn (admitted *pro hac vice*)
SHUMAN, GLENN & STECKER
600 17th Street, Suite 2800 South
Denver, CO  80202
Telephone: (303) 861-3003
rusty@shumanlawfirm.com

Brett D. Stecker, (admitted *pro hac vice*)
SHUMAN, GLENN & STECKER
326 W. Lancaster Avenue
Ardmore, PA  19003
Telephone: (303) 861-3003
brett@shumanlawfirm.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| STEFFEN MAUTE, derivatively on behalf of MERIT MEDICAL SYSTEMS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FRED P. LAMPROPOULOS; RAUL PARRA; A. SCOTT ANDERSON; JILL D. ANDERSON; THOMAS J. GUNDERSON; F. ANN MILLNER; LYNNE N. WARD; and JUSTIN F. LAMPROPOULOS, <br><br> Defendants, <br><br> – and – <br><br> MERIT MEDICAL SYSTEMS, INC., a Utah corporation, <br><br> Nominal Defendant. | **PLAINTIFF STEFFEN MAUTE'S MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND EXPENSES** <br><br><br> Case No. 2:21-cv-00346-RJS-DBP <br><br> Chief District Judge Robert J. Shelby <br><br> Magistrate Judge Dustin B. Pead |

# **Table of Contents**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   BACKGROUND OF THE ACTION ....................................................... 3

    A.    Factual Background ................................................................. 3

    B.    Procedural Background and Settlement Negotiations ........................... 4

    C.    The Settlement Terms ................................................................. 7

    D.    Notice to Current Merit Stockholders ............................................. 9

III.  ARGUMENT ...................................................................................... 9

    A.    The Settlement is Fair, Reasonable, and Adequate, and Should Be Finally Approved by the Court.................................................................. 9

        1.    Standard of Review................................................................. 9

        2.    The Settlement is Fair, Reasonable, and Adequate.................................. 12

        3.    Factors Supporting the Settlement ........................................... 15

            i.    The Benefits Achieved........................................................ 16

            ii.    The Risks of Establishing Liability ....................................... 17

            iii.   The Risks of Establishing Damages .................................... 19

            iv.   The Complexity, Expense, Risk, and Duration of Further Litigation 21

            v.    The Reaction of Current Merit Stockholders.................................. 22

            vi.   Opinion of Plaintiff's Counsel........................................... 23

    B.    Plaintiff's Counsel's Agreed Upon Fee and Expense Award is Fair and Reasonable and Should Be Approved.................................................. 24

        1.    Agreed Upon Fees in Litigation Are Favored........................................ 25

        2.    The Fee and Expense Award is Fair and Reasonable Based on the Federal "Substantial Benefits" Doctrine.................................................. 27

3.    The Fee and Expense Award Is Fair Under Applicable Legal Standards. 28

4.    The Fee and Expense Award is Fair and Reasonable Based on the Results Obtained ........................................................................................................ 30

5.    The Contingent Nature of Plaintiff's Counsel's Undertaking Justifies the Fee and Expense Award .......................................................................................... 31

6.    Public Policy Supports the Approval of the Fee and Expense Award ...... 32

7.    Plaintiff's Counsel's Lodestar Also Supports a Finding That the Fee and Expense Award Is Reasonable ............................................................................. 33

**IV.    THE INCENTIVE AWARD SHOULD BE APPROVED ......................................... 34**

**V.    CONCLUSION ........................................................................................ 36**

## I.    PRELIMINARY STATEMENT

Plaintiff Steffen Maute ("Plaintiff") respectfully submits this memorandum of law in support of final approval of the proposed settlement (the "Settlement") of the derivative claims brought on behalf of Merit Medical Systems, Inc. ("Merit" or the "Company") against certain of its current and former officers and directors, as set forth in the August 23, 2022 Stipulation and Agreement of Settlement (the "Stipulation").[1]  Plaintiff seeks the entry of an order, substantially in the form attached hereto as Exhibit 1: (1) finally approving the Settlement as fair, reasonable, and adequate; (2) approving the Fee and Expense Award of $1 million in attorneys' fees and unreimbursed expenses; and (3) approving the nominal Incentive Award for Plaintiff.

The Settlement completely and finally resolves the derivative claims in the above-captioned shareholder derivative action (the "Action").  The Settlement is the result of extensive arm's-length negotiations between the parties to the Action (the "Parties"), who were assisted by a highly experienced neutral mediator, Michelle Yoshida, Esq. ("the Mediator" or "Ms. Yoshida") of the mediation, arbitration, and dispute resolution firm Phillips ADR Enterprises ("Phillips ADR").[2]  As a result of the Settlement, Merit has agreed to adopt a series of significant corporate governance measures which address Plaintiff's allegations and are designed to preclude the recurrence of the wrongdoing alleged in the Action (the "Reforms").  The negotiation of the Reforms was hard-fought by very sophisticated parties and the Settlement confers substantial

---

[1]    Unless otherwise defined herein, all defined terms shall have the meanings as set forth in the Stipulation.

[2]    See the Declaration of Michelle Yoshida in Support of Final Approval of Derivative Settlement and Award of Attorneys' Fees and Expenses ("Yoshida Decl."), attached hereto as Exhibit 2.

benefits upon Merit and Current Merit Stockholders.  As such, the Settlement constitutes an excellent resolution of a case of substantial complexity.[3]

Plaintiff alleged in the Action, in part based on an inspection of certain non-public books and records produced by Merit pursuant to Utah Code Ann. § 16-10a-1602 ("§ 16-10a-1602"), that over an approximately nine month span from February 2019 through October 2019 (the "Relevant Period"), the Individual Defendants[4] breached their fiduciary duties by making a series of materially false and misleading statements regarding certain key acquisitions which had been recently made by Merit.  The Reforms obtained in this proposed Settlement are a comprehensive set of procedural and structural governance measures designed to address alleged corporate shortcomings at Merit which gave rise to the Action, while improving the Company's overall compliance capabilities to further align the interests of Merit with the interests of its stockholders. As a result of the substantial benefits obtained in the Settlement, Merit and Current Merit

---

[3]    On October 18, 2022, the Court entered an Order Preliminarily Approving Derivative Settlement and Providing for Notice ("the Preliminary Order"), directing that a final settlement hearing be held on February 16, 2023 (the "Settlement Hearing") and approving the Notice of the Settlement as proper notice pursuant to Fed. R. Civ. P. 23.1 ("Rule 23.1"). Pursuant to the Preliminary Order, Notice of the Settlement was provided which contained detailed descriptions of the history of the Action and the Settlement, the claims that will be released if the Settlement is approved, and the agreed-to Fee and Expense Award to reimburse Plaintiff's Counsel's time and expenses for initiating, litigating, and settling the Action.  The Notices further disclosed the date and time of the Settlement Hearing and advised Current Merit Stockholders of the procedures for objecting to the Settlement. To date, and even though Merit has thousands of Current Merit Stockholders, Plaintiff's Counsel are unaware of any objections to the proposed Settlement or to the Fee and Expense Award.

[4]    The "Individual Defendants" to the Action are Fred P. Lampropoulos, Raul Parra, A. Scott Anderson, Jill D. Anderson, Thomas J. Gunderson, F. Ann Millner, Lynne N. Ward, and Justin F. Lampropoulos, each of whom is a current or former member of Merit's Board of Directors (the "Board") and/or a current or former senior officer of Merit (collectively, the "Individual Defendants" and together with Merit, the "Defendants").

Stockholders are positioned to reap the long-term benefits of strong corporate governance by virtue of the Reforms.

As discussed below, the Settlement requires Merit to adopt the Reforms, which will substantially enhance the way Merit is governed and provide material value to the Company and Current Merit Stockholders. The Reforms will not only protect Merit against future instances of wrongdoing similar to the alleged wrongdoing which gave rise to the Action; they will also make the Board more effective representatives of Merit and its stockholders through the implementation of policies which address the composition of the Board and the manner in which the Board operates. These material and valuable benefits justify this Court's approval of the Settlement, the Fee and Expense Award, and the Incentive Award as fair, reasonable, and adequate, in light of the extensive and successful services rendered by Plaintiff's Counsel in initiating, prosecuting, and favorably resolving the Action.[5]

## II.    BACKGROUND OF THE ACTION

### A.  Factual Background

Nominal defendant Merit, a publicly traded medical device company, is a Utah corporation headquartered in South Jordan, Utah. Historically, Merit has sold "accessory" products, such as syringes, inflation devices, and wires for use during non-surgical procedures. Shortly before the start of the Relevant Period, Merit also began selling "therapeutic devices," which are higher-margin products used to treat or cure diseases and used during surgical procedures.

---

[5]    See the Declaration of Brett D. Stecker in Support of Final Approval of Derivative Settlement and Award of Attorneys' Fees and Expenses ("Stecker Decl."), attached hereto as Exhibit 3.

In late 2018, Merit acquired: (i) Cianna Medical, Inc. ("Cianna"), a manufacturer of devices for the treatment of breast cancer that was the largest acquisition in the Company's history; and (ii) certain assets of Vascular Insights, LLC ("Vascular Insights") associated with the manufacturing and sales of ClariVein, a specialty infusion catheter used to treat to treat superficial venous disease.  Among other things, Plaintiff's Verified Stockholder Derivative Complaint (the "Complaint") alleged that, beginning in February 2019, the Individual Defendants breached their fiduciary duties to Merit and its stockholders in connection with materially false and misleading statements about the Cianna and Vascular Insights acquisitions and the integrations thereof. Certain of these statements were made in Merit's public filings with the U.S. Securities and Exchange Commission (the "SEC"), including the Company's Annual Report on SEC Form 10-K for fiscal year 2018.  The Complaint alleged that the Individual Defendants' false and misleading statements included assertions that Merit had successfully integrated Cianna and maintained its sales force, and that sales of ClariVein products were driving Merit's growth.  Plaintiff further alleged that certain of the Individual Defendants made suspicious insider sales of Merit stock during the Relevant Period.

### B.  Procedural Background and Settlement Negotiations

On October 29, 2020, Plaintiff sent a demand letter to Merit's corporate secretary which demanded the inspection of internal Company books and records (the "Inspection Demand") pursuant to § 16-10a-1602.  By letter dated November 9, 2020, the Company responded to the Plaintiff's Inspection Demand.  Counsel for Plaintiff and Merit thereafter engaged in several meet and confer discussions concerning the scope of documents which the Company would produce.

4

Counsel for Plaintiff and Merit also began negotiating a confidentiality agreement which would govern Plaintiff's use of the documents produced by the Company (the "Inspection Production").

Upon reaching an agreement as to the scope of documents that would be produced pursuant to § 16-10a-1602, Merit made an initial Inspection Production to Plaintiff on November 9, 2020, subject to a commitment of confidentiality which was formalized in writing on November 30, 2020. A Supplemental Inspection Production took place on December 9, 2020.

On May 20, 2021, Plaintiff initiated this Action on behalf of Merit by filing the Complaint in this Court under seal (with a redacted version publicly filed). The Complaint contained allegations based in part on information derived from and citations to certain non-public documents obtained by Plaintiff via the Inspection Demand pursuant to § 16-10a-1602. The Complaint asserted claims against each of the Individual Defendants for breach of fiduciary duty and unjust enrichment under Utah law based on the allegations described above.

Shortly after the filing of the Complaint, the Parties to the Action agreed to a temporary stay of litigation. As part of the stay, Defendants agreed to produce discovery documents to Plaintiff which had been produced in the related federal securities class action captioned *In re Merit Medical Systems, Inc. Securities Litigation,* Case No. 8:19-cv-02326-DOC-ADS (C.D. Cal.) (the "Securities Action"). Defendants thereafter produced to Plaintiff, on a rolling basis, eight (8) separate productions from the Securities Action totaling approximately five-hundred twenty-five thousand (525,000) pages of internal corporate documents, which Plaintiff's Counsel reviewed and analyzed.

On October 5, 2021, the Parties participated in a full-day, in-person mediation session with the Mediator in Corona Del Mar, California (the "First Mediation"). While a resolution was not

reached by the Parties at the conclusion of the First Mediation, the Parties made substantial progress and thereafter continued to engage in extensive communications and further efforts over the following weeks and months aimed at reaching a settlement. These communications were both direct between counsel for the Parties, and through the Mediator. As a result of these further negotiations, the Parties were ultimately able to reach a tentative agreement on many of the Reforms contained within the Settlement on February 22, 2022.

With substantial progress having been made, the Parties participated in a second mediation session with the Mediator on February 25, 2022. During this "Second Mediation" the Parties were able to reach a final agreement on the Reforms and thereafter began negotiating an agreed-to payment of attorneys' fees and reimbursement of expenses to Plaintiff's Counsel. The Parties were not able to reach agreement on this final remaining settlement term at the conclusion of the Second Mediation, even with the assistance of the Mediator. Nevertheless, the Parties subsequently continued good faith negotiations for over three months following the Second Mediation. On June 14, 2022, the Mediator issued a double-blind "Mediator's Proposal" to the Parties calling for the payment of $1 million in combined attorneys' fees and expenses to Plaintiff's Counsel. On June 22, 2022, the Mediator communicated that all Parties had agreed to the Mediator's Proposal and the $1 million Fee and Expense Award, subject to final approval of the Company's Non-Party Directors, and also subject to the approval of the Court. This final term completed the Parties' settlement negotiations.

Counsel for the Parties thereafter prepared the Stipulation, which was presented to Merit's Non-Party Directors. Merit's Non-Party Directors unanimously voted to approve the Settlement as reflected in the Stipulation at a meeting on July 22, 2022.

### C.  The Settlement Terms

As a condition of the Settlement, Merit has agreed to institute and maintain the Reforms for a period of not less than four (4) years.[6]  As the Defendants have expressly acknowledged in the Stipulation, the filing of the Action substantially contributed to the relief achieved in the Settlement, and the Reforms confer a substantial benefit on Merit and Current Merit Stockholders. Moreover, as the Stipulation provides, the Company's Non-Party Directors, exercising their independent business judgment, believe that the Settlement is in the best interests of, and provides substantial benefit to, Merit and Current Merit Stockholders.

The Reforms include an array of procedural and structural governance measures specifically designed to address the alleged corporate shortcomings giving rise to the Action, while improving Merit's overall compliance capabilities to further align the interests of the Company with those of its stockholders.  The Reforms, which are set forth fully at Exhibit A to the Stipulation, include, *inter alia*: (i) the addition of two (2) new independent directors to the Board; (ii) revised "Criteria for Membership" on the Board in the Company's Corporate Governance Guidelines (the "Governance Guidelines"); (iii) enhanced responsibilities for Merit's Lead Independent Director, per amendments to the Governance Guidelines; (iv) a comprehensive review of the Company's Insider Trading Policy to be conducted by Merit's Independent Directors, Chief Legal Officer, and Chief Compliance Officer, with a formal written report to be provided thereafter to the full Board; (v) enhanced duties of the Board's Audit Committee per

---

[6]     Per the terms of the Settlement, the Reforms shall remain in place at Merit for not less than four (4) years, subject to the right to alter or amend such terms or policies in the event a majority of Merit's Independent Directors determine that modification thereof is in the best interests of the Company and its stockholders.

amendments to the Company's Audit Committee Charter; and (vi) enhanced reporting to the Board regarding a number of critical issues, including but not limited to, pending compliance issues, whistleblower issues, reports of wrongdoing by management, potential or actual issues concerning the status of ongoing new or planned products, and the effectiveness of Merit's policies, procedures, systems and controls designed to ensure regulatory compliance.

Corporate governance reforms such as the Reforms achieved here have formed the basis of settlements of numerous stockholder derivative actions, as strong corporate governance is fundamental to a corporation's well-being and success.  *See, e.g., In re Google Inc. S'holder Derivative Litig.,* No. CV-11-04248, Order (N.D. Cal. Jan. 21, 2015) (approving settlement where relief was in the form of corporate governance enhancements); *Barovic v. Ballmer,* No. C14-0540-JCC, 2016 U.S. Dist. LEXIS 6671 (W.D. Wash. Jan. 13, 2016) (same); *Rosenfeld v. Campanelli, et al.,* Civil Action No. 13-135711-CZ Final Order and Judgment (Mich. St. Ct., Oakland Cnty. July 7, 2015) (same).  Indeed, "[c]ourts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *In re NVIDIA Corp. Derivative Litig.*, No. 06-06110, 2008 U.S. Dist. LEXIS 117351, at *10 (N.D. Cal. Dec. 22, 2008) (citation omitted); *accord In re Rambus Inc. Derivative Litig.*, No. 06-3513, 2009 U.S. Dist. LEXIS 131845, at *9 (N.D. Cal. Jan. 20, 2009) (recognizing that the "substantial benefits" of the derivative settlement which "provides long term remedial measures that are specifically designed to protect the shareholders."); *Mohammed v. Ells*, No. 12-cv-1831-WJM-MEH, 2014 U.S. Dist. LEXIS 118796, at *11 (D. Colo. Aug. 26, 2014) (approving derivative settlement where "the corporate governance reforms provided for as part of the settlement are specifically and appropriately designed to prevent the recurrence of the alleged misconduct that formed the basis

for this action."); *In re DaVita Healthcare Partners, Inc. Deriv. Litig.*, 2015 U.S. Dist. LEXIS 74372, at *3 (D. Colo. 2015) (same).

### D.  Notice to Current Merit Stockholders

Pursuant to the Preliminary Order, the Company posted the Notice on the Investor Relations portion of Merit's website on November 1, 2022.  On the following day, November 2, 2022, the Company filed the Summary Notice with the SEC via a Current Report on Form 8-K and published the Summary Notice via a press release.[7]

The Notices contained detailed descriptions of the history of the Action and the Settlement, the claims that will be released if the Settlement is approved, the Fee and Expense Award sought by Plaintiff's Counsel, and the Incentive Award for which Plaintiff could apply.  The Notices further disclosed the date and time of the Settlement Hearing and advised Current Merit Stockholders of the procedures for objecting to the proposed Settlement, the Fee and Expense Award, and/or the Incentive Award.  To date, nearly three months after the Notices were issued by the Company, Plaintiff's Counsel have not received any objections to the Settlement, the Fee and Expense Award, or the Incentive Award.

## III.    ARGUMENT

### A. The Settlement is Fair, Reasonable, and Adequate, and Should Be Finally Approved by the Court

#### 1.  Standard of Review

Merit is incorporated in Utah, and thus Utah law applies to all substantive aspects of the Action, including the standard for settlement review.  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S.

---

[7]        The forms of notice are collectively referred to herein as the "Notices."

90 (1991).  Utah federal and state courts, however, typically look to the well-developed corporate law of Delaware.  *See, e.g., Stender v. Archstone-Smith Operating Trust*, 910 F.3d 1107, 1114 (10th Cir. 2018); *In re Zagg, Inc.*, 2014 U.S. Dist. LEXIS, **9-17 (D. Utah Oct. 9, 2014); *Rawcliffe v. Anciaux,* 416 P.2d 362, 369-70 (Utah 2017); *Arndt v. First Interstate Bank of Utah, N.A.*, 991 P.2d 584, 589 (Utah 1999).   Delaware courts have long favored the voluntary settlement of contested claims. *See, e.g., Ryan v. Gifford*, No. 2213-C, 2009 Del. Ch. LEXIS 1, at *16 (Del. Ch. Jan. 2, 2009); *Nottingham Partners v. Dana*, 564 A.2d 1089, 1102 (Del. 1989); *Polk v. Good*, 507 A.2d 531, 535 (Del. 1986); *Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979).[8] Settlements are particularly favored in complex shareholder actions because they promote judicial economy. *See Prezant v. DeAngelis*, 636 A.2d 915, 922-23 (Del. 1994); *see also Maher v. Zapata*, 714 F.2d 436, 456 (5th Cir. 1983); *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986).[9]  With respect to the jurisprudence favoring settlement, that policy will only be served by final approval of this Settlement so that, aside from the benefits flowing to the Company and Current Merit Stockholders, the judicial system and the Parties to the Action may move on without further litigation and expense.

---

[8]    Federal courts also strongly favor compromises which resolve contested issues and claims. *See, e.g.*, *Williams v. First Nat'l Bank,* 216 U.S. 582 (1910); *MWS Wire Indus., Inc. v. California Fine Wine Co.,* 797 F.2d 799, 803 (9th Cir. 1986); *Make a Difference Found., Inc. v. Hopkins*, No. 10-cv-00408-WJM-MJW, 2012 U.S. Dist. LEXIS 36251, at **7-8 (D. Colo. Mar. 19, 2012).

[9]    In *Zimmerman*, 800 F.2d at 392, the Fourth Circuit stated that settlements of shareholder derivative actions are "favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself."

Rule 23.1 (like Delaware's Chancery Court Rule 23.1) requires court approval of a shareholder derivative action settlement or dismissal.[10] *Jones v. Nuclear Pharmacy, Inc*., 741 F.2d 322, 325 (10th Cir. 1984); *City of Detroit v. Grinnell Corp*., 495 F.2d 448, 454 (2d Cir. 1974). The Court's function in reviewing a proposed settlement is to evaluate the facts and circumstances that bear on the reasonableness of the proposed settlement. *Prezant*, 636 A.2d at 921. In its evaluation of a settlement, the Court need not try the issues or decide the merits of the case. *Id*.[11] Rather, as set forth more fully below, the Court must consider the nature of the claims, the possible defenses to the claims, the legal and factual obstacles to be faced by the plaintiff at trial, and the delay, expense, and complexity of litigation. *Kahn v. Sullivan*, 594 A.2d 48, 59 (Del. 1991); *Ryan*, 2009 Del. Ch. LEXIS 1, at *18. In the Tenth Circuit, settlements are presumptively fair when they are negotiated at "arm's-length" by experienced counsel. *See, e.g., Lucas v. Kmart Corp*., 234 F.R.D. 688, 693 (D. Colo. 2006).

Because a settlement represents an exercise of judgment by the negotiating parties, the function of the court reviewing a settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues intentionally left unresolved. *See Officers for Justice v. Civil Service Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982);

---

[10]     Rule 23.1 provides that a shareholder derivative action "shall not be dismissed or compromised without the approval of the court, and notice…shall be given to shareholders or members in such manner as the court directs." *See* Fed. R. Civ. P. 23.1(c).

[11]     *See also Ryan*, 2009 Del. Ch. LEXIS 1, at *18 (stating that "a settlement is not a rehearsal of a trial"); *Krinsky v. Helfand*, 156 A.2d 90, 94 (Del. 1959) (noting that the court is not to "try the issues of the case" because "any such requirement would defeat the purpose of the settlement itself.")

*Polk*, 507 A.2d at 535.[12]  Where, as here, the Parties have thoroughly investigated the factual background of the case, vigorously advanced their respective views of the strengths and weaknesses of the case, and negotiated at arm's-length and in good faith to arrive at a Settlement whereby Plaintiff has obtained valuable benefits for Merit and Current Merit Stockholders, the Settlement should be approved. *See Barkan v. Armsted Indus., Inc.*, 567 A.2d 1279, 1281 (Del. 1989); *Sugarland Indus. v. Thomas*, 420 A.2d 142, 147 (Del. 1980).

        2.   The Settlement is Fair, Reasonable, and Adequate

The Settlement is fair, reasonable, and adequate to Merit and Current Merit Stockholders. Indeed, it is an excellent result for Merit and Current Merit Stockholders in light of the substantial benefits obtained and the challenges Plaintiff would have faced going forward with prosecution of the Action. In the context of the alleged wrongdoing, the Settlement provides lasting benefits to Merit through the adoption and implementation of the long-term Reforms, which are specifically designed to protect and preserve Merit for the benefit of the Company and Current Merit Stockholders. *See generally, In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). The establishment of enhanced corporate governance standards, such as the Reforms here, can provide significant benefits to the nominal defendant corporation in a derivative suit. *See Citron v. Burns*, No. 7647, 1985 Del. Ch. LEXIS 382, *6 (Del. Ch. Feb. 4, 1985).[13]

---

[12]     *Accord Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124-25 (8th Cir. 1975).

[13]     Notably, federal courts interpreting state law (usually, Delaware law) have reached this same conclusion on numerous occasions. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (collecting cases from the Second, Fourth, Fifth, and Sixth Circuits and finding that remedial measures are an adequate basis for settlement and judicial approval of derivative settlements).

For this reason, courts regularly approve non-pecuniary settlements with corporate governance reforms which are tailored to the misconduct alleged. *See In re Texaco, Inc. S'holder Litig.*, 20 F. Supp.2d 577, 584-85 (S.D.N.Y. 1998). Here, the Settlement provisions are specifically designed to minimize the probability of future violations of fiduciary duties and resulting damages to the Company by Merit's senior officers and directors. *See In re Infinity Broadcasting Corp.*, 802 A.2d 285 (Del. 2002) (holding that settlement's future impact on the corporation is properly considered in evaluating a proposed settlement and that it would be reversible error for a court to only consider immediate tangible results in determining the fairness of a proposed settlement).

There can be little doubt that well-governed companies with truly engaged boards of directors tend to outperform those that are not perceived to have these qualities.[14] Moreover, it is equally clear that well-governed companies with strong boards tend to command a stock market valuation premium compared to less-well governed companies.[15] As a result of the Settlement,

---

[14]    A 2003 study by Gompers, Ishii and Metrick of over 1500 large companies in the 1990s concluded that stockholders owning shares in the companies with the "strongest" corporate governance mechanisms produced "abnormal" returns 8.5% higher than less well-governed companies. Paul A. Gompers, Joy L. Ishii, and Andrew Metrick, *Corporate Governance and Equity Prices*, Quarterly Journal of Economics 118 (2003). Building on this study, in 2003, Cremers and Nair found that companies with strong corporate governance mechanisms produced annualized returns 10-15% higher than less well-governed companies. K.J. Martijn Cremers and Vinay B. Nair, *Governance Mechanisms and Equity Prices*, Yale International Center for Finance Working Paper No. 03-15; NYU Center for Law and Business Research Paper No. 03-09 (August 2003).

[15]    The leading international consulting firm McKinsey & Co. began a study in 2000 where they interviewed over 2000 institutional investors. Approximately 75% of the respondents reported that board performance was at least as important to them as financial performance. In addition, nearly 80% of the respondents stated that they would be willing to pay a premium for shares of a company that was well-governed versus one that was not, assuming that the past financial performance of the company was similar. *Investor Opinion Survey on Corporate Governance*, McKinsey & Co. (June 2000).

Merit and Current Merit Stockholders are positioned to reap the benefits of a better-governed Company. For example, per the terms of the Settlement, Merit will adopt new, revised "Criteria for Membership" on the Board in its Governance Guidelines, along with enhanced responsibilities for Merit's Lead Independent Director. There will also be enhanced reporting to the Board regarding, *inter alia,* pending compliance issues, whistleblower issues, reports of wrongdoing by management, potential or actual issues concerning the status of ongoing new or planned products, and the effectiveness of Merit's policies, procedures, systems, and controls designed to ensure regulatory compliance. These Reforms are designed to prevent a recurrence of events at Merit such as those which gave rise to the Action.[16] And, very significantly, the Reforms also include the addition of two new independent directors to the Board.[17]

---

[16]    *See, e.g., Cohn v. Nelson,* 375 F. Supp.2d 844, 853 (E.D. Mo. 2005), approving a derivative settlement and finding that:

> The Settlement's Corporate Governance reforms [are] specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws in the future. As a result of the implementation to the settlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors.

[17]    An independent board is the bedrock of sound corporate governance and supervision of corporate affairs. *See, e.g.*, Victor Brudney, *The Independent Director – Heavenly City or Potemkin Village?*, 95 Harv. L. Rev. 597 (1982) (assessing the merits of addressing corporate wrongdoing with regulation as opposed to increased director independence); Ira M. Millstein and Paul W. MacAvoy, *The Active Board of Directors and Performance of The Large Publicly Traded Corporation*, 98 Colum. L. Rev. 1283, 1318 (1998) (finding "a substantial and statistically significant correlation between an active, independent board and superior corporate performance"); Note, *Beyond "Independent" Directors: A Functional Approach to Board Independence*, 119 Harv. L. Rev. 1553 (2006) (noting that "the need for active, independent boards has become conventional wisdom"). Indeed, nearly every self-styled corporate governance expert -- be it CALPERS, the Institute of Institutional Stockholders, the Corporate Library, or certain well-known academics -- believes that the first step to strong corporate governance is having an

Merit's conformance to the high standards of corporate governance required by the Settlement is fully expected to preclude a repetition of the problems detailed in the Complaint. Consequently, the Settlement should be finally approved.

### 3. Factors Supporting the Settlement

Generally, Delaware courts, in reviewing a proposed settlement of a shareholder derivative action (as in virtually every jurisdiction), make a determination as to whether the settlement is "fair, reasonable and adequate." *See Polk*, 507 A.2d at 536. Although there is no "bright-line" test which courts employ in making the "fair, reasonable and adequate" determination, some factors courts typically review in this regard are: (1) the benefits achieved by the settlement; (2) the risks of establishing liability; (3) the risks of establishing damages; (4) the complexity, expense, risk and duration of further litigation; (5) the reaction of affected shareholders to the proposed settlement; and (6) the views of counsel.[18]

Here, application of the foregoing factors strongly supports approval of the Settlement. Indeed, the Settlement, which materially enhances Merit's corporate governance practices, more than fairly, reasonably, and adequately resolves Plaintiff's claims. In light of the substantial challenges continued litigation of the Action would present, Plaintiff respectfully submits that the Settlement represents an excellent result for Merit and Current Merit Stockholders.

---

independent board of directors.

[18] *Id.*; *see also In re Ortiz' Estate*, 27 A.2d 368, 374 (Del. Ch. 1942); *PaineWebber R&D Partners, L.P. v. Centocor, Inc.*, No. 14405, 1999 Del. Ch. LEXIS 48, at *50 (Del. Ch. Mar. 15, 1999).

i.    *The Benefits Achieved*

As Defendants have expressly acknowledged in the Stipulation, the Reforms confer a substantial benefit on Merit and Current Merit Stockholders. Similarly, as the Stipulation provides, Merit's Non-Party Directors, exercising their independent business judgment, believe the Settlement provides substantial benefits to Merit and Current Merit Stockholders.  The benefit is the adoption of the Reforms which are tailored to address the wrongdoing alleged in the Action and seek to ensure that similar conduct will not threaten the Company again.

For example, as noted *supra,* the Action alleged that the Individual Defendants breached their fiduciary duties during the Relevant Period by making a series of materially false and misleading statements and that certain of these statements were issued in Merit's SEC filings, including its Annual Report on SEC Form 10-K for fiscal year 2018.  Per the Reforms, the Audit Committee Charter will be amended such that the members of the Audit Committee will be required to receive and review certain disclosures from Merit's CEO and CFO made in connection with the certification of Merit's Quarterly and Annual Reports filed with the SEC.  By way of further example, the Action also alleged that certain Individual Defendants made suspicious sales of Merit stock during the Relevant Period.  Per the Reforms, a comprehensive review of the Company's Insider Trading Policy will be conducted by Merit's Independent Directors, Chief Legal Officer, and Chief Compliance Officer, with a formal written report to be provided thereafter to the full Board.

The Reforms also include material changes to the responsibilities of the Board, including enhanced responsibilities for Merit's Lead Independent Director and the Audit Committee, as well as the addition of two new independent directors to the Board.  By creating defined controls at

16

both the Board and senior management levels of the Company, the Reforms create a series of internal controls that will limit future events like those that gave rise to the Action. The Reforms convey a cognizable and material benefit to the Company and support approval of the Settlement.

ii.    *The Risks of Establishing Liability*

Complex shareholder litigation is always uncertain, and this Action was no different. Plaintiff, to recover on the Company's claims at trial, would have had to, *inter alia*, demonstrate that making a pre-suit demand on the Board was "futile" and that the Individual Defendants' actions were not the product of valid business judgment. Satisfying both tests would have been a significant challenge for Plaintiff.

Here, Plaintiff did not make a pre-suit demand on the Board to commence the Action.  To pursue his claims, Plaintiff would first have to establish that demand on the Board was excused as a matter of law.  *See, e.g., GLFP, Ltd. v. CL Mgmt., Ltd*., 163 P.3d 636, 645 (Utah App. 2007); *Dansie v. City of Herriman*, 134 P.3d 1139, 1146 (Utah 2006); *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984).  Whether Plaintiff sufficiently alleged with particularity that pre-suit demand on the Board would have been futile would undoubtedly have been the subject of a motion to dismiss pursuant to Rule 23.1.  Thus, absent Settlement, there is, at the least, an open question as to whether Plaintiff possessed standing to bring claims on Merit's behalf. Establishing demand futility is always an uncertain proposition, particularly where, as here, a significant portion of the Board consists of "outside" directors. *See, e.g., Beam v. Stewart*, 845 A.2d 1040, 1048-52 (Del. 2004); *Levine v. Smith*, 591 A.2d 194, 197-208 (Del. 1991). Indeed, as Plaintiff's Counsel can attest through their own substantial experience in this area of the law, the pre-suit demand requirement is no empty procedural test. Stecker Decl. at ¶¶34-36. Thus, in light of the governing caselaw on

17

demand excusal,[19] Plaintiff believed there was a possibility that the Action may never have progressed beyond the pleading stage, and that the merits of his claims might never have been presented to the Court.

Even assuming Plaintiff had adequately alleged demand futility, he still would have had to overcome the considerable protections afforded the Board under the so-called "business judgment rule." The business judgment rule generally affords a strong presumption that, in making a disinterested business decision, the directors of a Utah (or Delaware) corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *Resolution Trust Corp. v. Hess,* 820 F. Supp. 1359, 1366-67 (D. Utah 1993); *In re Walt Disney Co. Derivative Litig*., 907 A.2d 693, 753-54 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *Aronson*, 473 A.2d at 810. Although Plaintiff believed in his arguments against the protections afforded by the business judgment rule with respect to the acts challenged in the Action, the prospect that the Individual Defendants could have been shielded by this protective umbrella made establishing liability in the Action uncertain. Stecker Decl. at ¶37.

All the reasons set forth above lend support to the proposition that a positive resolution of the Action was uncertain. That Plaintiff was able to achieve the Settlement in the face of these

---

[19]    Plaintiff would have disputed this, but Plaintiff anticipated that on a Rule 23.1 motion dismiss, Defendants might take the position that Utah's standard for pleading demand futility is even more demanding than the daunting Delaware standard: "[t]he Utah Supreme Court recognizes only two instances in which the futility exception will be met: (1) . . . if the corporation had specifically and explicitly stated that it would not pursue the claims brought in the derivative action" [or] (2) . . . if making a demand would be substantively detrimental in that it could permit the alleged perpetrator to cover up his misdeeds or to cause further harm to the corporation because he had been alerted that his unlawful conduct had been uncovered." *GLFP*, 163 P.3d at 646 (*quoting Dansie*, 134 P.3d at 1147).

obstacles is a testament to the Settlement's fairness, reasonableness, and adequacy, thus strongly suggesting that the Settlement should be approved.

### iii. The Risks of Establishing Damages

Even if Plaintiff had been successful in establishing liability, to establish damages at trial, Plaintiff would have had to prove, *inter alia*, that the claims in the Action actually caused the Company to suffer non-exculpated damages, and that the Individual Defendants, as a matter of law, could be held liable for those damages. Under traditional applications of Utah (or Delaware) law, Plaintiff faced a formidable challenge establishing and collecting monetary damages in the Action. Stecker Decl. at ¶38.

Undoubtedly, the Individual Defendants would have argued that, at most, Plaintiff alleged "due care" oversight claims. Because the Company's Articles of Incorporation contain an exculpatory clause for such claims, permissible under Utah Code Ann. § 16-10a-841, Plaintiff may have ultimately proved his claims, only to see the Individual Defendants exculpated. *See, e.g., Prod. Res. Group, LLC v. NCT Group, Inc.*, 863 A.2d 772, 799 (Del. Ch. 2004). Plaintiff believes he could have asserted strong arguments against the application of a "due care" analysis to at least some of his claims, but the possibility that some or all of Plaintiff's claims could have been characterized as due care claims could have meant that the claims were subject to dismissal well ahead of a trial. Stecker Decl. at ¶39.

Beyond the hurdle of establishing Individual Defendants' liability for their alleged wrongdoing, Plaintiff faced considerable uncertainty with respect to establishing damages to Merit. Upon Plaintiff's establishment of liability, the issue of damages to Merit would have been hotly disputed and clearly would have been the subject of expert testimony proffered by all Parties.

Stecker Decl. at ¶40.[20]  The damages assessments of experts retained by the Parties would surely vary substantially and the assessment of this crucial element of Plaintiff's claims would be reduced at trial to a "battle of the experts." It is far from certain that a jury would have disregarded the Individual Defendants' experts' opinions. Indeed, a jury might be swayed by defense experts seeking to establish that damages were caused by factors other than Individual Defendants' wrongdoing, or, alternatively, trying to minimize the amount of the Company's damages. *See, e.g., In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997). Conceivably, a jury could find that there were no damages or that the damages were a mere fraction of the amount that Plaintiff contended.

By contrast, the Settlement terms provide the certainty of known, material benefits to the Company. As the U.S. Court of Appeals for the Fifth Circuit cogently observed:

> Where, as here, the derivative suit is largely an attack on past corporate management practices, as well as on some present officers and directors, the dollar amount of a possible judgment, which is essentially the sole goal in the class action damage suit, is not the sole, and may well not be the most important, matter to be considered, for the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long and short-term, than the dollar amount of any likely judgment in its favor in the particular action.

*Maher*, 714 F.2d at 461.[21] "The evaluation of such an economic impact is necessarily judgmental and imprecise and normally does not lend itself to meaningful quantification." *Id*.

---

[20]    *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages...is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable").

[21]    Indeed, in light of the highly material therapeutic benefits of the Settlement, one could argue that the corporate governance relief obtained is, and will be, more valuable to the Company and its stockholders over the long-term than any comparatively modest monetary judgment

Thus, while it is clear to Plaintiff that Merit suffered losses based on the conduct challenged in the Action, the question of whether the Company suffered legal, non-exculpated damages is a much more complicated question. Stecker Decl. at ¶¶38-40. Thus, complex damages issues versus the known benefits of Settlement clearly weigh in favor of its approval.

iv.    *The Complexity, Expense, Risk, and Duration of Further Litigation*

In addition to the substantial risks associated with enforcing the Company's rights through the Court, there were numerous risks posed by the complexity and likely expense of further prosecution of the Action. The Action involved complex claims which, if litigation continued, would likely result in a weeks-long trial involving dozens of witnesses.

The expense of such a trial and the use of both judicial resources and the resources of the Parties would have been substantial. Further, submitting a matter to a jury is always, at best, an uncertain proposition. *See Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1300-01 (D.N.J. 1995) ("[W]hen parties negotiate a settlement they have far greater control of their destiny than when a matter is submitted to a jury. Moreover, the time and expense that precedes the taking of such a risk can be staggering. This is especially true in complex commercial litigation."). The considerable expense of further litigation, with the concurrent risk of no recovery in the Action, injunctive or monetary, provides further support for the Settlement.

Additionally, based on the nature of the Action, it is likely that any judgment in favor of Plaintiff would have been the subject of extensive post-trial motions and appeals, further prolonging the Action, and adding a considerable risk factor. Thus, the Settlement, providing

---

Plaintiff may have obtained at trial.

immediate benefits, is advantageous to the Company. *See, e.g., In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 748 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("[a]n appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself.").[22]

Plaintiff weighed each of these risks against the immediate benefits the Settlement will confer upon the Company and Current Merit Stockholders. Stecker Decl. at ¶¶41-44. These risks presented the possibility not only that prosecution of the Action could be unsuccessful, but that prosecution of the Action through extensive depositions and trial could be potentially detrimental to the Company.[23] In light of the complexity, length, and uncertainty of continued prosecution of the Action, and the benefits achieved by the Settlement, the conclusion is inescapable -- the Settlement is fair, reasonable, and adequate, and should be finally approved.

> *v.    The Reaction of Current Merit Stockholders*

As discussed above, pursuant to the Court's Preliminary Order, the Company posted the Notice on the Investor Relations portion of Merit's website on November 1, 2022.  On the

---

[22]    *See, e.g., In re Apollo Group, Inc. Sec. Litig.*, No. 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008) (jury verdict in favor of plaintiffs vacated and judgment as a matter of law entered in favor of defendants); *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v. entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversal of multimillion dollar judgment obtained after protracted trial).

[23]    *See, e.g., Ryan*, 2009 Del. Ch. LEXIS 1 at *30 (noting that savings to the nominal defendant corporation in legal and other professional fees that would have been incurred but for the settlement of the litigation "are properly considered by the Court when deciding whether a settlement is fair, reasonable, and adequate.").

following day, November 2, 2022, Merit filed the Summary Notice with the SEC via a Current

Report on Form 8-K and published the Summary Notice via a press release. Stecker Decl. at ¶45.

Pursuant to the Preliminary Order, any objections to the Settlement must be lodged with

the Court and served on the Parties no later than February 2, 2023.  Here, and although Merit has

nearly 57 million shares outstanding held by thousands of stockholders,[24] nearly three months after

the Notices were issued, Plaintiff has not received a single objection to the Settlement (or for that

matter, to the Fee and Expense Award).[25]

vi.    <i>Opinion of Plaintiff's Counsel</i>

In appraising the fairness of the Settlement, the opinion and recommendation of

experienced counsel favoring the settlement is entitled to considerable weight. As one federal court

stated: "Because the settlement resulted from arm's length negotiations between experienced

counsel...the Court may presume the settlement to be fair, adequate, and reasonable." *See, e.g.,*

*Lucas*, 234 F.R.D. at 693; *In re Nat'l Student Marketing Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974)

(stating that "[t]he opinion and judgment of experienced counsel, whose labors produced the

settlement, should also receive due consideration."); *Schleiff v. Chesapeake & Ohio Railway Co.*,

---

[24]    See the Yahoo! finance page for Merit at https://finance.yahoo.com/quote/MMSI/key-statistics?p=MMSI. Notably, more than 98% of the Company's float is held by institutional investors. It should go without saying that institutional stockholders are more active than ever, and that they have the financial resources and expertise to pursue objections in cases of this sort if they feel it is warranted. Here, none have stepped forward to date, and Plaintiff respectfully suggests that this factor should weigh heavily in favor of approval of the Settlement.

[25]    Of course, Plaintiff will timely respond in the event of the filing of any objection(s) by the February 2, 2023 objection deadline.

43 F.R.D. 175, 179 (S.D.N.Y. 1967) (noting that "recommendation of the compromise by the experienced counsel for plaintiffs is entitled to great weight").[26]

Here, Plaintiff's Counsel have litigated scores of derivative and class actions and have well-known national reputations of pursuing their cases to a successful resolution. Stecker Decl. at ¶47. Based on their knowledge of the facts of the Action and their extensive experience, Plaintiff's Counsel have made a considered judgment that the Settlement is in the best interests of Merit and Current Merit Stockholders and is an excellent achievement under all the circumstances. Accordingly, the Settlement should be finally approved.

### B. Plaintiff's Counsel's Agreed Upon Fee and Expense Award is Fair and Reasonable and Should Be Approved

Merit has received substantial benefits as a result of Plaintiff's Counsel's efforts in initiating and prosecuting the Action, and in negotiating the Settlement. In recognition of these substantial benefits, Merit and/or the Company's insurers have agreed to pay Plaintiff's Counsel the $1 million Fee and Expense Award. Stecker Decl. at ¶7. Counsel for the Parties agreed to this amount only after the principal terms of the Settlement were agreed upon and with the substantial assistance and oversight of Ms. Yoshida, who made a double-blind mediator's proposal that was accepted by the Parties.[27] Yoshida Decl. at ¶¶11, 19. The Fee Award is meant to reward Plaintiff's

---

[26]     *Accord Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (citations omitted) ("[T]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness. Attorneys, having intimate familiarity with a lawsuit after litigating the action, are in the best position to evaluate the action, and the court should not without good cause substitute its judgment for theirs.").

[27]     *See, e.g., Todd v. STAAR Surgical Co.,* 2017 U.S. Dist. LEXIS 176183, at *6 (C.D. Cal. Oct. 24, 2017) (approving settlement facilitated by "experienced mediator Michelle Yoshida of Phillips ADR").

Counsel for their efforts in prosecuting the Action on a fully contingent basis and obtaining an excellent Settlement, which favorably resolves the issues involved in the Action. As discussed herein, the Fee and Expense Award is reasonable in light of the significant benefits achieved, the effort expended in securing the benefits set forth herein, and the entirety of the relevant circumstances. Thus, Plaintiff's Counsel respectfully submits that the Fee and Expense Award is fair and reasonable and warrants the Court's final approval.

1. Agreed Upon Fees in Litigation Are Favored

The Fee and Expense Award, which was negotiated by experienced counsel familiar with complex shareholder litigation, reflects an appropriate fee and expense amount for the substantial benefits obtained for the Company in this Action. Moreover, the Parties' agreement on the amount of attorneys' fees is an appropriate resolution of the issue, and the negotiated fee is consistent with other negotiated fees approved in similar derivative cases.

Further, the U.S. Supreme Court has endorsed this type of consensual resolution of attorneys' fee issues in these kinds of cases as the ideal toward which litigants should strive. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) (holding that an agreed-to fee is an ideal situation because "[a] request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."). Absent evidence of collusion, a negotiated fee is entitled to substantial weight and deference. *See generally, Prandini v. Nat'l Tea Co*., 557 F.2d 1015 (3d Cir. 1977); *Court Awarded Attorney's Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985). Otherwise, Plaintiff's Counsel would have little incentive to attempt to negotiate a fee to which Defendants would not object. There would be little reason to negotiate

and compromise to bring a matter to closure if the Court were prepared, absent very strong reasons, to second-guess the Parties' valuation of the services performed by Plaintiff's Counsel.

Here, the Parties' negotiations were facilitated by the Mediator and based upon an informed analysis of what an appropriate fee would be for the benefits achieved and the fees awarded in similar situations. Yoshida Decl. at ¶19. Notably, the Fee and Expense Award is the product of Ms. Yoshida's double-blind "mediator's proposal" which was accepted by the Parties. *Id.*

In *Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985), the Second Circuit concluded that courts should be hesitant to interfere in fee arrangements between settling parties in shareholder actions when defendants have agreed "not to oppose" the payment of fees up to a certain amount:

> [W]here . . . the amount of fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.

*Id.* at 905 n.5; *see also Court Awarded Attorney's Fees*, 108 F.R.D. at 267; *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("in cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees.").

Here, since the Parties have agreed to the amount of the Fee and Expense Award, this Court's role in approving the Fee and Expense Award is very different from a "statutory fee shifting" case, in which the defendants have not agreed to pay the plaintiff's counsel's fees and thus reserve the right to challenge every item of work performed that underlies the requested fee. Here, Defendants have agreed with Plaintiff's Counsel on a fair and reasonable sum and have

agreed to pay that sum. Thus, the Court should approve the Fee and Expense Award as fair and reasonable. *See, e.g., Officers for Justice*, 688 F.2d at 625.

        2.   The Fee and Expense Award is Fair and Reasonable Based on the Federal <u>"Substantial Benefits" Doctrine</u>

The Fee and Expense Award was negotiated with the substantial assistance of the Mediator and was agreed upon only after Ms. Yoshida made a "mediator's proposal," which was accepted by the Parties following the Parties' agreement on the substantive terms of the Settlement. Yoshida Decl. at ¶¶11, 19. Thus, there is no question that the agreed-upon Fee and Expense Award was negotiated by the Parties at arm's-length and in good faith. Moreover, under the "substantial benefit" doctrine, counsel who prosecute a shareholder derivative case which confers benefits on the corporation are entitled to an award of attorneys' fees and costs. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 676 (1980); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970). In *Mills*, the U.S. Supreme Court stated that "an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a [stockholders' action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature." *Id*. at 395.

The $1 million Fee and Expense Award is also well below several other recent settlements where corporate governance benefits were achieved in successful derivative litigation. *See In re Southern Co. S'holder Derivative Litig.*, No. 1:17-cv-00725-MHC, slip op. (N.D. Ga. June 9, 2022) ($3.5 million fee for corporate therapeutics); *In re MiMedx Group, Inc. S'holder Derivative Litig.*, No. 1:18-cv-04486-WMR, slip op. (N.D. Ga. Dec. 21, 2020) ($3.5 million fee for corporate governance reforms); *Nixon-Crenshaw v. Coley*, No. 1:18-cv-25289-AHS, slip op. (S.D. Fla. Oct.

1, 2021) ($2.5 million fee for corporate therapeutics); *In re Conduent Inc. S'holder Litig.*, No. 1:20-cv-10964-MKV, slip op. (S.D.N.Y. Jul. 11, 2022) ($2.2 million fee for corporate governance therapeutics).

The Settlement provides Merit with substantial and valuable corporate governance reforms, which courts across the country endorse as providing significant value to corporations. *Maher*, 714 F.2d at 461 ("effects of the suit on the functioning of the corporation may have a substantially greater impact on it, both long- and short-term, than the dollar amount of any likely judgment . . . ."). These Reforms will not only reduce the chance of the improprieties alleged by Plaintiff from occurring in the future, but also will make Merit's directors more effective representatives of the Company's shareholders, thus providing additional substantial benefits and value to Merit and its shareholders to last for years to come.

Indeed, courts have consistently recognized that the result achieved is a major factor to be considered in approving a fee award. *See, e.g., Hensley*, 461 U.S. at 436 (stating that the "most critical factor is the degree of success obtained"). Thus, in light of the substantial benefits conferred upon the Company by Plaintiff's Counsel's initiation, prosecution, and settlement of the Action, the separately negotiated Fee and Expense Award should be approved.

3. The Fee and Expense Award Is Fair Under Applicable Legal Standards

Like the standards for settlement approval, because Merit is a Utah corporation and Utah federal and state courts look to Delaware's well-developed corporate law (*See, e.g., Stender*, 910 F.3d at 1114; *Rawcliffe*, 416 P.2d at 369-70), this Court should analyze the Fee and Expense Award

under Delaware law. *See Cohn*, 375 F. Supp.2d at 854.[28] Delaware has long recognized that the successful prosecution of derivative claims entitles the plaintiff's counsel to an award of reasonable attorney's fees and reimbursement of expenses. *See Maurer v. Int'l Re-Ins. Corp.*, 95 A.2d 827 (Del. 1953). Additionally, a pecuniary benefit to the corporation in a derivative action is not a prerequisite to an award of attorneys' fees. *See, e.g., Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980).

In shareholder litigation, the approval of a fee agreement is a matter committed to the sound discretion of the Court. *See, e.g., Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164-65 (Del. 1989). In exercising its discretion, the Court's primary consideration is the benefit achieved through the litigation. *See, e.g., In re Prodigy Commc'n Corp. S'holders Litig.*, 2002 Del. Ch. LEXIS 95, at **17-18 (Del. Ch. Jul. 26, 2002). Other pertinent factors include the contingent nature of the fee arrangement, the complexity of the case, the quality of the work performed, and the standing and ability of the lawyers involved. *See, e.g., Sugarland*, 420 A.2d at 150; *Swacker v. Pennroad Corp.*, 57 A.2d 63, 69 (Del. 1947). Application of these factors strongly supports the reasonableness of the Fee and Expense Award.

---

[28]     Plaintiff's Counsel respectfully submits that federal and Delaware law regarding awards of attorneys' fees and expenses in actions of this sort is substantially similar, and that the common concepts employed in awarding fees produces the same analysis and result. For example, the Tenth Circuit has adopted the "*Johnson* factors" laid out in *Johnson*, 488 F.2d at 717, which include: (1) the time and labor required; (2) the novelty and difficulty of the question presented by the case; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Gottlieb v. Barry*, 43 F.3d 474, 483 (10th Cir. 1994).

###### 4.   The Fee and Expense Award is Fair and Reasonable Based on the Results Obtained

Courts often first look to "the nature of the benefits" conferred in evaluating a fee award.

*See Sugarland*, 420 A.2d at 150. Here, the benefits conferred through the Settlement are significant

and more than justify the agreed upon fee. *See, e.g., Tandycrafts*, 562 A.2d at 1165 (noting that it

is not necessary that the benefit conferred on the shareholders be directly pecuniary for a fee award

to be proper, provided, as here, there is specific benefit to the corporation/shareholders); *Allied

Artists*, 413 A.2d at 878; *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966). Indeed, even if

the benefit is not easily quantifiable, under *Chrysler* and its progeny, the governance benefits

enjoyed by Merit and its shareholders as a result of the Settlement are clearly compensable.[29] In

fact, Delaware courts have consistently placed a significant value upon non-monetary benefits

obtained in cases similar to the Action, involving complex corporate governance issues. *See e.g.,

Chrysler*, 223 A.2d at 389 (affirming fee award for corporate governance changes). Because the

Reforms described above are directly related to the alleged breaches of duties and underlying

claims in the Action, Plaintiff's Counsel respectfully submit that these enhanced protective

measures will better protect the Company going forward, and they will help prevent future

Company losses. *Id*.; Stecker Decl. at ¶26.[30] Thus, the corporate Reforms stemming from the

---

[29]     In the oft-cited *Chrysler* decision, the Delaware Supreme Court held that changes in corporate policy or a heightened level of protection for shareholders justifies an award of counsel fees.  *Chrysler,* 223 A.2d at 386.

[30]     *See also Seinfeld v. Robinson*, 246 A.D.2d 291, 298 (N.Y. App. 1st Dep't 1998) (awarding fees in a derivative action which resulted in the corporation "implementing procedures that will prevent the exact sequence of events from reoccurring, [therefore] plaintiffs have furnished a benefit to all shareholders").

Settlement are clearly compensable, and the amount of the Fee and Expense Award that Defendants have agreed to pay is reasonable based on what has been awarded in similar actions which have produced similar relief. As such, the Fee and Expense Award should be approved.

     5.   The Contingent Nature of Plaintiff's Counsel's Undertaking Justifies the Fee and <u>Expense Award</u>

Courts have long recognized that in reviewing fee agreements, the fact that the petitioner's compensation is contingent upon recovery should be taken into account. The contingency factor is based on elementary considerations of fairness and justice. As the Fourth Circuit explained in *McKittrick v. Gardner*, 378 F.2d 872, 875 (4th Cir. 1967), "[t]he effective lawyer will not win all of his cases, and any determination of the reasonableness of his fees in those cases in which his client prevails must take account of the lawyer's risk of receiving nothing for his services." *See also Chrysler*, 223 A.2d at 389 (Chancellor exercised "sound business judgment" by taking "the contingent nature of the litigation" into consideration in fixing the amount of attorneys' fees). The contingent nature of the engagement of Plaintiff's Counsel in the Action and the risks of litigation should be given substantial weight by the Court in reviewing the Fee and Expense Award. When Plaintiff's Counsel undertook the representation of the Plaintiff in this Action, they were aware that they would devote hours of hard work to the prosecution of a difficult case, possibly on an expedited basis, without any assurance of receiving any fees or even reimbursement for out-of-pocket expenses.

Moreover, the risk of non-payment in contingent-fee stockholder litigation is quite real. Indeed, the reported and unreported opinions of the federal and Delaware courts are replete with

examples of other stockholder actions that were dismissed outright on motion practice,[31] or ultimately ended in post-trial defeat.[32] No fee of any sort is earned or awarded in such cases, nor do plaintiffs' counsel recover their often substantial out-of-pocket expenses.

Thus, while Plaintiff's Counsel succeeded in obtaining an excellent result for the Company and its stockholders, it cannot be disputed that they incurred substantial risk that the Action would be unsuccessful and that their efforts would go entirely uncompensated. The Fee and Expense Award appropriately reflects the risk that Plaintiff's Counsel would expend substantial time, effort, and costs only to have the Action dismissed. Thus, the Fee and Expense Award should be approved based on the contingent nature of Plaintiff's Counsel's undertaking.

6. Public Policy Supports the Approval of the Fee and Expense Award

Individuals wronged by violations of corporate law should have reasonable access to counsel with the ability and experience necessary to analyze and litigate complex cases. The costs and fees involved in such litigation often substantially outweigh the economic interest the individual stockholder has at stake. Moreover, such individuals rarely have the financial resources to pay customary fixed hourly rates for such services. The complexity and the societal importance of shareholder litigation requires the involvement of the most able counsel obtainable. To encourage first-rate attorneys to represent plaintiffs on a contingent basis in this type of socially

---

[31] There are so many federal and Delaware decisions (many of which were affirmed on appeal) dismissing stockholder suits based on Rule 23.1 (demand futility) and Rule 12(b)(6) (failure to state a claim) that any effort to provide an illustrative list would seem trivial. It should suffice to say that far more stockholder actions end in defeat than victory.

[32] *See, e.g., Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001) (entering judgment for defendants on all claims after two trials); *Kahn v. Lynch Commc'n. Sys., Inc*., 669 A.2d 79 (Del. 1995) (dismissal of all derivative claims on appeal).

important litigation, attorneys' fees awarded should reflect this goal. *See, generally, Allied Artists*, 413 A.2d at 879. The outstanding result achieved in the Action is a prime example of the value created by skilled and experienced Plaintiff's Counsel, and their efforts and results deserve to be rewarded.

> 7.  Plaintiff's Counsel's Lodestar Also Supports a Finding That the Fee and Expense Award Is Reasonable

While not an articulated requirement, Courts in this Circuit have used lodestar as a method for evaluating the reasonableness of attorneys' fees. *See Ryskamp v. Looney*, 2012 U.S. Dist. LEXIS 114190 at *15 (D. Colo. Aug. 14, 2012); *Mohammed*, 2014 U.S. Dist. LEXIS 118796, at *11. "Where the lodestar is used as a cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04 CIV. 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *48 (S.D.N.Y. Dec. 23, 2009) (citation omitted). Here, such a cross-check supports the Fee and Expense Award.

Achieving the substantial benefits created by the Settlement required Plaintiff's Counsel to invest 1,396.25 hours in time on a fully contingent basis and spend $17,532.18 in expenses. Stecker Decl. at ¶50-52.[33] Plaintiff's Counsel spent the time and expenses on, *inter alia*: (i) the preparation of Plaintiff's Inspection Demand; (ii) negotiations with Merit regarding the Inspection Production and the related confidentiality agreement; (iii) the review and analysis of confidential documents produced by Merit pursuant to § 16-10a-1602, including Board minutes, Board presentations, and other Board documents; (iv) the preparation and filing of the detailed Complaint, (v) researching

---

[33]    Declarations detailing Plaintiff's Counsel's time and expenses are attached hereto at Exhibits 4-6.

the applicable law with respect to the claims asserted in the Action and the potential defenses thereto; (vi) the review and analysis of approximately 525,000 pages of internal corporate documents that were produced in the Securities Action; (vii) researching corporate governance issues; (viii) the preparation of Plaintiff's detailed, confidential mediation statement and settlement demand submitted in advance of the First Mediation, and (ix) all relevant aspects of the extensive mediation and settlement process. Plaintiff's Counsel's lodestar equals $1,159,130. *Id.*

The requested fee represents a negative lodestar multiplier of approximately 0.86. A "multiplier of less than one (sometimes called a negative multiplier) suggests that the negotiated fee award is a reasonable and fair valuation of the services rendered to the class by class counsel." *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 854 (N.D. Cal. 2010). *See also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) ("[T]he lodestar cross-check results in a negative multiplier of less than 0.92 – a strong indication of the reasonableness of the proposed fee.").[34]

## IV.    THE INCENTIVE AWARD SHOULD BE APPROVED

As provided for in the Stipulation, Plaintiff may apply for an Incentive Award in the amount of $2,500, to be paid from the Fee and Expense Award. Stecker Decl. at ¶8. Plaintiff's Counsel respectfully submits that this nominal award should be approved based on the substantial benefits Plaintiff helped to create for all Current Merit Stockholders by pursuing the Action derivatively on Merit's behalf. Indeed, Plaintiff was the only Merit stockholder who stepped

---

[34]    A negative multiplier "is reasonable because it will not bring a windfall to co-lead plaintiffs' counsel." *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013(LAK)(AJP), 2007 U.S. Dist. LEXIS 13661, at *30 (S.D.N.Y. Mar. 1, 2007).

forward to pursue Merit's derivative claims, and through his efforts Merit and Current Merit Stockholders now stand to benefit from the Settlement.[35]

There is a long history of the federal courts and Delaware common law authorizing service awards for representative plaintiffs in stockholder actions. *See, e.g., In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) (service awards are an important way of reimbursing representatives who take on a variety of risks and tasks when they commence representative actions); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 353 (S.D.N.Y. 2005) *aff'd in part, vacated in part, remanded sub nom. Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) (based on common law's recognition of the important policy role plaintiffs play in representative actions); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 374 (S.D. Ohio 1990) (awarding $55,000 and $35,000 awards). This principle was reaffirmed by the U.S. District Court for the District of Minnesota: "[s]uch enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005).

The proposed Incentive Award is clearly modest when compared with other awards approved by federal courts. *See, e.g., In re Remeron EndPayor Antitrust Litig.*, No. Civ. 02- 2007 FSH, 2005 U.S. Dist. LEXIS 27011, at **93-94 (D.N.J. 2005) (approving $30,000 awards); *In re Cendant Corp. Deriv. Litig.*, 232 F. Supp. 2d 327 (D.N.J. 2002) (approving $25,000 award).

---

[35]    *See* the Declaration of Steffen Maute in Support of Plaintiff's Motion for Final Approval of Derivative Settlement ("Maute Decl."), attached hereto as Exhibit 7.

Plaintiff has submitted a declaration in support of the Settlement and the Incentive Award. See

Maute Decl. Accordingly, the Incentive Award should be finally approved.

## V.    CONCLUSION

The Settlement is an outstanding resolution of a case of substantial complexity and costs.

Accordingly, Plaintiff respectfully requests that the Court finally approve the Settlement, the Fee

and Expense Award, and the Incentive Award.

DATED: January 26, 2023

Respectfully submitted,

**ANDERSON & KARRENBERG**

/s/ *Jared D. Scott*
Jared D. Scott
***Utah Counsel for Plaintiff***

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn, *admitted pro hac vice*
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003

**SHUMAN, GLENN & STECKER**
Brett D. Stecker, *admitted pro hac vice*
326 W. Lancaster Ave.
Ardmore, PA 19003
(303) 861-3003

**KASKELA LAW LLC**
D. Seamus Kaskela
18 Campus Blvd. Ste. 100
Newtown Square, PA 19073
(888) 715-1740

***Additional Counsel for Plaintiff***